

**IT IS ORDERED as set forth below:**

**Date: September 2, 2025**

Sage M. Sigler
U.S. Bankruptcy Court Judge

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WELLMADE FLOOR COVERINGS INTERNATIONAL, INC. *et al.*,[1] | Case No. 25-58764-SMS |
| Debtors. | (Jointly Administered) |

**FINAL ORDER (A) GRANTING DEBTORS' MOTION
FOR (1) AUTHORITY TO INCUR POST-PETITION SECURED
INDEBTEDNESS, (2) AUTHORITY TO GRANT SUPERPRIORITY STATUS
PURSUANT TO 11 U.S.C. § 364(c), AND (3) AUTHORITY TO GRANT PRIMING
LIENS PURSUANT TO 11 U.S.C. § 364(d), (B) AUTHORIZING POSTPETITION USE
OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION, (C)
MODIFYING THE AUTOMATIC STAY, AND (D) GRANTING RELATED RELIEF**

Upon the motion [Doc. No. 15] (the "**Motion**")[2] of the above-captioned debtors and

debtors-in-possession (collectively, the "**Debtors**") seeking the entry of an interim order (the

"**Interim Order**") and a final order (the "**Final Order**"), pursuant to §§ 105, 361, 362, 363, 364(c),

364(d), 507(b), and 552(b) of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Wellmade Industries MFR. N.A LLC (1058) and Wellmade Floor Coverings International, Inc. (8425). The mailing address for the Debtors for purposes of these chapter 11 cases is: 1 Wellmade Drive, Cartersville, GA 30121.

[2] Capitalized terms used, but not defined, herein shall have the meaning ascribed to such terms in the Motion or DIP Agreement, as applicable.

2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 7007-1, 9013-1, 9013-2, and 9014-2 of the Local Rules of the United States Bankruptcy Court for the Northern District of Georgia (the "**Local Rules**") and *Second Amended and Restated General Order 26-2019, Procedures for Complex Chapter 11 Cases*, dated February 6, 2023 (the "Complex Case Procedures"): (1) authorizing the Debtors to obtain post-petition financing consisting of a superpriority secured multi-draw term loan credit facility in the aggregate amount not to exceed $5,000,000.00 (the "**DIP Facility**") under the *Amended and Restated Senior Secured Debtor-in-Possession Loan and Security Agreement* (the "**DIP Agreement,**" attached hereto as Exhibit "1") between SummitBridge National Investments VIII LLC (the "**DIP Lender**") and the Debtors; (2) authorizing the Debtors to enter into the DIP Loan Documents (as defined in the DIP Agreement); (3) granting the DIP Lender superpriority administrative expense claims pursuant to 11 U.S.C. § 364(c), subject to the Carve-Out (as defined below); (4) granting priming liens pursuant to 11 U.S.C. § 364(d) to the DIP Lender, subject to the Carve-Out; (5) authorizing the postpetition use of proceeds of the DIP Facility and Cash Collateral in accordance with the Approved Budget (as defined herein); (6) granting adequate protection on account of the diminution in the value of the Prepetition Collateral (as defined herein) as a consequence of the Debtors' use, sale or lease of the Prepetition Collateral, including any Cash Collateral (as defined herein); (7) waiving the Debtors' right to surcharge the Collateral of the DIP Lender pursuant to section 506(c) of the Bankruptcy Code; (8) modifying the automatic stay to the extent necessary to implement and effectuate the terms of the Interim Order; (9) waiving any applicable stay with respect to the effectiveness and enforceability of this Final Order (including

a waiver pursuant to Bankruptcy Rule 6004(h)); and (10) granting related relief, all as more fully set forth in the Motion.

The Court has considered the Motion, the presentation of counsel at the final hearing on August 29, 2025 (the "**Final Hearing**"), and the entire record and has determined that approval of the relief requested in the Motion is necessary to avoid immediate and irreparable harm to Debtors and their estates and is fair and reasonable and in the best interest of the Debtors, their estates, and all parties in interest, and is essential for the preservation and continued operation of the Debtors' business and the maximization of the value of Debtors' assets; and it appearing that the Debtors' entry into the DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefore, hereby finds and determines as follows:[3]

A.    On August 4, 2025 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Georgia (this "**Court**").  The Debtors have continued to manage and operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On August 7, 2025, this Court entered an order directing joint administration of the Chapter 11 Cases.  On August 14, 2025, the United States Trustee for the Northern District of Georgia (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code.

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*.

B.      This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the

parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue for the

Chapter 11 Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362,

363, 364, 507(b), and 552(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004,

and 9014, Local Rules 7007-1, 9013-1, 9013-4, and 9014-2, and Section G of the Complex Case

Procedures.

C.      The Debtors' current liquidity is insufficient to fund the costs of administration of

these Chapter 11 Cases and the Debtors' expenses in the ordinary course of their business

operations.  Despite their efforts, the Debtors have been unable to find another entity willing to

provide financing upon terms as favorable as the DIP Lender proposes.  The Debtors are unable to

obtain unsecured credit.  The Debtors also are unable to obtain secured credit allowable under §

364(c) of the Bankruptcy Code without granting priming liens under § 364(d)(1) of the Bankruptcy

Code and superpriority claims under the terms and conditions set forth in the Interim Order and in

the DIP Agreement.  The Debtors believe that the DIP Financing (as defined herein) under the

terms of the DIP Agreement will be made upon terms at least as favorable as any other financing

it can obtain.

D.      The Debtors have requested that (i) the Prepetition Lender agree to the Debtors

entering into the DIP Agreement in accordance with the terms set forth herein and permit the

Debtors to use the Prepetition Lender's Cash Collateral in accordance with the terms set forth

herein, and (ii) the DIP Lender enter into the DIP Facility under which the Debtors may obtain

loans from the DIP Lender through multi-draws in an aggregate principal amount not to exceed

$5,000,000 (the "**DIP Loan**").  The DIP Lender is willing to establish the DIP Facility upon the terms and conditions set forth in the DIP Agreement, the Interim Order, and the Final Order up to the amount of $5,000,000.

E.      The DIP Lender's willingness to establish the DIP Facility and to fund the DIP Loan, is conditioned upon the Debtors' satisfaction of all conditions precedent and certain milestones as set forth in Sections 2 and 7 of the DIP Agreement (the "**Conditions and Milestones**") and (i) the Debtors obtaining Court approval to enter into the DIP Agreement (and all documents related to the DIP Agreement) and to incur all obligations of the Debtors thereunder; (ii) the DIP Lender being granted as security for the prompt payment and performance of all obligations under the DIP Agreement (the "**DIP Obligations**," as defined below), first priority, perfected security interests in and priming liens in the Collateral (as defined in paragraph 11(b)(i) of this Final Order).

F.      The "**DIP Financing**" consists of a One Hundred Twenty Thousand Dollar ($120,000.00) draw by the Debtors under the DIP Agreement upon entry of the Interim Order (the "**First Draw**"), the second draw of three million eight hundred eighty thousand dollars ($3,880,000) (the "**Second Draw**"), and a third draw of one million dollars (the "**Third Draw**" and  together with the First DIP Draw, the "**DIP Financing**") under the conditions delineated in paragraph I(7).

G.      Upon the Debtors' receipt of the First Draw, the Debtors became borrowers under the DIP Agreement and DIP Loan Documents. Upon entry of the Interim Order, the Debtors were expressly and immediately authorized and empowered to execute and deliver the DIP Loan Documents and to incur and perform the DIP Obligations in accordance with, and subject to, the

terms of the Interim Order and the DIP Loan Documents, and to deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens and pursuant to this Final Order, all such authority and power is hereby confirmed and continued.

H.      Prior to the Petition Date, the DIP Lender received a One Hundred Fifty Thousand Dollar ($150,000.00) nonrefundable expense deposit under the terms of the DIP Agreement (the "**Expense Deposit**").  The DIP Agreement provides for the DIP Lender to receive a break-up fee in the event that a third-party lender provides the Debtors with an alternative debtor in possession facility that is approved by a final DIP order, the DIP Lender shall be entitled to a break-up fee of One-Hundred Twenty Thousand Dollars ($120,000.00) (the "**Break-Up Fee**") which shall be deemed to be earned upon entry of any such final DIP order and shall be an administrative expense in the Bankruptcy Case.  Given the entry of this Final Order, no Break-Up Fee shall be awarded.

I.      The material terms of the DIP Agreement for repayment of the DIP Loan are:

(1)      On August 7, 2025, upon entry of the Interim Order and the Debtors' compliance with the Conditions and Milestones, the DIP Lender was authorized to fund the First DIP Draw to be applied to the DIP Lender's Underwriting Fee and Origination Fee, both of which are defined in the DIP Agreement.

(2)      On August 8, 2025, the Second Draw of three million eight hundred eighty thousand dollars ($3,880,000) was funded upon (a) the Debtors' designation of a Stalking Horse Bid for a purchase of the Debtors' assets in an amount not less than the sum of the DIP Obligations (including the Origination Fee, the Extension Fee, the Exit Fee, the Underwriting Fee) and any secured pre-petition indebtedness of the

Debtors, including the Prepetition Obligations and (b) execution of DIP Facility Documentation in a form acceptable to DIP Lender and Debtors.

(3)    On August 25, 2025, the Court entered the *Second Interim Order Granting Emergency Motion for (A) (1) Authority to Incur Post-Petition Secured Indebtedness, (2) Authority to Grant Superpriority Status Pursuant to 11 U.S.C. § 364(c), (3) Authority to Grant Priming Liens Pursuant to 11 U.S.C. § 364(d), (B) Authorizing Postpetition Use of Cash Collateral and Granting Adequate Protection, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "**Second Interim Order**").

(4)    The DIP Financing shall be used by the Debtors solely for the purposes set forth in the DIP Agreement, including to pay expenses subject to the Approved Budget, as it may at any time be amended, supplemented, updated or extended with the prior written consent of the DIP Lender.  The Committee shall be (a) promptly provided with copies of any amendments to the DIP Agreement and (b) concurrently delivered copies of any reporting provided to the DIP Lender or the Prepetition Lender during these cases.

(5)    The Debtors shall execute and deliver such other agreements and documents as the DIP Lender shall reasonably require in connection with the DIP Financing.  The DIP Financing became an obligation of the Debtors upon their receipt of funding pursuant to the DIP Agreement.  The DIP Loan shall be secured by duly perfected DIP Liens and DIP Security Interests (as defined in subparagraph 9 below) in favor of the DIP Lender in the Collateral.  The DIP Lender is willing to advance the DIP Financing upon the terms and conditions set forth herein and in the DIP Agreement.

(6)     The DIP Financing balance shall bear interest at the rate of twelve percent (12%) per annum on an actual/360 day basis and be payable in arrears (the "**Interest Rate**") as set forth in the DIP Agreement.  The interest payments shall be paid on the first business day of each calendar month (the "**Interest Payments**").  The DIP Lender shall credit the Interest Payments each month from an interest payment reserve which shall be a segregated funding account established for the sole benefit of DIP Lender to fund the Interest Payments (the "**Interest Payment Reserve**").

(7)     The Debtors may make a Third Draw up to the amount of One Million Dollars ($1,000,000); *provided, however,* absent the consent of the Prepetition Lender, which shall not be unreasonably withheld, the Debtors may only make the Third Draw if the Debtors' available cash drops below Five Hundred Thousand Dollars ($500,000).

(8)     The limit for the DIP Financing shall be up to Five Million Dollars ($5,000,000.00).

(9)     The "**DIP Obligations**" shall include all indebtedness, liabilities, obligations, covenants and duties now or at any time or times hereafter owing by the Debtors to DIP Lender pursuant to or in connection with the DIP Agreement, this Interim Order and any Final Order, or any other DIP Loan Document including all principal, interest, fees (including, but not limited to, the Origination Fee, any Extension Fee, the Underwriting Fee, and the Exit Fee), indemnification, and reimbursement payments, costs, and expenses (including all reasonable fees and expenses of counsel to DIP Lender).

(10)    The DIP Lender shall be entitled to conduct periodic field exams upon reasonable notice to the Debtors.

(11)    The Debtors' obligation to repay the DIP Obligations shall be secured by a security interest in, and lien upon, all of the Debtors' Collateral (the "**DIP Liens and DIP Security Interests**"), excluding avoidance actions under chapter 5 of the Bankruptcy Code and state law (collectively, "**Avoidance Actions**") or the proceeds thereof.  The DIP Obligations and DIP Liens and DIP Security Interests shall be an allowed first priority secured claim, under Bankruptcy Code § 364(d), fully payable before any other secured claim, and a superpriority claim under Bankruptcy Code § 364(c) (the "**DIP Superpriority Claim**"), prior to and superior in right of payment of any other claim against the Debtors or their estates, heretofore or hereafter arising or incurred in this case or any succeeding or superseding case under the Bankruptcy Code.

(12)    Each of the terms and conditions of the DIP Financing contained in the DIP Agreement are incorporated herein by this reference, except, to the extent this Final Order differs from the DIP Agreement, this Final Order shall control.

(13)    The DIP Liens and DIP Security Interests were deemed effective, valid, and perfected as of the date of the entry of the Interim Order, without the necessity of the giving of any notice, the filing of any documents or other instruments or the taking of any action otherwise required to be given, filed or taken under applicable non-bankruptcy law for the perfection of security interests or mortgages, with such validity and perfection being binding upon any subsequently appointed trustee, either in this Chapter 11 case or a case under any other chapter of the Bankruptcy Code, and on any and all other creditors of the Debtors who have or may hereafter extend credit to the Debtors, or file a claim of any nature whatsoever, in this Chapter 11 case or any superseding bankruptcy case of the

Debtors.  If the DIP Lender shall, in its sole discretion, choose to file such financing statements and otherwise confirm perfection of such security interests and liens, all such financing statements or similar instruments were deemed to have been filed or recorded at the time and on the date of entry of the Interim Order and the automatic stay of 11 U.S.C. § 362 shall be deemed modified to permit any and all such filings without further order of the Court.

(14)  The priority of the DIP Liens and DIP Security Interests and the DIP Superpriority Claim granted under the Interim Order and this Final Order shall not be "primed" pursuant to 11 U.S.C. § 364(d), nor shall any of the DIP Lender's rights under the Interim Order and this Final Order be modified or affected by any plan of reorganization confirmed in this Chapter 11 case without the express written consent of the DIP Lender.

(15)  Subject to the Carve-Out, no indebtedness or obligation of the Debtors of any kind or nature whatsoever (other than future obligations to the DIP Lender) shall be repayable or secured on a parity with, or in any manner be prior to the DIP Obligations. Moreover, any security interests or liens upon any of the Debtors' assets which, after taking into account the provisions of the Interim Order and Final Order, may be avoided by the Debtors or any subsequently appointed trustee and which are preserved by the estate shall be junior and subordinate to the DIP Liens and DIP Security Interests.

(16)  In the event the Debtors default under the terms of the DIP Agreement or this Final Order and Debtors fail to cure such default within five (5) business days from the date of written notice of the default pursuant to the terms of the DIP Agreement, and if the Debtors fail to do so, the DIP Lender may file a notice of

10

default on the dockets of the Chapter 11 Cases (the "**Default Declaration**"). The Default Declaration shall be served via electronic mail on the following (a) proposed counsel for the Debtors, John D. Elrod (elrodj@gtlaw.com) and Allison McGregor (Allison.McGregor@gtlaw.com); (b) counsel for AHF IC, LLC, Austin Jowers (AJowers@KSLAW.com) and Christopher Coleman (Christopher.Coleman@kslaw.com); (c) the Office of the United States Trustee, c/o Lindsay Kolba (Lindsay.P.Kolba@usdoj.gov); and (d) proposed counsel for the Committee, Bradford J. Sandler (bsandler@pszjlaw.com). If Debtors or any other party in interest fail to respond to the Default Declaration within three (3) business days, the automatic stay provisions in § 362 of the Bankruptcy Code shall be vacated and modified as set forth in the DIP Agreement and this Final Order.  The Debtors are further deemed to waive all rights to notice and hearing of any kind prior to the exercise by the DIP Lender of its rights to repossess the Collateral or to replevy, attach or levy upon such Collateral without prior notice or hearing.  The rights, remedies, powers and privileges conferred upon the DIP Lender pursuant to this Final Order shall be in addition to and cumulative with those contained in the DIP Lender in the DIP Agreement, the DIP Loan Documents or created under applicable law.

J.      The Debtors have made diligent inquiry to find other sources of funding to support Debtors' post-petition financial needs. The Debtors believe that the terms and conditions of the proposed borrowing from the DIP Lender, as laid out in the DIP Agreement, as modified herein, are fair and reasonable, were negotiated by the parties in good faith, and are the best available

terms to the Debtors under the present market conditions and financial circumstances of the Debtors.  The Debtors are unable to obtain unsecured credit or credit that is not secured by a senior lien on the Collateral as described herein.  The proposed DIP Facility, upon the terms and conditions set forth in the DIP Agreement and this Final Order, is essential and necessary for the preservation and maintenance of the Debtors' estates.

K.      It is in the best interests of the Debtors, their estates and their creditors that Debtors be given the authority to consummate, and that this Court approve and order the consummation by Debtors, of the DIP Facility, and to execute and deliver any and all other documents and instruments reasonably requested by the DIP Lender to execute, effectuate, carry out, or consummate the terms and conditions of the DIP Facility as set forth in the DIP Agreement and this Final Order.

L.      The DIP Lender is acting in good faith in offering to provide the DIP Facility to Debtors on the terms described herein and in the DIP Agreement.

M.      Without prejudice to the rights of the Committee and other parties in interest to bring any Claims and Defenses during the Challenge Period (each as defined below), the Debtors admit, stipulate, acknowledge, and agree (and this Paragraph C hereof shall be referred to herein collectively as the "**Debtors' Stipulations**") as follows:

a.      Prepetition Obligations.  As of the Petition Date, all of the Debtors were unconditionally indebted and liable to the Prepetition Lender (as defined herein), without defense, counterclaim or offset of any kind, for the following: all debts, liabilities and obligations of every kind and nature owed by the Debtors under the Prepetition Loan Documents (as defined herein), including, without limitation pursuant to that certain (i)

Loan Agreement, dated as of March 29, 2024, related to a term loan (the "**Prepetition Term Loan**") in the original principal amount of $20,000,0000 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Term Loan Agreement**" and the promissory note issued by the Debtors to the Prepetition Lender in connection therewith, the "**Prepetition Term Loan Note**"), plus accrued and unpaid interest, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection therewith, in each case in accordance with the terms of the Prepetition Loan Documents, and (ii) Loan Agreement, dated as of March 29, 2024, relating to a revolving credit facility (the "**Prepetition Revolving Loan**" and together with the Prepetition Term Loan, collectively, the "**Prepetition Loans**") in the maximum principal amount of $7,000,000.00 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition RLOC Loan Agreement**", and the promissory note issued by the Debtors to the Prepetition Lender in connection therewith, the "**Prepetition Revolving Loan Note**", and together with the Prepetition Term Loan Agreement, the Prepetition Term Loan Note, the Prepetition RLOC Loan Agreement, and the other prepetition agreements and instruments entered into and executed in connection therewith, collectively, the "**Prepetition Loan Documents**"), plus accrued and unpaid interest, fees (including any prepayment fees), expenses, penalties, premiums and other obligations incurred in connection therewith, in each case in accordance with the terms of the Prepetition Loan

Documents, among the Debtors, as borrowers, the Guarantors[4] (the Debtors, together with the Guarantors, the "**Prepetition Loan Parties**"), and AHF IC, LLC in its capacity as successor-by-assignment to Northwest Bank (the "**Prepetition Lender**").  All liabilities and other obligations of the Debtors arising under the Prepetition Loan Documents and applicable law and all other "Obligations" (as defined in the Prepetition Loan Documents) shall collectively be referred to herein as the "**Prepetition Obligations**", and are secured by first priority security interests in and liens on (the "**Prepetition Liens**") substantially all of the assets of the Prepetition Loan Parties, including Cash Collateral (as defined herein) (the "**Prepetition Collateral**").[5]

   b. <u>Non-avoidable Liens</u>.  The Prepetition Liens are valid, binding, perfected, non-avoidable, and enforceable liens on and security interests in the Prepetition Collateral, subject in each case, prior to giving effect to this Final Order, to those other liens explicitly permitted by the applicable Prepetition Loan Documents (in each case, only to the extent such permitted exceptions were valid, properly perfected, non-avoidable liens senior in priority to the respective liens and security interests of the Prepetition Lender on the Petition Date) (the "**Permitted Priority Liens**"), if any.

   c. <u>Collateral</u>. For purposes of this Final Order, the term "**Cash Collateral**" shall mean and include all "cash collateral" as defined in section 363 of the Bankruptcy Code in which the Prepetition Lender has a perfected lien, security interest or other interest,

---

[4] In connection with borrowing the Prepetition Loans, Ming Chen and Zhu Chen, who together own 100% of the equity of Wellmade Floor Coverings International, Inc., executed personal guaranties in favor of the Prepetition Lender.

[5] The Prepetition Lender and the Debtors are in the process of reconciling the outstanding amount of the Prepetition Obligations as of the Petition Date.  The Debtors reserve all rights on the amount of the Prepetition Obligations.

in each case whether existing on the Petition Date, arising pursuant to the Interim or Final Order, or otherwise.  The Debtors stipulate that any and all of the Debtors' cash, cash equivalents, negotiable instruments, investment property, securities, and any amounts generated from the use, sale, lease or other disposition of the Prepetition Collateral, in each case wherever located, constitute Cash Collateral and Prepetition Collateral of the Prepetition Lender.

    d. <u>No other Liens</u>. To the Debtors' knowledge, as of the Petition Date, there were no other perfected liens on or security interests in the Prepetition Collateral except for the Prepetition Liens.

  N. The continued use of Cash Collateral has been negotiated in good faith and at arms' length among the Debtors, the Prepetition Lender, the DIP Lender, and, therefore, the use of the Cash Collateral by the Debtors in accordance with the terms of this Final Order shall be deemed to have been extended, issued, or made in "good faith."

  O. In addition to the terms of the DIP Facility, the Debtors have an immediate and critical need to use Cash Collateral to continue the Debtors' ordinary course business operations and to maintain the value of the bankruptcy estates in these Chapter 11 Cases.  Based on the record presented to the Court at the Final Hearing, the terms of use of the DIP Facility and Cash Collateral are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. The Prepetition Lender shall consent to the Debtors entering into the DIP Agreement and using Cash Collateral on the terms and conditions provided for herein, including the granting of the Adequate Protection Liens and Adequate Protection Superpriority Claims (as defined herein).  The adequate protection provided herein to the Prepetition Lender, as

applicable, and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary to obtain the consent or non-objection of such parties.

P.      Notice of the Motion and Final Hearing was properly given by Debtors to (i) the U.S. Trustee, (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis, (iii) counsel to the Prepetition Lender, (iv) counsel to the DIP Lender, and (v) counsel to the Committee. The notice and opportunity to object given by Debtors' Notices of Hearing [Docket Nos. 41 & 98] was appropriate, adequate, and satisfactory under the particular circumstances of this case.

Q.      For the reasons stated above, the Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and the Local Rules. Absent granting the relief set forth in this Final Order, the Debtors' estates and their ability to successfully sell their assets or otherwise preserve the enterprise value of the Debtors' estates will be immediately and irreparably harmed. Authorization of the use of the Cash Collateral in accordance with this Final Order is therefore in the best interests of the Debtors' estates.

R.      The Debtors have prepared and delivered to the Prepetition Lender and DIP Lender an agreed upon 13-week budget (the "**Approved Budget**"), a copy of which is attached hereto as Exhibit "2". The Approved Budget reflects the Debtors' anticipated net cash flow and anticipated disbursements on a weekly basis for the period from the Petition Date through and including November 1, 2025. The Approved Budget is reasonable under the facts and circumstances. The Committee shall be promptly provided with any updates or amendments to the Approved Budget and there shall be no changes to the budgeted fees and expenses of the Committee's professionals without the Committee's express written consent.

**NOW, THEREFORE**, based upon the foregoing findings of fact, it is hereby **ORDERED, ADJUDGED AND DECREED**:

1.      The notice provided of the emergency relief sought in the Motion is adequate to comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  The Debtors are granted the relief sought in the Motion and are authorized to incur the DIP Financing from the DIP Lender upon the terms and conditions set forth in the DIP Agreement and this Final Order.

2.      The Debtors are expressly authorized to execute, deliver, perform and consummate all the terms and conditions set forth in the DIP Agreements and this Final Order, and any and all other documents and instruments reasonably requested by the DIP Lender to execute, effectuate, carry out, or consummate the terms and conditions of the DIP Financing and this Final Order.

3.      The DIP Lender's security interest and lien upon the Collateral are granted pursuant to 11 U.S.C. § 364(d), and, subject to the Carve-Out, shall be a first priority secured claim, and a valid and perfected security interest in and lien upon the Collateral, in the amount of the DIP Financing;  provided that the DIP Lender shall exercise commercially reasonable efforts to recover from all Collateral other than commercial tort claims or the proceeds thereof before turning to such commercial tort claims or the proceeds thereof.  Payment of the DIP Financing shall be secured by a valid and perfected security interest in and lien in and upon all of the Collateral with priority over any other existing or future lien, security interest or encumbrance upon such property and assets.  Any security interests or liens upon the Debtors' assets which are avoided by the Debtors or any subsequently appointed trustee and which are preserved by the estates shall be junior and subordinate to the security interest and lien in favor of the DIP Lender hereunder.

4.      The payment of the DIP Financing and any claim asserted by the DIP Lender in this case for the repayment of the DIP Financing, subject to the Carve-Out, shall be granted superpriority status pursuant to 11 U.S.C. § 364(c) and shall be prior and superior in right of payment to any other claim made or asserted against the Debtors and their estates, heretofore or hereafter arising or incurred in this case or any succeeding or superseding case under the Bankruptcy Code; provided that the DIP Lender shall exercise commercially reasonable efforts to recover from all Collateral other than commercial tort claims or the proceeds thereof before turning to such commercial tort claims or the proceeds thereof.

5.      Subject to the Carve-Out, no indebtedness or obligation of the Debtors of any kind or nature whatsoever shall be repayable or secured on parity with, or in any manner be senior to, the DIP Financing.

6.      The security interests and liens in, on and to the Collateral granted by the Debtors to the DIP Lender pursuant to the DIP Agreement and the Interim Order, as such order is confirmed and continued by this Final Order, were deemed effective, valid, and perfected as of the date of the closing of the DIP Financing, without the necessity of the giving of any notice, the filing of any documents or other instruments or the taking of any action otherwise required to be given, filed or taken under applicable non-bankruptcy law for the perfection of security interests or mortgages, with such validity and perfection being binding upon any subsequently appointed trustee, either in these Chapter 11 cases or cases under any other chapter of the Bankruptcy Code, and on any and all other creditors of the Debtors who have or may hereafter extend credit to the Debtors, or file a claim of any nature whatsoever, in this Chapter 11 case or any superseding bankruptcy cases of the Debtors.  If the DIP Lender, in its sole discretion, choose to file such

financing statements and otherwise confirm perfection of such security interests and liens, all such financing statements or similar instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim Order and the automatic stay of 11 U.S.C. § 362 shall be deemed modified to permit any and all such filings without further order of the Court. Without limiting the foregoing, the Prepetition Lender, in its discretion, may file a photocopy of the Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of the Interim Order.

7.      If the Chapter 11 Cases are dismissed or converted, neither the entry of an interim or final order in the Bankruptcy Case approving the DIP Agreement nor the dismissal or conversion of the Chapter 11 Cases shall affect the rights or remedies of the DIP Lender under the DIP Agreement or this Final Order. All rights and remedies under the DIP Agreement, the Interim Order or this Final Order shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed or converted. Until payment in full of the DIP Loan, it shall constitute an event of default under the DIP Agreement if the Debtors seek, or if there is entered, any order dismissing the Chapter 11 Cases. If an order dismissing the Chapter 11 Cases is entered, (i) such order shall provide that subject to the rights of the superpriority lien of the DIP Lender, the DIP Loan Documents and DIP Facility shall continue in full force and effect and shall maintain its priority as provided in this Final Order until payment in full of all the obligations due and owing the DIP Lender under the DIP Agreement; (ii) all superpriority liens of the DIP Lender shall remain binding on all parties in interest and rights granted to the DIP Lender under the DIP Agreement, the Interim

Order and this Final Order and in any Interim Order or Final Order shall not be affected, and (iii) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests under the DIP Agreement and in any Interim Order or Final Order.

8.      Subject to the terms and conditions contained in this Paragraph 8, each of the DIP Liens and DIP Security Interests, the superpriority claims, the Prepetition Liens and Security Interests, and the Adequate Protection Liens and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out (as defined below):

a.      Carve-Out. For purposes of this Final Order, "**Carve-Out**" means (i) all unpaid fees required to be paid in these Chapter 11 Cases to the clerk of the Court (including any noticing agent appointed by the Court) and to the U.S. Trustee under 28 U.S.C. § 1930(a); (ii) all reasonable fees and expenses up to $10,000 incurred by a chapter 7 trustee and payable under section 726(b) of the Bankruptcy Code, (iii) the allowed and unpaid fees, costs, and disbursements of professionals retained by the Debtors in these Chapter 11 Cases and the Debtors' ordinary course professionals to the extent set forth in the Approved Budget, and (iv) the allowed and unpaid fees, costs, and disbursements of professionals retained by the Committee in these Chapter 11 Cases up to $500,000.

b.      In the event the Debtors default under the terms of the DIP Agreement or this Final Order and fail to cure such default as prescribed in the DIP Agreement, specifically failing to respond to any notice of default filed on the dockets of the Chapter 11 Cases, the automatic stay provisions in § 362 of the Bankruptcy Code shall be vacated and modified as set forth in the DIP Agreement and this Final Order including, without

limitation, paragraph I(14) above.  The Debtors are further deemed to waive all rights to notice and hearing of any kind prior to the exercise by the DIP Lender of its rights to repossess the Collateral or to replevy, attach or levy upon such Collateral without prior notice or hearing.  The rights, remedies, powers and privileges conferred upon the DIP Lender pursuant to this Final Order shall be in addition to and cumulative with those contained in the DIP Agreement, the DIP Loan Documents or created under applicable law.

9.    Subject to the terms hereof and in accordance with the Approved Budget, the Debtors are hereby authorized to use Cash Collateral as set forth in the Approved Budget.

10.    Cash Collateral shall be only used for the purposes permitted under the Approved Budget, including (i) to provide working capital needs of the Debtors and for general corporate purposes of the Debtors; and (ii) to make the payments or fund amounts otherwise permitted in this Final Order and the Approved Budget.  Notwithstanding the foregoing, disbursements by the Debtors for "Total Operating Disbursements" on an aggregate basis may not exceed the amounts specified in the Approved Budget by more than fifteen percent (15%).

11.    The Prepetition Lender is entitled, pursuant to sections 361, 362(d), and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral (including, without limitation, the Cash Collateral) on which the Prepetition Lender holds perfected security interests as of the Petition Date in an amount equal to the aggregate postpetition diminution in value of the Prepetition Collateral, including any Cash Collateral, from and after the Petition Date (such diminution in value, the "**Diminution in Value**"), including, without limitation, to the extent such diminution results from the sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the subordination of the Prepetition Liens to the Carve-Out, or the

imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such adequate protection, as set forth in the paragraphs below, the "**Adequate Protection Obligations**"). As adequate protection, the Prepetition Lender is hereby granted the following:

    a. ***Superpriority Claim***. The Adequate Protection Obligations due to the Prepetition Lender shall constitute allowed joint and several superpriority claims against each of the Debtors as provided in Bankruptcy Code section 507(b) (collectively, the "**Adequate Protection Superpriority Claims**"), with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, subject and subordinate only to the Carve-Out and the DIP Liens and DIP Security Interests and the claims granted to the DIP Lender hereunder, provided that (i) the Adequate Protection Superpriority Claims shall not attach to, or be payable from, Avoidance Actions or the proceeds thereof and (ii) the Prepetition Lender shall exercise commercially reasonable efforts to recover from all Prepetition Collateral before turning to any other Collateral;

    b. ***Adequate Protection Liens***. Subject to the Carve-Out and the DIP Liens and DIP Security Interests, as security for the Adequate Protection Obligations, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession, control or further act by the Prepetition Lender of or with respect to any Postpetition Collateral (as defined below), the following security interests and liens are hereby granted to the Prepetition Lender (all such liens and security interests, the "**Adequate Protection Liens**"):

        i. Subject to the Carve-Out and the DIP Liens and DIP Security Interests, pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), a valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement first priority lien on, and security interest in, all property (including any previously

unencumbered property, but excluding Avoidance Actions or the proceeds thereof), whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to Bankruptcy Code section 541(a)), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, commercial tort claims, tax or other refunds, insurance proceeds, letters of credit, any owned real estate, real property leaseholds, fixtures, deposit accounts, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property leases (and proceeds from the disposition thereof), other equity or ownership interests held by a Debtor, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located (all such property (including the Junior Collateral as defined herein), other than the Prepetition Collateral in existence immediately prior to the Petition Date, being collectively referred to as, the "**Postpetition Collateral**" and collectively with the Prepetition Collateral, the "**Collateral**"), which liens and security interests shall be senior to any and all other liens and security interests other than the DIP Liens and DIP Security Interests, Carve-Out, and the Permitted Priority Liens, if any (the "**Approved Liens**").

ii.  Subject to the DIP Liens and DIP Security Interests and the Carve-Out, pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), a valid, binding, continuing, enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interest in, all property (excluding Avoidance Actions and the proceeds thereof), whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to Bankruptcy Code section 541(a)),

property of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, commercial tort claims, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), other equity or ownership interests held by a Debtor, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether now existing or hereafter acquired, that is subject only to (x) the DIP Liens and DIP Security Interests, (y) the Permitted Priority Liens, or (z) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b), which valid, perfected and unavoidable liens are senior in priority to the security interests and liens in favor of the Prepetition Lender (the "**Junior Collateral**").

iii.  Other than with respect to the DIP Liens and DIP Security Interests and the Carve-Out, the Adequate Protection Liens shall not be (1) subject or subordinate to, or *pari passu* with, (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or (b) any lien or security interest arising on or after the Petition Date, subject to the Carve-Out, or (2) except as otherwise set forth herein, subordinated to or made *pari passu* with any other lien, claim or security interest under Bankruptcy Code sections 363 or 364 or otherwise, provided that (i) the Adequate Protection Liens shall not attach to, or be payable from, Avoidance Actions or the proceeds thereof and (ii) the Prepetition Lender shall exercise commercially reasonable efforts to recover from all Prepetition Collateral before turning to any other Collateral.

      c.   Subject to the terms and conditions contained in this paragraph, the prepetition security interests and liens of the Prepetition Lender, the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall be subject and subordinate to the Carve-Out and the DIP Liens and DIP Security Interests and DIP Superpriority Claim.

12.     As additional adequate protection:

     a.    Without limiting any rights of the Prepetition Lender under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement for obtaining the consent of the Prepetition Lender to entry of this Final Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall promptly pay or reimburse, in full in cash, regular interest payments on the Prepetition Obligations in accordance with the Prepetition Loan Documents, which shall continue to accrue at the default rate(s) set forth therein, whether or not budgeted in the Approved Budget, and without further notice, motion, or application to, order of, or hearing before, this Court, it being understood that all such interest shall be included as Adequate Protection Obligations owed by the Debtors to the Prepetition Lender.  Nothing herein shall be deemed a waiver of any claim by the Prepetition Lender for reimbursement of any prepetition or postpetition fees, expenses, or other amounts payable under the Prepetition Loan Documents, which claims are hereby preserved; nor shall the Debtors or the Committee be deemed to have agreed to any such claims.

     b.    Subject to the rights of the Committee and other parties in interest to bring any Claims and Defenses during the Challenge Period, the Prepetition Lender shall have the right to credit bid (x) up to the full amount of the Prepetition Obligations (including,

without limitation, all accrued and unpaid interest, fees (including reasonable attorneys'
fees), and expenses) under the Prepetition Loan Documents and (y) the Adequate
Protection Superpriority Claims and any unpaid amounts due and owing under paragraph
12(a) hereof, as applicable, in the sale of any of the Collateral, including, without
limitation, pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a
plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a
chapter 7 trustee for any Debtor under Bankruptcy Code section 725.

13.    The Interim Order, which is confirmed and continued by this Final Order,  shall be
sufficient and conclusive evidence of the validity, enforceability, perfection, priority and non-
avoidability of the Adequate Protection Liens granted to the Prepetition Lender hereunder without
the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, control
agreement, or other instrument or document which may otherwise be required under the law of
any jurisdiction or (b) taking any other action to validate or perfect these liens or to entitle the liens
with the priorities granted herein.  Notwithstanding the foregoing, the Prepetition Lender may, in
its sole discretion, enter into and file, as applicable, financing statements, mortgages, security
agreements, notices of liens, and other similar instruments, agreements, or documents, and is
hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to
do so, and all such financing statements, mortgages, security agreements, notices, and other
agreements or documents shall be deemed to have been filed or recorded as of the date of entry of
the Interim Order.  The applicable Debtors are authorized to execute and deliver to the Prepetition
Lender all such financing statements, mortgages, notices, and other documents as the Prepetition
Lender may reasonably request to evidence and confirm the contemplated priority of the liens

granted pursuant hereto.  Without limiting the foregoing, the Prepetition Lender, in its discretion, may file a photocopy of the Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of the Interim Order.

14.    The Interim Order, Second Interim Order, or this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Lender to request additional forms of adequate protection at any time or any party-in-interest's right to object thereto.

15.    The Debtors' rights to use Cash Collateral shall automatically terminate (the date of such termination, the "**Termination Date**"), without further notice or court proceeding, on the earliest to occur of (i) one business day after the Final Hearing (or, if consented to in writing by the Prepetition Lender acting in its sole discretion, such later date), if the Final Order (provided that such Final Order has not been reversed, vacated, stayed, unless such stay has been vacated, or appealed, unless such appeal has been dismissed or otherwise finally resolved and affirms entry of the Final Order), which Final Order shall be consistent with the Interim Order or otherwise acceptable to the Prepetition Lender, in its sole discretion, has not been entered by this Court on or before such date; or (ii) November 2, 2025 (or, if consented to in writing by the Prepetition Lender acting in its sole discretion, such later date); or (iii) the occurrence of any events set forth in this paragraph 15(a) through (g) below, unless waived by the Prepetition Lender, in its sole discretion (each of the following events, a "**Termination Event**" and collectively, the "**Termination Events**"):

a.      on or before the date that is August 29, 2025, the Bidding Procedures Order shall not have been approved by order of the Court, in form and substance reasonably acceptable to the Prepetition Lender and DIP Lender;

b.      on or before October 3, 2025, the Court shall not have entered a sale order approving one or more agreements for the sale of substantially all of the Debtors' assets (the "**Approved Sale(s)**"), which order and agreement(s) shall be in form and substance reasonably acceptable to the Prepetition Lender and DIP Lender (and, at a minimum, shall provide for proceeds sufficient to repay the Prepetition Obligations and DIP Obligations plus any accrued fees and interest with respect to same in cash at the closing of the Approved Sale(s));

c.      the Approved Sale(s) shall not have been consummated by November 2, 2025;

d.      the Debtors' failure to: (i) use the Collateral, including without limitation Cash Collateral, in a manner consistent with the Approved Budget, or (ii) comply with any other covenant or agreement specified in this Final Order; in each case where such failure shall have continued unremedied for three (3) business days following receipt of written notice by the Debtors from the Prepetition Lender of such failure;

e.      the date any provision of the Final Order shall for any reason cease to be valid and binding or any Debtor shall so assert in any pleading filed in any court;

f.      the date (i) any Chapter 11 Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal or conversion of any Chapter 11 Case pursuant to Bankruptcy Code

28

section 1112; or (ii) a trustee, responsible officer, or an examiner (other than a fee examiner) pursuant to Bankruptcy Code section 1104 is appointed or elected, as applicable, in any Chapter 11 Case, any Debtor applies for, consents to, or acquiesces in, any such appointment, or the Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Prepetition Lender, in its sole discretion; or

g.      commencement of any action, including the filing of any pleading, by any Debtor against the Prepetition Lender with respect to any of the Prepetition Obligations or Prepetition Liens.

16.   Effect of Stipulations.

a.      The stipulations, releases and admissions contained in this Final Order shall be binding upon the Debtors and any successor(s) thereto in all circumstances.  The stipulations, releases and admissions contained in this Final Order, shall be binding upon all other parties in interest, including the Committee or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "**Trustee**"), unless and to the extent (a) the Committee or any other party in interest other than any Debtor (including any Trustee), in each case, after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part the validity, enforceability, priority or extent of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations held by or on behalf of the Prepetition Lender or otherwise asserting or prosecuting any Avoidance Actions, recharacterization, subordination, "lender liability", or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the

"**Claims and Defenses**") against the Prepetition Lender in connection with any matter related to the Prepetition Obligations, or the Prepetition Collateral or the Prepetition Liens by no later than the later of (i) in the case of any such adversary proceeding filed by the Committee or another party in interest with requisite standing, **September 26, 2025**, and (ii) any such later date agreed to in writing by the Prepetition Lender, in its sole discretion, or specified by the Court for cause (the time period established by the later of the foregoing clauses (i) and (ii), the "**Challenge Period**"), and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Claims and Defenses or other challenge or claim in any such duly filed adversary proceeding.  If the Committee files a motion for standing to bring Claims and Defenses against the Prepetition Lender during the Challenge Period, such Challenge Period shall be tolled with respect to such Claims and Defenses until three (3) Business Days following the date on which this Court enters an order granting such motion, provided, however, that the Committee must attach to such motion a copy of its complaint detailing the Claims and Defenses against the Prepetition Lender.  If no adversary proceeding is timely filed prior to the expiration of the Challenge Period by the Committee or a party in interest, in any case which has been granted the appropriate standing, without further order of this Court: (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind

pursuant to the Bankruptcy Code or applicable nonbankruptcy law, for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases; and (y) the Prepetition Obligations, and the Prepetition Lender's Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further Claims and Defenses or other challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any such adversary proceeding is timely filed by a party in interest with appropriate standing prior to the expiration of the Challenge Period, the stipulations and admissions contained in this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any Committee and any other Person, including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding.

b.    Nothing in this Final Order vests or confers standing on the Committee or any other person, entity, or party-in-interest to assert any claim on behalf of any Debtor or any estate of any Debtor, or relieves the Committee or any other person, entity, or party-in-interest from any requirement under the Bankruptcy Code or otherwise to obtain standing and authorization from this Court prior to asserting any claim on behalf of any Debtor or any estate of any Debtor.  The Prepetition Lender agrees not to raise as a defense in connection with any Claims and Defenses against the Prepetition Lender the ability of the Committee to file derivative suits on behalf of limited liability companies under

applicable state law; *provided*, for the avoidance of doubt, that all other standing arguments and defenses shall be preserved.

17.    As a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Loan Documents, no costs or expenses of administration of the Chapter 11 Cases, which have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against or recovered from the DIP Lender, any of the DIP Obligations, or the Collateral of the DIP Lender pursuant to Bankruptcy Code sections 105(a) or 506(c), or otherwise, without the prior written consent of the DIP Lender in its sole discretion, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or any of its representatives.

18.    The provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including the DIP Lender, Prepetition Lender, the Committee, the Debtors and their respective successors and assigns (including any Trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) as provided herein.  The protections afforded to the DIP Lender and the Prepetition Lender under this Final Order and any actions taken pursuant thereto, shall survive the entry of an order dismissing any or all of the Chapter 11 Cases or converting any or all of the Chapter 11 Cases into a case(s) under chapter 7 of the Bankruptcy Code, and the DIP Liens, Adequate Protection Liens and the Adequate Protection Superpriority Claims shall continue in the Chapter 11 Cases, in any such successor case(s) or after any such dismissal.  Except as otherwise provided

herein, the DIP Liens, Adequate Protection Liens and the Adequate Protection Superpriority Claims shall maintain their priorities as provided in this Final Order, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness, or any conversion of any of the Chapter 11 Cases into a case(s) pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of the Chapter 11 Cases, or by any other act or omission until the DIP Loan and the Prepetition Obligations are indefeasibly paid in full in cash.

19.     The automatic stay shall be modified or lifted to the extent necessary to allow the Prepetition Lender and DIP Lender to take any actions or to provide any notices to the Debtors, in each case, as contemplated by and in accordance with the Interim and Final Order.

20.     Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution of effectiveness of this Final Order as provided in such Rules. This Final Order shall constitute findings of fact and conclusions of law, and the Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Final Order. To the extent that any finding of fact shall be determined to be a conclusion of law it shall be so deemed and vice versa.

21.     Except as specifically amended, superseded, or modified hereby, the provisions of the Interim Order and any actions taken by the Debtors, the DIP Lender, or the Prepetition Lender in accordance therewith shall remain in effect and are hereby ratified by this Final Order.

22.     The terms and conditions of this Final Order shall be binding upon, and inure to the benefit of, the parties hereto, and their respective successors and assigns, including but not limited to any trustee appointed in this or any superseding bankruptcy case.

23.     In the event of any conflict in any of the terms or provisions of this Final Order with any terms or provisions of the financing arrangements set forth in the DIP Agreement, the Interim Order, or the Second Interim Order, the terms and provisions of this Final Order shall prevail and be controlling as of the date of entry.

24.     The priority of the DIP Lender's liens and security interests granted under the Interim Order and the Second Interim Order, which is confirmed and continued by this Final Order, shall not be "primed" pursuant to 11 U.S.C. § 364(d), nor shall any of the DIP Lender's rights under the Interim Order, the Second Interim Order, or Final Order be modified or affected by any plan of reorganization confirmed in this Chapter 11 case without the express written consent of the DIP Lender.

25.     This Court shall have and retain exclusive jurisdiction over the subject matter of this Final Order to resolve any dispute in connection with the rights and duties specified herein as a "core proceeding" under 28 U.S.C. § 157(b)(2).

###End of Order###

Prepared and presented by:

**GREENBERG TRAURIG, LLP**

*/s/ John D. Elrod*
John D. Elrod, GA Bar No. 246604
Jake Evans, GA Bar No. 797018
Allison J. McGregor, GA Bar No. 860865
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: 678-553-2259
Facsimile: 678-553-2269
Email: elrodj@gtlaw.com
Jake.Evans@gtlaw.com
Allison.McGregor@gtlaw.com

*Proposed Counsel for the Debtors in Possession*

## **Distribution List**

Wellmade Floor Coverings International, Inc.
1 Wellmade Drive
Cartersville, GA 30121

Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road, NE, Suite 2500
Atlanta, Georgia 30305
Attn: John D. Elrod

Kurtzman Carson Consultants LLC d/b/a Verita Global
222 N. Pacific Coast Highway, 3rd Floor
El Segundo, CA 90245
Attn: Drake D. Foster

Office of the United States Trustee
362 Richard Russell Federal Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

Pachulski Stang Ziehl & Jones LLP
1700 Broadway, 36th Floor
New York, NY 10019
Attn: Bradford J. Sandler

Small Herrin
100 Galleria Parkway, Suite 350
Atlanta, GA 30339,
Attn: Gus H. Small

## **EXHIBIT 1**

**DIP Agreement**

### AMENDED AND RESTATED SENIOR SECURED
### DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **AMENDED AND RESTATED SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement") is dated as of August ___, 2025, and is between **Wellmade Floor Coverings International, Inc. and Wellmade Industries MFR NA LLC** and a debtor and debtor-in-possession (collectively "Borrower" or "Debtor" or "Debtors"), and **SummitBridge National Investments VIII LLC,** a Delaware limited liability company ("DIP Lender").

### W I T N E S S E T H:

WHEREAS, on August 4, 2025 (the "Petition Date"), Borrower filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), Case No. 25-58764 and 25-58760;

WHEREAS, Borrower is continuing in the possession of its assets and in the management of its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Parties previously entered into the Senior Secured Debtor-in-Possession Loan and Security Agreement, dated as of August 7, 2025 (the "Prior Agreement"), pursuant to which the DIP Lender agreed to provide a multi draw term loan credit facility to Borrower in an aggregate principal amount not to exceed $4,000,000 and Borrower agreed to provide DIP Lender with first-priority Liens on the DIP Collateral;

WHEREAS, the Parties desire to amend, restate, and supersede and replace in its entirety the Prior Agreement as set forth herein;

WHEREAS, Borrower has requested DIP Lender to provide a senior secured multi draw term loan credit facility (the "DIP Facility") to Borrower in an aggregate principal amount not to exceed $5,000,000 for the purposes described herein;

WHEREAS, to provide security for the repayment of the loan made available pursuant hereto and payment of the other obligations of Borrower hereunder, Borrower has agreed to provide DIP Lender with first-priority Liens (as defined below) on the DIP Collateral (as defined below); and

WHEREAS, DIP Lender is willing to make the DIP Facility available only upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, Borrower and DIP Lender agree as follows:

1.    **Definitions**. The terms listed below shall be defined as follows:

"Affiliate" shall mean, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Approved Budget" shall have the meaning set forth in Section 7(a).

"<u>Authorized Officer</u>" shall mean any executive officer of Borrower and any other officer or similar official thereof with significant responsibility for the administration of the obligations of Borrower in respect of this Agreement and the other DIP Loan Documents.

"<u>Bankruptcy Code</u>" shall have the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the Recitals.

"<u>Borrower</u>" shall have the meaning set forth in the Preamble.

"<u>Budget</u>" shall mean the Initial Approved Budget, as replaced from time to time by each subsequent Approved Budget as provided in <u>Section 7(a)</u>.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or legal holiday under the laws of the State of Georgia or any other day on which banking institutions located in the State of Georgia are authorized or required by law or other governmental action to close.

"<u>Carve-Out</u>" shall have the meaning set forth in the DIP Orders.

"<u>Chapter 11 Case</u>" shall mean, collectively, Case Nos. 25-58764 and 25-58760 currently pending before the Bankruptcy Court.

"<u>Closing Date</u>" shall mean the first Business Day following the satisfaction of the conditions set forth in <u>Section 4</u>.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986.

"<u>Commitment</u>" shall have the meaning set forth in <u>Section 2(a)</u>.

"<u>Committee</u>" shall mean the official committee of unsecured creditors in the Chapter 11 Case appointed pursuant to Section 1102 of the Bankruptcy Code.

"<u>Committee Professionals</u>" shall have the meaning set forth in the definition of the DIP Financing Order.

"<u>Control</u>" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appoint of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Debtor Professionals</u>" shall have the meaning set forth in the definition of the DIP Financing Order.

"<u>Default</u>" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"<u>Default Rate</u>" shall mean a per annum variable interest rate equal to the Interest Rate <u>plus 5.00%.</u>

"<u>DIP Bank Accounts</u>" shall mean the debtor-in-possession bank accounts used by Borrower and either approved by the U.S. Trustee or authorized by an order of the Bankruptcy Court.

"<u>DIP Collateral</u>" shall have the meaning set forth on <u>Schedule I</u>.

2

"DIP Facility" shall have the meaning set forth in the Recitals.

"DIP Financing Order" shall mean a Final Order of the Bankruptcy Court approving the DIP Facility and entered in the Chapter 11 Case, in form and substance satisfactory to DIP Lender in its sole discretion.

"DIP Orders" shall mean, collectively, the Interim DIP Order and DIP Financing Order.

"DIP Lender" shall have the meaning set forth in the Preamble.

"DIP Liens" shall mean the Liens against the DIP Collateral authorized by the DIP Financing Order.

"DIP Loan" shall have the meaning set forth in Section 2(a).

"DIP Loan Documents" shall mean this Agreement, the DIP Financing Order, and all other agreements, guaranties, instruments, certificates and documents executed or delivered in connection with, as contemplated by or as support for this Agreement or any of the Obligations, whether by Borrower or any other Person.

"Environmental Laws" shall mean any and all federal, national, supranational, state, provincial and local laws, statutes, ordinances, rules, regulations, permits, licenses, approvals, rules of common law and orders of courts or Governmental Authorities, relating to the protection of human health, occupational safety with respect to exposure to Hazardous Substances, or the environment, now or hereafter in effect, and in each case as amended from time to time, including requirements pertaining to the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, handling, reporting, licensing, permitting, investigation or remediation of Hazardous Substances.

"Event of Default" shall have the meaning set forth in Section 8.

"Excluded Taxes" shall mean (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed by the United States of America or the jurisdiction where DIP Lender's principal office or lending office is located, (b) U.S. Federal withholding Taxes imposed on amounts payable hereunder pursuant to the Law in effect as of the date of this Agreement and (c) U.S. Federal withholding Taxes imposed pursuant to FATCA.

"Exit Event" shall mean the earlier to occur of the (a) Maturity Date and (b) full repayment of the DIP Loan and all other Obligations (other than any contingent obligations for which no claim has been asserted) whether as a result of the acceleration of the DIP Loan or otherwise.

"Exit Fee" shall mean a fee owed by Borrower to DIP Lender in an amount equal to two percent (2.0%) on the DIP Facility Amount payable upon the repayment in full of the DIP Facility

"Expense Deposit" shall mean that certain $150,000 nonrefundable deposit paid to DIP Lender by Borrower for the purpose of having such deposit applied in a manner and priority acceptable to DIP Lender in its sole discretion to the reasonable transaction costs, fees and expenses incurred by DIP Lender in connection with the DIP Loan or the DIP Loan Documents, including reasonable legal fees, the Origination Fee, the Underwriting Fee, the Exit Fee, the Break-Up Fee, other fees, costs and expenses of DIP Lender, title searches, title policies and updates to third party reports.

"Extraordinary Receipts" shall mean any cash received by Borrower not in the ordinary course of business, including (a) foreign, United States, state or local Tax refunds, (b) proceeds of insurance (other than to the extent such insurance proceeds are immediately payable to a Person that is not Borrower

or is used for repairs or remediation as permitted by the Budget), (c) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (d) condemnation awards (and payments in lieu thereof), (vi) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not Borrower), and (e) any purchase price adjustment received in connection with any purchase agreement, in each case, solely with respect to any of the DIP Collateral described in clauses (a) through (g) and (i) of the definition of DIP Collateral.

"Extension Fee" shall mean a fee owed by Borrower to DIP Lender in an amount equal to $40,000.00.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Final Order" shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, stayed or modified and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing will then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment will have been affirmed by the highest court to which such order was appealed, or certiorari will have been denied, or a new trial, reargument, or rehearing will have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing will have expired.

"Governmental Authority" shall mean any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing, including any central bank stock exchange regulatory body arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Hazardous Substance" shall mean any substance or material meeting any one or more of the following criteria:  (a) it is or contains a substance designated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance under any Environmental Law; (b) it is toxic, explosive, corrosive, ignitable, infectious, radioactive, mutagenic or otherwise hazardous to human health or the environment and is or becomes regulated by any Governmental Authority; (c) its presence may require investigation or response under any Environmental Law; (d) it constitutes a nuisance, trespass or health or safety hazard to Persons or neighboring properties; or (e) it is or contains, without limiting the foregoing, friable asbestos, polychlorinated biphenyls, urea formaldehyde foam insulation, petroleum hydrocarbons, petroleum derived substances or wastes, crude oil, nuclear fuel, natural gas or synthetic gas.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under this Agreement or any other DIP Loan Document, and (b) without duplication of any Taxes covered in subclause (a) of this definition, Other Taxes.

"Initial Approved Budget" shall mean the Budget attached hereto as Exhibit A.

4

"Interest Determination Date" means the Closing Date and the first day of each calendar month thereafter.

"Interest Payment Date" shall mean the first Business Day of each calendar month and the Maturity Date.

"Interest Payment Reserve" shall mean a Segregated Funding Account established for the sole benefit of DIP Lender to fund interest payments, the Exit Fee and any Extension Fees when due as provided in this Agreement, which reserve shall (a) be held by DIP Lender or its designee and (b) be funded with five hundred thousand dollars ($500,000) to cover cash interest requirements and any extension fees (if applicable).

"Interest Rate" shall mean a rate of twelve percent (12.0%) per annum on an actual/360 basis and be payable monthly in arrears.

"Interim DIP Order" shall mean an order of the Bankruptcy Court pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure approving the DIP Facility on a preliminary basis to authorize the initial draw of $120,000.00 and entered in the Chapter 11 Case, in form and substance satisfactory to DIP Lender in its reasonable discretion.

"Law" shall mean any international, foreign, Federal, state or local statute, treaty, rule, guideline, regulation, ordinance, code, or administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lien" shall mean, with respect to any asset, any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or other), or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Laws of any jurisdiction).

"Main Office" shall mean the main office of DIP Lender, currently located at 1700 Lincoln Street, Suite 2150, Denver, Colorado 80203, or such other location as DIP Lender may designate as its main office from time to time.

"Material Adverse Effect" shall mean, with respect to any event, act, condition, or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, resulting in a material adverse change in, or a material adverse effect on, (a) the business, condition (financial condition or otherwise), operations, properties, projections or prospects of Borrower, any facilities or operations being financed, the property serving as collateral for the DIP Facility, other than customary impacts from a chapter 11 filing, (b) the ability of Borrower to perform any of its Obligations under the DIP Loan Documents, (c) the rights and remedies of DIP Lender under any of the DIP Loan Documents, (d) the legality, validity or enforceability of any of the DIP Loan Documents, or (e) the perfection or priority of the DIP Liens.

"Maturity Date" shall mean six (6) months from the closing date with two separate three (3) month extension options provided that there are no uncured Events of Default.

5

"Obligations" shall mean all indebtedness, liabilities, obligations, covenants and duties now or at any time or times hereafter owing by Borrower to DIP Lender pursuant to or in connection with this Agreement or any other DIP Loan Document including all principal, interest, fees, expenses, indemnification, and reimbursement payments, costs, and expenses (including all reasonable fees and expenses of counsel to DIP Lender), whether direct or indirect, absolute or contingent, due or to become due, joint or several, liquidated or unliquidated or now existing or hereafter arising hereunder or thereunder.

"Order" shall mean an order of the Bankruptcy Court entered in the Bankruptcy Case.

"Origination Fee" shall mean an Origination Fee equal to two percent (2.0%) on the Commitment Amount to be paid in cash upon entry of an Interim DIP Order. If the Third Draw is approved and funded, the remaining amount of the Origination Fee applicable to the draw amount shall be paid to DIP Lender contemporaneous with funding.

"Other Taxes" shall mean, collectively, all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement, or registration of, from the receipt of security interests in, or otherwise with respect to this Agreement or any other DIP Loan Document.

"PATRIOT Act" shall mean the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, limited liability partnership, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Professional Persons" shall have the meaning set forth in the DIP Financing Order.

"Related Parties" shall mean, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Remedies Notice Period" is defined in Section 8. Events of Default and Remedies, paragraph (b).

"Requirements of Law" shall mean, as to Borrower, the articles or certificate of incorporation and by-laws or other organizational or governing documents of Borrower, and each federal, state, local and foreign Law or determination of an arbitrator or a court or other Governmental Authority, in each case, applicable to or binding upon Borrower or any of its property or to which Borrower or any of its property is subject.

"Segregated Funding Account" shall mean the segregated deposit account of Borrower bearing account number #1020125485.

"Stalking Horse Bid" shall mean an offer from a qualified bidder for a purchase of the Debtors' assets in an amount that shall not be less than the sum of the DIP Facility (including the Origination Fee, the Extension Fee, the Exit Fee, the Underwriting Fee) and any secured pre-petition indebtedness of the Debtors.

6

"Superpriority DIP Claims" shall mean all of the claims of DIP Lender on account of the Obligations, which claims shall be entitled to the benefits of Section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in Sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Permitted Prior Liens (as such term are defined in the DIP Financing Order) and to the extent expressly provided in the DIP Financing Order.

"Tax" or "Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholding (including backup withholding), assessments, fees, value added tax or any other goods, services, use or sales tax, or other charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

"U.S. Trustee" shall mean the United States Trustee for Region 21.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of Georgia; provided that if by reason of mandatory provisions of Law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of DIP Lender in any DIP Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Georgia, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Underwriting Fee" shall mean one percent (1.0%) on the Commitment Amount to be paid in cash upon entry of an Interim DIP Order. If the Third Draw is approved and funded, the remaining amount of the Underwriting Fee applicable to the draw amount shall be paid to DIP Lender contemporaneous with funding.

Unless otherwise defined herein or the context otherwise requires, any uncapitalized terms used herein which are defined in the UCC have the respective meanings provided in the UCC, including commercial tort claims, goods, proceeds and supporting obligations.

2.     **Borrowing, Conversions, Renewals and Payments**.

(a)     Subject to the terms and conditions set forth herein (including the conditions to borrowing set forth in Section 4), DIP Lender agrees to extend up to five million dollars ($5,000,000) (the "DIP Loan") funded upon satisfaction of all conditions precedent with multiple draws made available subject to the satisfaction of certain milestones set forth in Section 7 (the "Commitment"). The Commitment Amount will be available subject to the amounts and milestones identified below. Borrower shall be entitled to prepay the DIP Loan in accordance with the terms and conditions of this Agreement; provided, however, that Borrower may not re-borrow any amount of the DIP Loan that has been repaid or otherwise paid. The Commitment shall terminate concurrently with the making of the advance of the DIP Loan on the Closing Date. On the Closing Date, DIP Lender shall, subject to the satisfaction of all applicable conditions precedent and all other terms and conditions set forth herein with respect thereto, disburse the proceeds of the DIP Loan as set forth in the Initial Approved Budget (which shall include the direct funding of the Interest Payment Reserve by DIP Lender and reimbursement of payment of fees, costs and expenses payable by Borrower hereunder) with any remainder to be remitted to the Segregated Funding Account. DIP Lender is not required to keep any external or internal notations in respect of the advance of the DIP Loan and the failure to make such notations or keep any such records shall not limit or affect Borrower's obligations to pay all amounts owing hereunder as and when due; provided, however, that to the extent DIP Lender prepares or maintains any such notations or records, the notations and records of DIP Lender shall be deemed conclusive absent manifest error.

(b)    The advance made available to Borrower through the DIP Loan shall be used as follows, subject to the DIP Financing Order and the restrictions set forth in Section 2(c):

(i)    payment of transaction costs, fees and expenses incurred by DIP Lender in connection with the DIP Loan and the DIP Loan Documents, including reasonable legal fees, the Origination Fee, the Underwriting Fee, the Exit Fee, other reasonable fees, costs and expenses of DIP Lender, title searches, title policies, recording fees and updates to third party reports not otherwise paid by the Expense Deposit;

(ii)    funding of the Interest Payment Reserve on the Closing Date; and

(iii)    funding of Borrower's operations, capital expenditures and other working capital needs to the extent made in accordance with the Budget;

(iv)    payment of costs of administration of the Chapter 11 Case to the extent set forth in, and in accordance with, the Budget and the DIP Financing Order; and

(v)    the unpaid fees, costs, and disbursements of professionals in the Chapter 11 Case as set forth in the definition of the term "Carve-Out" in the DIP Orders.

(c)    Notwithstanding anything to the contrary herein, no proceeds of the DIP Loan may be used or otherwise made available for any fees or expenses incurred by any Person in connection with:

(i)    the investigation, initiation or prosecution of any claims (including for the avoidance of liens or security interests) against DIP Lender or any of its affiliates, or preventing, hindering, or delaying the assertion of enforcement of any lien, claim, right or security interest or realization upon any collateral that secures any loan, including the DIP Loan, made to Borrower by DIP Lender;

(ii)    a request to use cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior consent of DIP Lender;

(iii)    a request, without the prior consent of DIP Lender, for authorization to obtain debtor-in-possession financing or other financial accommodations without the prior written consent of DIP Lender, unless such financing would pay DIP Lender in full; or

(iv)    any act which has the effect of materially or adversely modifying or compromising the rights and remedies of DIP Lender, or which results in the occurrence of an Event of Default under the DIP Loan Documents, unless otherwise agreed by DIP Lender;

(d)    Borrower hereby promises to pay to the order of DIP Lender via wire transfer or ACH transfer to its Main Office the principal amount of the DIP Loan on the Maturity Date, plus all accrued interest, fees, and other Obligations then outstanding in full in cash.

(e)    Borrower shall have the right to make prepayments of principal in whole or in part at any time or from time to time, provided that: (i) Borrower shall give DIP Lender irrevocable notice of each prepayment by 12:00 pm Atlanta, Georgia time at least two Business Days prior to the date of any such prepayment of the DIP Loan; and (ii) any partial payments shall be in a minimum amount equal to fifty thousand dollars ($50,000); and (iii) in the event that Borrower should repay the DIP Facility prior to the Maturity Date, all other Obligations shall be due and payable on the date of such repayment.

3.    Interest and Fees.

(a)     Interest shall accrue on the outstanding principal amount of the Obligations calculated on the basis of a year of 360 days for the actual number of days elapsed. Borrower promises to pay accrued interest on all outstanding principal amount of the Obligations at the Interest Rate on each applicable Interest Payment Date commencing on the first Interest Payment Date occurring after the Closing Date. Each payment due hereunder shall be paid from the Interest Payment Reserve to the extent funds are available therein. After the occurrence of an Event of Default, all outstanding Obligations (to the fullest extent permitted by applicable Law) shall bear interest from and including the date of such Event of Default until paid in full at the Default Rate.

(b)     <u>Fees</u>. Subject only to <u>Section 15</u> and notwithstanding any other term or condition to the contrary contained in this Agreement, Borrower shall, on the applicable date set forth below, pay the following fees:

(i)     <u>Origination Fee</u>. On the Closing Date, Borrower shall pay the Origination Fee to DIP Lender. The Origination Fee will be paid with a portion of the proceeds of the DIP Loan. If the Third Draw is approved and funded, the remaining amount of the Origination Fee applicable to the draw amount shall be paid to DIP Lender contemporaneous with funding.

(ii)     <u>Underwriting Fee.</u> The DIP Facility shall be subject to an Underwriting Fee equal to one percent (1.0%) on the Commitment Amount to be paid in cash upon entry of an Interim DIP Order. If the Third Draw is approved and funded, the remaining amount of the Underwriting Fee applicable to the draw amount shall be paid to DIP Lender contemporaneous with funding.

(iii)     <u>Extension Fee</u>. The DIP Facility shall be subject the Extension Fee as described in Section 16.

(iv)     <u>Exit Fee</u>. Upon the occurrence of an Exit Event, Borrower shall pay the Exit Fee to DIP Lender on the date of such occurrence.

All of the foregoing fees described above in this <u>Section 3(b)</u> shall be fully earned upon becoming due and payable in accordance with the terms hereof, shall be nonrefundable for any reason whatsoever and shall be in addition to any other fees, costs and expenses payable pursuant to the DIP Loan Documents.

(c)     All payments hereunder shall be made in lawful money of the United States and in immediately available funds, free and clear of and without deduction for any and all present or future applicable Taxes and liabilities with respect thereto (with appropriate gross-up for withholding taxes) and shall not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute Borrower may have. Any extension of time for the payment of any Obligation resulting from the due date falling on a non-Business Day shall be included in the computation of interest. The date, amount, and the interest rate with respect to the DIP Loan, and all payments of any Obligations with respect thereto, shall be recorded by DIP Lender on its books and, at the discretion of DIP Lender prior to any transfer of this Agreement at any other time, may be endorsed by DIP Lender on a schedule. Any such endorsement shall be conclusive absent manifest error. Borrower waives presentment, demand, notice of dishonor, protest, and any other notice or formality with respect to this Agreement or any other DIP Loan Document (other than the DIP Financing Order).

**4.     Conditions Precedent**.  The effectiveness of this Agreement and the other DIP Loan Documents and the obligation of DIP Lender to make the advance of the DIP Loan is subject to the following conditions precedent, each of which must be satisfied in a manner satisfactory to DIP Lender in its sole but reasonable discretion:

9

(a)        DIP Lender (or its counsel) shall have received the following:

(i)        a counterpart of this Agreement duly executed by Borrower;

(ii)        a certificate signed by the secretary or assistant secretary of Borrower, including a certificate of incumbency with respect to each Authorized Officer of such Person executing a DIP Loan Document, together with appropriate attachments which shall include the following: (A) a copy of the certificate of formation of Borrower certified to be true, complete and correct by the Secretary of State of the State of Georgia; (B) a true, complete and correct copy of the other governing documents of Borrower; (C) a true, complete and correct copy of the resolutions of all of the directors of Borrower authorizing the execution, delivery and performance by Borrower of the DIP Loan Documents and authorizing the borrowing hereunder; and (D) a certificate of good standing from the Secretary of State of the State of Georgia;

(iii)        copies of all other DIP Loan Documents (other than the DIP Financing Order), duly executed by the parties thereto;

(iv)        Borrower's completed DIP Lender's "Know Your Customer" questionnaire required to satisfy DIP Lender's internal compliance.;

(v)        [Intentionally Omitted];

(vi)        any other documents reasonably requested by DIP Lender in connection with the DIP Loan, Borrower, or the DIP Collateral;

(b)        DIP Lender shall have executed this Agreement and each of the other DIP Loan Documents;

(c)        All motions and other documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to DIP Lender in its sole discretion;

(d)        The Bankruptcy Court shall have entered the DIP Financing Order, which order shall provide that the automatic stay shall be vacated to the extent necessary to allow DIP Lender to exercise any rights or remedies it has upon the occurrence and continuance of an Event of Default and following the expiration of the Remedies Notice Period, and the DIP Financing Order shall be in full force and effect and shall not have been vacated, reversed, or rescinded or, without the prior written consent of DIP Lender, in its sole discretion, amended or modified and no appeal of the DIP Financing Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective;

(e)        Subject to the Carve-Out, DIP Lender shall have a valid and perfected Lien on and security interest in the DIP Collateral on the basis and with the priority set forth in the DIP Financing Order, and such Lien of DIP Lender shall be senior to all other Liens;

(f)        DIP Lender shall have a valid and enforceable superpriority administrative expense claim for all Obligations owing to DIP Lender by Borrower pursuant to the terms of the DIP Loan Documents, regardless of whether such Obligations are currently due, as may be provided for pursuant to 11 U.S.C. 364(c)(1) and 507(b), except as otherwise expressly provided in the DIP Financing Order;

(g)        Borrower shall have paid, and DIP Lender shall have received, the non-refundable Expense Deposit;

10

(h)    The representations and warranties made by Borrower herein shall be true and correct in all material respects (unless any such representation or warranty is qualified as to materiality, Material Adverse Effect or similar language, in which case such representation and warranty shall be true and correct in all respects) as of the Closing Date except to the extent they expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in material respects (unless any such representation or warranty is qualified as to materiality, Material Adverse Effect or similar language, in which case such representation and warranty shall be true and correct in all respects) on and as of such earlier date;

(i)    DIP Lender shall have approved the Initial Approved Budget in its reasonable discretion;

(j)    There shall not exist any Law, ruling, judgment, order, injunction, or other restraint that, in the judgment of DIP Lender, prohibits, restricts or imposes a materially adverse condition on Borrower, the DIP Facility, or the exercise by DIP Lender of its rights as a secured party with respect to the DIP Collateral.

(k)    No Material Adverse Effect shall have occurred;

(l)    All legal matters incident to this Agreement and the borrowing hereunder shall have been resolved satisfactorily to DIP Lender, in its reasonable discretion; and

(m)    DIP Lender shall have received such other documents, approvals (including, without limitation, all necessary internal approvals and consents of DIP Lender) and items as required herein or as DIP Lender may reasonably request.

(n)    No Default or Event of Default shall exist or be continuing either prior to or after giving effect to the making such advance of the DIP Loan;

(o)    A Budget approved by the DIP Lender shall be in effect; and

(p)    The making of the advance of the DIP Loan (and the use of the proceeds therefrom) shall not violate any Requirements of Law and shall not be enjoined, temporarily, preliminarily or permanently or otherwise.

(q)    As a condition to fund the Third Draw, the DIP Lender must have received approval from its investor, and the Debtor must have satisfied any requirements in the DIP Financing Order related to the funding of the Third Draw.

5.    **Indemnifications**.

(a)    <u>Indemnified Taxes</u>.  Borrower agrees that all payments made pursuant to or on account of this Agreement or any of the DIP Loan Documents shall be made by Borrower free and clear and without deduction or withholding for any Tax, except as required by applicable Law. If any applicable Law requires the deduction of or withholding of any Tax from any such payment, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by Borrower pursuant to or on account of this Agreement or any DIP Loan Documents shall be increased as necessary so that after such deduction or withholding has been made (including any such deduction or withholding that may be applicable to additional sums payable under this <u>Section 5(a)</u>) DIP Lender shall receive an amount equal to the amount it would have received had no such deduction or withholding been made. Borrower, upon request, shall provide to DIP Lender evidence

11

of such payment made to the relevant Governmental Authority within 10 Business Days thereof and shall also provide to DIP Lender any official tax receipt or other documentation issued by the appropriate Governmental Authorities with respect to the payment of Indemnified Taxes. Borrower hereby agrees that it shall indemnify and reimburse DIP Lender, on demand, for any loss, liability, or expense incurred by DIP Lender as a result of any failure by Borrower to pay Indemnified Taxes as and when due, whether or not such Indemnified Taxes were correctly or legally imposed by the relevant Governmental Authority. Borrower shall timely pay to the relevant Governmental Authority or, at the option of DIP Lender, reimburse it for Other Taxes

> (b)    <u>Indemnification by Borrower</u>.  Borrower shall indemnify DIP Lender and each Related Party (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including Borrower) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other DIP Loan Documents, (ii) the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by Borrower, or any environmental liability related in any way to Borrower, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any of Borrower's trustees or creditors, and regardless of whether any Indemnitee is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

> (c)    <u>No Liability</u>.  Borrower acknowledges and agrees that no Indemnitee shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Borrower or creditors of any of the foregoing arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of such Indemnitee in performing the services that are the subject of the DIP Loan Documents.

> **6.    Representations**.  Borrower represents and warrants that the following statements are true and correct as of the Closing Date and as of the date of each advance of the DIP Loan and each delivery of financial information pursuant to <u>Section 7(a)</u>:

> (a)    The exact legal name of Borrower is as set forth on the signature pages to this Agreement. Borrower is a corporation, duly organized, validly existing and in good standing under the laws of the State of Georgia.  Subject to the approval of the Bankruptcy Court, Borrower has the right and power to enter into and discharge all of its Obligations under the DIP Loan Documents.

> (b)    The execution, delivery and performance of the DIP Loan Documents by Borrower have been duly authorized by all necessary corporate actions of Borrower.

> (c)    Upon approval of the Bankruptcy Court, the DIP Loan Documents constitute the legal, valid, and binding obligations of Borrower, enforceable against Borrower in accordance with their terms.

(d)       Upon approval of the Bankruptcy Court, the execution, delivery, and performance by Borrower of the DIP Loan Documents and all other documents contemplated hereby or thereby, and the use of the proceeds of the DIP Loan, do not and will not: (i) conflict with or constitute a breach of, or default under, or require any consent under, or result in the creation of any Lien, charge, or encumbrance upon the property or assets of Borrower pursuant to any other agreement or instrument (other than any pledge of or security interest granted in any DIP Collateral pursuant to any DIP Loan Document) to which Borrower is a party or is bound or by which their properties may be bound or affected; or (ii) violate any provision of any Requirement of Law (including Regulation U of the Federal Reserve Board) or any order, writ, judgment, injunction, decree, determination, or award presently in effect having applicability to Borrower.

(e)       Upon entry of the DIP Financing Order, no consent, approval, or authorization of, or registration, declaration, or filing with, any Governmental Authority or other Person is required as a condition to or in connection with the due and valid execution, delivery and performance by Borrower of any DIP Loan Document.

(f)       Except for the Chapter 11 Case, as disclosed therein, and except for any other litigation identified to DIP Lender in writing, there are no actions, suits, investigations, or proceedings pending or threatened at law, in equity, in arbitration or by or before any other authority involving or affecting: (i) Borrower that, if adversely determined, are likely to have a Material Adverse Effect; (ii) any material part of the assets or properties of Borrower or any part of the DIP Collateral under any DIP Loan Document; or (iii) the execution, delivery or performance of any of the DIP Loan Documents or the consummation of any of the transactions contemplated therein. There are currently no material judgments entered against Borrower, other than as disclosed to DIP Lender in writing, and Borrower is not in default with respect to any judgment, writ, injunction, order, decree or consent of any court or other judicial authority, which default is likely to have or has had a Material Adverse Effect.

(g)       Borrower is in compliance with all Requirements of Law in all material respects.

(h)       This Agreement, taken together with the DIP Financing Order, is effective to create in favor of DIP Lender legal, valid, enforceable, and continuing first-priority Liens on, and security interests in, the DIP Collateral pledged hereunder or thereunder, in each case subject to no Liens other than with respect to Liens permitted under the DIP Financing Order.  Pursuant to the terms of the DIP Financing Order, no filing or other action will be necessary to perfect or protect such Liens. Pursuant to and to the extent provided in the DIP Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case under Sections 364(c)(1) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, except as otherwise expressly permitted under the DIP Financing Order.

(i)       Borrower is in compliance with the terms and conditions of the DIP Financing Order. The DIP Financing Order is in full force and effect and has not been vacated, reversed, or rescinded or, without the prior written consent of DIP Lender, in its sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(j)       The proceeds from the DIP Facility will be used only to make only those payments and reserve deposits set forth in Section 2(b) and will not be used for any purpose described in Section 2(c).

(k)       A true and complete copy of the Initial Approved Budget, as agreed to with DIP Lender as of the Closing Date, is attached as Exhibit A.

13

(l)        All written information, reports, other papers and data relating to Borrower furnished by or at the direction of Borrower to DIP Lender were, at the time furnished, complete and correct in all material respects and none contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading as of the time when made or delivered. All financial statements provided to DIP Lender fairly present the financial position and results of operations of Borrower as at the respective dates thereof and for the periods therein referred to and are consistent with the books and records of Borrower. No fact is currently known to Borrower which is likely to have or has had a Material Adverse Effect. With respect to projections, estimates and forecasts given to DIP Lender, such projections, estimates and forecasts are based on Borrower's good faith assessment of the future of the business at the time made, and Borrower had a reasonable basis for such assessment at the time made.

(m)        Borrower has timely filed all tax returns and reports required by law to have been filed by it and has paid all income taxes and other taxes, assessments and governmental charges or levies imposed upon it, upon its income or profits or upon any of its properties due and payable with respect to such return or otherwise owing by Borrower except for any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings and as to which Borrower is maintaining adequate reserves with respect thereto in accordance with generally accepted accounting principles in the United States.

**7.        Covenants**.  Borrower agrees that so long as any Commitment hereunder or any Obligation or other amount payable hereunder or under any DIP Loan Document (other than any contingent obligations for which no claim has been asserted) remains unpaid:

(a)        Borrower shall provide to DIP Lender, as soon as possible but, in any event, no later than the twenty-fifth (25th) calendar day following the last calendar day of the immediately preceding calendar month, (i) copies of the monthly operating reports together with monthly banking statements filed in the Chapter 11 Case simultaneously with their filing, which reports will be timely filed by Borrower in accordance with the applicable United States Trustee guidelines and regulations and (ii) an updated weekly cash flow forecast in form and substance satisfactory to DIP Lender in its sole but reasonable discretion for the subsequent 13-week period (each such forecast reasonably approved by DIP Lender, consistent with the form of the Initial Budget and otherwise in accordance with the provisions hereof, an "Approved Budget"), together with a comparison to the then current Approved Budget of the actual results, expenditures and performance of Borrower for such period. Borrower will promptly provide notice to DIP Lender of any Material Adverse Effect, Default or Event of Default and reasonable details thereof.

(b)        From time to time and promptly (and in any event within ten calendar days of) upon the reasonable request of DIP Lender, Borrower shall provide to DIP Lender (i) such data, certificates, reports, statements, documents or further information regarding the business, assets, liabilities, financial position, projections, results of operations or business prospects of Borrower, and (ii) such information and documentation reasonably requested by DIP Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(c)        Borrower will execute any and all further documents, financing statements, agreements, and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), which may be required under any applicable Law, or which DIP Lender may reasonably request, to effectuate the transactions contemplated by this Agreement and the other DIP Loan Documents or to grant, preserve, protect, or perfect the Liens created by this Agreement, , the DIP Financing Order or any other DIP Loan Document or the validity or priority of any such Lien, all at the expense of Borrower.

(d)      Except for and to the extent permitted under the DIP Orders, Borrower shall not, directly or indirectly, incur, create, assume, suffer to exist, or permit any administrative expense claim or Lien that is *pari passu* with or senior to the claims or Liens, as the case may be, of DIP Lender against Borrower hereunder or under the DIP Financing Order, or apply to the Bankruptcy Court for authority to do so.  Borrower shall not have any new non-ordinary course indebtedness to any party except expressly permitted by DIP Lender in writing. Without the prior written consent of DIP Lender,  Borrower shall not, directly or indirectly, incur, create, assume, suffer to exist, or permit any Lien in any asset or property (whether real or personal) that is unencumbered as of the Closing Date or apply to the Bankruptcy Court for authority to do so.

(e)      Borrower shall not, directly or indirectly (i) seek, support, consent to, or suffer to exist any modification, stay, vacation, or amendment of the DIP Financing Order, except for any modifications and amendments agreed to in writing by DIP Lender in its sole discretion, (ii) apply to the Bankruptcy Court for authority to take any action prohibited by this Agreement (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of DIP Lender) or (iii) seek authorization for, or permit the existence of, any claims other than that of DIP Lender entitled to a superpriority under Section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the Superpriority DIP Claims, except as otherwise expressly permitted under the DIP Orders.

(f)      Borrower shall not make or commit to make payments to critical vendors (other than those critical vendors that are approved in writing by DIP Lender or by a Final Order of the Bankruptcy Court) in respect of prepetition amounts in excess of the amount included in the Budget. Borrower shall not make any payments in respect of any indebtedness except to DIP Lender or as expressly permitted in writing by DIP Lender. Borrower shall not permit any amendment, modification or waive any of its rights under any indebtedness without the prior written consent of DIP Lender.

(g)      Except as otherwise provided herein or approved by DIP Lender, Borrower will not, and will not permit any subsidiary, affiliate or other Person to, directly or indirectly (i) use any cash or the proceeds of the DIP Loan in a manner or for a purpose other than those consistent with this Agreement, the DIP Financing Order and the Budget or (ii) make any payment (as adequate protection or otherwise) on account of any claim or debt arising prior to the Petition Date other than payments authorized by the Bankruptcy Court and in compliance with the Budget. Borrower may, from time to time, request amendments to the then current Budget provided that any such amendments shall be subject to the Lender's consent in its sole discretion prior to effectiveness.

(h)      No DIP Collateral, or proceeds of the DIP Loan, may be used directly or indirectly by Borrower, any committee, any trustee, or other estate representative appointed in the Chapter 11 Case (or any successor case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(i)      to seek authorization to obtain Liens that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claims (except to the extent expressly permitted by this Agreement); or

(ii)      to prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of DIP Lender, any of its controlling Persons, affiliates, successors or assigns or any of each of the respective officers, directors, employees, agents, attorneys or advisors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the

15

validity, enforceability, priority, and extent of, or asserting any defense, counterclaim, or offset to the Obligations, the Superpriority DIP Claims, the DIP Loan Documents, and any DIP Liens, (D) any action seeking to invalidate, modify, set aside, avoid, or subordinate, in whole or in part, the Obligations, the DIP Loan Documents, any DIP Liens or any payments made with respect to any of the foregoing, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections or benefits granted to DIP Lender in the DIP Financing Order or under any of the DIP Loan Documents (including claims, proceedings, or actions that might prevent, hinder, or delay DIP Lender's assertions, enforcements, realizations, or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents or the DIP Financing Order), or (F) objecting to, contesting or interfering with, in any way, DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred.

(i)        [Intentionally Omitted].

(j)        Except as otherwise provided herein or approved by DIP Lender, Borrower will not use any cash or the proceeds of the DIP Facility in.a manner or for a purpose other than those consistent with the Budget, this Agreement, and the DIP Financing Order.

(k)        If Borrower obtains any financing other than the DIP Facility for any reason whatsoever, and that seeks to prime or be *pari passu* with the DIP Facility, the proceeds of such alternative financing must be used to first repay all outstanding Obligations, including any fees, costs and expenses due to DIP Lender under the DIP Loan Documents.

(l)        Borrower shall permit, upon reasonable notice but no more than once very month to the extent that no Default or Event of Default is continuing, or if a Default or Event of Default is continuing, without notice and at any time, representatives of DIP Lender to (i) visit and inspect the properties of Borrower, (ii) inspect, audit and make extracts from the books and records of Borrower, including all records relating to any DIP Collateral and (iii) discuss, with the Authorized Officers, Borrower's financial advisors, consultants and independent accountants and persons providing management services to Borrower, Borrower's businesses, assets, liabilities, financial positions, results of operations and business prospects. This Agreement shall constitute Borrower's authorization to its financial advisors to discuss Borrower's affairs, finances and accounts with such representatives of DIP Lender.

(m)        Borrower shall maintain insurance with respect to its properties and business against such casualties and contingencies of such type (including product liability, workers' compensation, larceny, embezzlement or other criminal misappropriation insurance) and in such amounts and with such coverages, limits and deductibles as is customary in the business of Borrower.  Borrower covenants not to make any material changes to these insurance coverages without the prior written consent of DIP Lender. Within 30 days of the Closing Date, Borrower shall name DIP Lender as (i) an additional insured under all liability insurance policies issued in favor of Borrower with respect to the DIP Collateral and (ii) lender loss payee under all casualty and other property insurance policies issued in favor of Borrower with respect to the DIP Collateral.

(n)        Borrower shall pay and discharge all income taxes and other taxes, assessments and governmental charges or levies imposed upon it, upon its income or profits or upon any of its properties, prior to the date on which penalties would attach thereto, and all lawful claims that, if unpaid, would become a Lien upon any of the DIP Collateral; provided, however, that Borrower shall not be required to pay any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings and as to which Borrower is maintaining adequate reserves with respect thereto in accordance with generally accepted accounting principles in the United States.

(o)        Borrower shall not sell, assign, lease, exchange, convey, transfer or otherwise dispose of any of the DIP Collateral except to the extent permitted by DIP Lender in its reasonable discretion

and with an order of the Bankruptcy Court approved by DIP Lender in its reasonable discretion; *provided, however,* Borrower may sell, assign, lease, exchange, convey, transfer or otherwise dispose of any of the DIP Collateral without DIP Lender consent, so long as the proceeds of such sale, assignment, lease, exchange, conveyance, or transfer are in an amount sufficient to pay Borrower's Obligations to DIP Lender in full upon any such transfer.

(p)    Other than the Interest Payment Reserve, Borrower shall deposit and maintain the proceeds of the advance of the DIP Loan or any DIP Collateral in the Segregated Funding Account until disbursed in accordance herewith and shall not commingle the funds on deposit in the Segregated Funding Account with funds received from any other source. From the Segregated Funding Account, Borrower shall only make withdrawals in order to make the payments in accordance with the Approved Budget or as otherwise permitted by the Bankruptcy Court. Borrower shall deposit and maintain all other cash and cash receipts in the DIP Bank Accounts (subject to segregation for endowment or other restricted funds which for clarity is not included in the DIP Collateral).

(q)    The Debtors shall satisfy the following milestones as set forth below (each individually, a "<u>Milestone</u>" and collectively, the "<u>Milestones</u>"):

(i)    An initial draw of one hundred twenty thousand dollars ($120,000) upon entry of an Interim DIP order to be applied to the Underwriting Fee and the Origination Fee; and

(ii)    A second draw of three million eight hundred eighty thousand dollars ($3,880,000) upon the Debtors' designation of a Stalking Horse Bid for a purchase of the Debtors' assets in an amount that shall not be less than the sum of the DIP Facility (including the Origination Fee, the Extension Fee, the Exit Fee, the Underwriting Fee) and any secured pre-petition indebtedness of the Debtors and (b) execution of DIP Facility Documentation in a form acceptable to DIP Lender and Debtors. For the avoidance of doubt, the Stalking Horse Bid shall not have any financing contingencies or material remaining due diligence and shall include a deposit of no less than 4% of the proposed purchase price. DIP Lender can waive any of the requirements in this paragraph (q)(ii) in writing.

(iii)    A third and final draw of one million dollars ($1,000,000) (the "Third Draw") may be requested by the Debtor and funded upon approval by the DIP Lender's investor. Contemporaneous with funding the Third Draw, thirty thousand dollars ($30,000) of the Third Draw will be immediately paid to DIP Lender to cover the Underwriting Fee and Origination Fee of the Third Draw.

**8.    Events of Default and Remedies**.

(a)    Each of the following shall constitute an Event of Default (each, an "<u>Event of Default</u>") under this Agreement:

(i)    Borrower fails to (i) pay the principal amount of the DIP Loan or any other Obligation as and when due and payable or (ii) maintain the amount on deposit in the Interest Payment Reserve to at least the amount required in the definition thereof;

(ii)    Any representation or warranty made or deemed made by Borrower in this Agreement or in any DIP Loan Document, or in any certificate, document, opinion, or financial or other statement furnished under or in connection with a DIP Loan Document, proves to have been incorrect in any material respect when made or deemed made;

(iii)    Borrower fails to perform or observe in any material respect any term, covenant, or agreement contained in any DIP Loan Document on its part to be performed or observed;

(iv)    Other than the Chapter 11 Case, Borrower is involved in a proceeding which would reasonably be expected to result in a forfeiture of all or a substantial part of any such party's assets or a material judgment is entered against Borrower and such judgment is not stayed from enforcement;

(v)    Any Lien or security interest purported to be created by any DIP Loan Document or the DIP Financing Order shall cease to be, or shall be asserted by Borrower or any other Person not to be, a valid, enforceable, perfected, first-priority (except as otherwise expressly permitted under such DIP Loan Document or the DIP Financing Order) Lien or security interest in the DIP Collateral purported to be covered thereby in any respect;

(vi)    a Material Adverse Effect occurs;

(vii)    Any of the following shall occur in the Chapter 11 Case:

(A)    filing of a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code by Borrower that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by DIP Lender;

(B)    Borrower files a pleading seeking to vacate or modify the DIP Financing Order without the prior written consent of DIP Lender;

(C)    entry of an order without the prior consent of DIP Lender amending, supplementing, or otherwise modifying the DIP Financing Order;

(D)    Intentionally Omitted.

(E)    any material violation of the terms of the DIP Financing Order;

(F)    the DIP Financing Order shall be vacated, reversed, modified, rescinded or amended, without the prior written consent of DIP Lender, in its sole discretion, or shall be appealed and a stay pending appeal is effective;

(G)    appointment of a Chapter 11 trustee in the Chapter 11 Case;

(H)    appointment of a responsible officer (other than a Chief Restructuring Officer) or examiner with enlarged powers relating to the operation of the business of Borrower without the prior written consent of DIP Lender; or

(I)    Borrower files (or supports another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or *pari passu* with DIP Lender's claims and Liens under the DIP Facility, except as otherwise expressly permitted under the DIP Orders.

(viii)    Borrower shall use cash collateral or DIP Loan proceeds, for any item other than those set forth in, and in accordance with, the Budget and as approved by the Bankruptcy Court or prepays any pre-petition debt except as approved by the Bankruptcy Court and DIP Lender; or

(ix)    Borrower shall fail to complete any Milestone as and when required by Section 7 of this Agreement.

18

(b)    **Remedies.** Upon the occurrence of an Event of Default as determined by DIP Lender, whether monetary or non-monetary, DIP Lender shall give written notice to Borrower of such default by electronic mail and overnight delivery (the "<u>Default Notice</u>") which notice shall state the Event of Default as defined herein and give Borrower five (5) business days from the date of the notice within which to cure the Event of Default (the "<u>Remedies Notice Period</u>").

Notice shall be delivered to:

**WELLMADE**
c/o AURORA MANAGEMENT PARTNERS
1201 Peachtree Street, Suite 1570
Atlanta, GA 30361
Attn: David Baker
dbaker@auroramp.com
Greg Baker
gbaker@auroramp.com

With a copy to:
John D. Elrod
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
<u>elrodj@gtlaw.com</u>

During the Remedies Notice Period, Debtors shall be entitled to (i) contest the occurrence or continued existence of any Event of Default and (ii) seek and obtain an emergency hearing before the Bankruptcy Court upon written notice to the DIP Lender. Except as provided in the immediately preceding sentence, no Debtor shall be entitled to seek any relief (including, without limitation, under Section 105 of the Bankruptcy Code) to the extent that such relief would impair, limit or restrict the rights and remedies of the DIP Lender as set forth in any DIP Loan Documents, as applicable.

Upon expiration of the Remedies Notice Period and Debtors' failure to cure the Event of Default, DIP Lender shall file a declaration (the "<u>Default Declaration</u>") with the Bankruptcy Court indicating that the Debtors failed to cure the Event of Default. If no response is filed to the Default Declaration within three (3) business days, the DIP Lender may submit a Court order providing that the automatic stay provided by Section 362 of the Bankruptcy Code shall be vacated and modified as set forth herein and in the DIP Financing Order. DIP Lender may take, subject to the provisions of the DIP Financing Order, any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

(a)    declare the unpaid principal of and any accrued interest in respect of the DIP Loan and any and all other indebtedness or obligations of any and every kind owing by Borrower to DIP Lender hereunder to be due, whereupon the same shall be immediately due and payable in cash without presentment, demand, notice of dishonor, protest, and any other notice or formality of any kind, all of which are hereby waived by Borrower;

(b)        enforce any and all rights against the DIP Collateral, including disposition of the DIP Collateral reasonably for application towards the Obligations;

(c)        [Intentionally Omitted.]; or

(d)        take any other actions or exercise any other rights or remedies permitted under the DIP Financing Order, the DIP Loan Documents, applicable Law or equity to effectuate the repayment of the Obligations.

Borrower shall cooperate fully with DIP Lender in its exercise of rights and remedies, whether against the DIP Collateral or otherwise. Borrower hereby waives any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of DIP Lender set forth in the DIP Financing Order and in the DIP Loan Documents, except as otherwise expressly provided herein or therein.

In case any one or more of the covenants or agreements set forth in this Agreement or any other DIP Loan Document shall have been breached by Borrower, and not cured within any applicable notice and cure period, then DIP Lender may proceed to protect and enforce DIP Lender's rights either by suit in equity or by action at law, including an action for damages as a result of any such breach or an action for specific performance of any such covenant or agreement contained in this Agreement or such other DIP Loan Document. DIP Lender acting pursuant to this paragraph shall be indemnified by Borrower against all liability, loss or damage, together with all costs and expenses related thereto (including reasonable legal and accounting fees and expenses), which indemnification obligations of Borrower shall be joint and several.

If the Bankruptcy Case is dismissed or converted, neither the entry of an interim or final order in the Bankruptcy Case approving this Agreement nor the dismissal or conversion of the Bankruptcy Case shall affect the rights or remedies of the DIP Lender under this Agreement  or any interim or final order entered in the Bankruptcy Case. All rights and remedies under this Agreement and any interim or final order shall remain in full force and effect as if the Bankruptcy Case had not been dismissed or converted. Until payment in full of all DIP Obligations, it shall constitute an Event of Default under this Agreement if Debtor seeks, or if there is entered, any order dismissing the Bankruptcy Case. If an order dismissing the Bankruptcy Case is entered, (i) such order shall provide that subject to the rights of the superpriority lien of the DIP Lender, the DIP Loan Documents and DIP Facility shall continue in full force and effect and shall maintain its priority as provided in any interim order or final order until payment in full of all the obligations due and owing the DIP Lender under this Agreement; (ii) all superpriority liens of the DIP Lender shall remain binding on all parties in interest and rights granted to the DIP Lender under this Agreement and in any interim or final order shall not be affected, and (iii) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests under this Agreement and in any interim or final order.

**9.        Certain Bankruptcy Matters**.

(a)        Borrower hereby agrees that the Obligations shall (i) subject to the Carve-Out, constitute Superpriority DIP Claims over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expense claims of the kind specified in Section 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court; and (ii) upon entry of the DIP Financing Order, not be subject to any claims against the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code.

(b)       In the event of a conflict between, or inconsistency among, the DIP Financing Order, on the one hand, and any other DIP Loan Document, on the other hand, the DIP Financing Order shall control.

(c)       Notwithstanding anything to the contrary contained herein or elsewhere:

(i)       DIP Lender shall not be required to prepare, file, register, or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any DIP Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the DIP Collateral granted by or pursuant to this Agreement, the DIP Financing Order or any other DIP Loan Document. If DIP Lender shall, in its sole discretion, from time to time elect to prepare, file, register, or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any DIP Collateral, or take any other action to validate, render enforceable, or perfect all or any portion of the DIP Liens, (A) all such documents and actions shall be deemed to have been filed, registered, published, or recorded or taken at the time and on the date that the DIP Financing Order is entered, and (B) shall not negate or impair the validity or effectiveness of this <u>Section 9</u> or of the perfection of any other Liens in favor of DIP Lender on the DIP Collateral.

(ii)      Except as otherwise agreed to by DIP Lender, the DIP Liens, lien priorities, Superpriority DIP Claims, and other rights and remedies granted to DIP Lender pursuant to this Agreement, the DIP Financing Order, or the other DIP Loan Documents (specifically including the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority DIP Claims provided herein and therein) shall not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of debt by Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Chapter 11 Case, or by any other act or omission whatsoever.

(d)       Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)       Subject to the Carve-Out, (A) no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto and (B) no priority claims, are or will be prior to or on a parity with any claim of DIP Lender against Borrower in respect of any Obligations;

(ii)      other than as provided in the DIP Financing Order or the other DIP Loan Documents, DIP Liens on the DIP Collateral shall constitute valid, enforceable and perfected Liens, and shall be prior to all other Liens against the DIP Collateral, now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     DIP Lender's Liens on the DIP Collateral shall continue to be valid, enforceable and perfected without the need for DIP Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the DIP Liens under applicable non-bankruptcy Law.

(e)       In connection with any sale of all or any portion of the DIP Collateral, including pursuant to Section 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of a plan of reorganization or liquidation subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by DIP Lender, in accordance with applicable Law, DIP Lender may "credit bid" up to the full amount of all Obligations in order to purchase (either directly or through one or more

21

acquisition vehicles) all or any portion of the DIP Collateral. In connection with the foregoing, DIP Lender shall have the right to assign its right to purchase all or any portion of Borrower's assets in connection with any such "credit bid" to a newly-formed acquisition vehicle that is an affiliate of DIP Lender; provided, however, that any such assignee of DIP Lender shall not have any shareholder, member, officer, director, or any Insider (as defined in Section 101(31) of the Bankruptcy Code ) of any of the foregoing in common with any of the management, officer or director of Borrower or any Insider of any of the foregoing.

**10.    Grant of Security**.

(a)    To secure the Obligations, effective immediately upon entry of the DIP Financing Order, pursuant to Sections 362, 364(c)(2) and 364(c)(3) of the Bankruptcy Code, DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected first position post-petition security interests in and Liens on all DIP Collateral.  In furtherance of the foregoing, Borrower hereby unconditionally grants, assigns, and pledges to DIP Lender, to secure the Obligations, a continuing lien on and security interest in and to the DIP Collateral.

(b)    To the extent permitted by applicable Law, Borrower hereby irrevocably authorizes DIP Lender and its affiliates, counsel, and other representatives, at any time and from time to time, to file in the name of Borrower or otherwise and without separate authorization or authentication of Borrower appearing thereon, such UCC financing statements or continuation statements as DIP Lender may reasonably deem necessary or reasonably appropriate to further perfect or maintain the perfection of the Lien of DIP Lender under this Agreement, and such financing statements and amendments may describe the DIP Collateral or such lesser part thereof as DIP Lender determines in its sole discretion. Borrower hereby also authorizes DIP Lender and its affiliates, counsel and other representatives, at any time and from time to time, to execute and file any and all agreements, instruments, documents and papers as DIP Lender may reasonably request to evidence the DIP Liens. Borrower agrees that, except to the extent that any filing office requires otherwise, a carbon, photographic, photostatic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. Borrower shall pay the costs of, or incidental to, any recording or filing of any financing or continuation statements or other assignment documents concerning the DIP Collateral.

(c)    Borrower will promptly deliver each instrument and any other document, and take any other action, that may be reasonably requested by DIP Lender in order to perfect the DIP Liens, all at the reasonable cost and expense of Borrower.

**11.    Fees and Expenses**.  Borrower shall pay or reimburse, as applicable, DIP Lender for all reasonable costs and expenses incurred by DIP Lender (including reasonable fees and expenses of legal counsel and due diligence expenses), in connection with (a) the preparation, negotiation, execution, delivery and administration of this Agreement and the other DIP Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (b) the enforcement or protection of its rights in connection with (i) this Agreement or any of the other DIP Loan Documents, or (ii) the DIP Loan, including all such costs and expenses incurred during any workout, restructuring or negotiations in respect of the DIP Loan. DIP Lender hereby acknowledges and agrees that, as of the Closing Date, Borrower has funded the Expense Deposit with DIP Lender to be applied, in such order and priority as DIP Lender determines in its sole discretion, to (i) the fees and costs of Borrower hereunder, and (ii) the out-of-pocket reasonable costs and expenses incurred by DIP Lender in connection with the negotiation, execution and delivery of this Agreement and the transactions contemplated herein.

(a)    **Break-Up Fee.** In the event that a third-party lender provides the Debtors with an alternative DIP facility that is approved by a final DIP order, the DIP Lender shall be entitled to a break-up fee of one-hundred twenty thousand dollars ($120,000) which shall be deemed to be earned upon entry of

any such final DIP order and shall be an administrative expense of the Bankruptcy Case. After application of the Expense Deposit to DIP Lender's reasonable costs and legal fees, DIP Lender shall apply the amount remaining in its Expense Deposit to the Break-Up Fee. If the amount remaining in the Expense Deposit is not sufficient to cover the entire Break-Up Fee, the remaining amount of the Break-Up Fee shall be paid from the loan proceeds of the alternative DIP facility or from the Debtors' cash on hand.

(b)      **Minimum Interest and Fee**. The DIP Facility shall be subject to a minimum interest and fee (including the Origination Fee, Underwriting Fee, Extension Fees and Exit Fee) requirement of four hundred thousand dollars ($400,000). If the Third Draw is approved by the Court and funded by the DIP Lender, the DIP Facility shall be subject to a minimum interest and fee (including the Origination Fee, Underwriting Fee, Extension Fees and Exit Fee) requirement of five hundred thousand dollars ($500,000).For the avoidance of doubt, the minimum interest and fee will always be equal to 10% of the DIP Facility.

12.      **Governing Law, Jurisdiction, Etc**. This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of Georgia, except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.

(a)      Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against DIP Lender, or any Related Party of the foregoing in any way relating to this Agreement or any other DIP Loan Document (other than the DIP Financing Order) or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court or, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of Georgia sitting in Albany County and of the United States District Court for the Northern District of Georgia, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in the Bankruptcy Court or such Georgia state court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Nothing in this Agreement or in any other DIP Loan Document shall affect any right that DIP Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other DIP Loan Document against Borrower or its properties in the courts of any jurisdiction.

(b)      Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other DIP Loan Document (other than the DIP Financing Order) in any court referred to in Section 12(b).  Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)      Each of DIP Lender and Borrower irrevocably consents to service of process in the manner provided for notices in Section 14(e).  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable Law.

13.      **Waiver of Jury Trial**.  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE,

AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 13</u>.

14.    **Miscellaneous**.

(a)    The provisions of this Agreement are intended to be severable. If for any reason any provisions of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

(b)    No amendment, modification, supplement, or waiver of any provision of this Agreement nor consent to departure by Borrower therefrom shall be effective unless the same shall be in writing and signed by Borrower and DIP Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(c)    No failure on the part of DIP Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof or preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by Law. The failure by DIP Lender at any time or times to require strict performance by Borrower of any provision of this Agreement or any of the other DIP Loan Documents shall not waive, affect or otherwise diminish any right of DIP Lender thereafter to demand strict compliance and performance with such provision.

(d)    The Obligations, representations and warranties of Borrower hereunder shall be joint and several. This Agreement shall be binding on Borrower and its successors and assigns and shall inure to the benefit of DIP Lender and its successors and assigns, except that Borrower may not assign, transfer or delegate this Agreement, any other DIP Loan Document or any of its Obligations hereunder or thereunder without the prior written consent of DIP Lender in its sole discretion. With the consent of Borrower, not to be unreasonably withheld, DIP Lender may assign all or a portion of its rights and obligations under this Agreement; <u>provided</u> that such consent shall not be required (i) at any time that an Event of Default has occurred and is continuing, (ii) in connection with any assignment to an affiliate of DIP Lender, or (iii) in connection with any merger or consolidation of DIP Lender.

(e)    Unless otherwise agreed in writing, notices shall be given to DIP Lender and Borrower at their address set forth in the signature page of this Agreement, or such other address communicated in writing by either such party to the other, which notices shall be deemed to be effective upon receipt.

(f)    The obligations of Borrower under <u>Sections 5</u>, 11, <u>12</u> and <u>13</u> shall survive the repayment of the DIP Loan, termination of the DIP Loan Documents, the occurrence of the effective date of any plan of reorganization and any discharge of claims against or interests in Borrower.

(g)    All representations and warranties made in this Agreement and the other DIP Loan Documents shall survive the making of any extension of credit hereunder and the delivery of any Note and shall continue in full force and effect until the full and final payment and performance of the Obligations and the termination of the DIP Loan Documents.

(h)    This Agreement and each other DIP Loan Document (other than the DIP Financing Order) may be executed in any number of counterpart signature pages, and by the different parties on different counterparts, each of which when executed shall be deemed an original but all such counterparts taken together shall constitute one and the same instrument. This Agreement and each other DIP Loan Document (other than the DIP Financing Order) will be deemed executed by the parties hereto when each has signed it and delivered its executed signature page to DIP Lender by facsimile transmission, electronic transmission or physical delivery. This Agreement and each other DIP Loan Document (other than the DIP Financing Order) constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. No party hereto or to any other DIP Loan Document (other than the DIP Financing Order) shall raise the use of a facsimile machine or digital imaging and electronic mail to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine or digital imaging and electronic mail as a defense to the formation of a contract and each such party forever waives any such defense. The words "execution," "signed," "signature," and words of like import in any DIP Loan Document (other than the DIP Financing Order) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, Records, or any other similar state laws based on the Uniform Electronic Transactions Act.

(i)    The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. The section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. References in this Agreement to "Preamble", "Recital", "Sections", "Schedules" or "Exhibits" shall be to the Preamble, Recitals, Sections, Schedules or Exhibits of or to this Agreement unless otherwise specifically provided. All references in this Agreement or any other DIP Loan Document (other than the DIP Financing Order) to statutes shall include all amendments of same and implementing regulations and any successor or replacement statutes and regulations; to any instrument or agreement (including any of the DIP Loan Documents (other than the DIP Financing Order)) shall include any and all modifications and supplements thereto and any and all restatements, extensions or renewals thereof to the extent such modifications, supplements, restatements, extensions or renewals of any such documents are permitted by the terms hereof and thereof; to any Person means and includes the administrators, legal representatives, successors and permitted assigns of such Person; to "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; or to the time of day means the time of day on the day in question in Atlanta Georgia, unless otherwise expressly provided in such DIP Loan Document. Unless the context of this Agreement or any other DIP Loan Document (other than the DIP Financing Order) clearly requires otherwise, references to the plural include the singular, references to the singular include the plural and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, with respect to any Default, is cured within any period of cure expressly provided in this Agreement. Whenever in any provision of this Agreement or any other DIP Loan Document (other than the DIP Financing Order) DIP Lender is authorized to take or decline to take any action (including making any determination) in the exercise of its "discretion" or "judgment," such provision shall be understood to mean that DIP Lender may take or refrain to take such action in its sole and absolute discretion.

**15.    Maximum Limit on Interest**. The provisions of this Agreement, the other DIP Loan Documents and all other agreements between Borrower and DIP Lender, whether now existing or hereafter

arising and whether written or oral, are hereby expressly limited so that, in no contingency or event whatsoever, whether by reason of acceleration of the maturity of the DIP Loan or otherwise, shall the amount contracted for, charged, taken, received, paid or agreed to be paid to DIP Lender for the use, forbearance, or detention of the DIP Loan or otherwise, exceed the Highest Lawful Rate, as herein defined. If, from any circumstance whatsoever, performance or fulfillment of any provision hereof or of any agreement between Borrower and DIP Lender shall, at the time performance or fulfillment of such provision shall be due, exceed the Highest Lawful Rate or otherwise transcend the limit of validity prescribed by applicable law, then, ipso facto, the obligation to be performed or fulfilled shall be reduced to the Highest Lawful Rate, and if, from any circumstance whatsoever, DIP Lender shall ever receive anything of value deemed interest under applicable Law in excess of interest the Highest Lawful Rate, an amount equal to any excessive interest shall be applied to the reduction of the principal balance owing hereunder, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal of the DIP Loan, then such excess shall be refunded to Borrower. All sums paid or agreed to be paid to DIP Lender for the use, forbearance, or detention of the indebtedness of Borrower to DIP Lender shall, to the extent permitted by applicable Law, be amortized, prorated, allocated and spread through the full term of the DIP Loan until payment in full, so that the rate of interest on account of such indebtedness will not at any time exceed the Highest Lawful Rate. The provisions of this paragraph shall control all agreements between Borrower and DIP Lender. The term "*Highest Lawful Rate*" as used herein shall mean the maximum non-usurious rate of interest permitted by whichever of applicable federal or Georgia Law from time to time permits the highest maximum non-usurious interest rate with respect to the DIP Loan.

16.    **Extension Option**.  Borrower may, prior to applicable Maturity Date, elect to request two separate three (3) month extensions provided that there are no uncured events of default by written notice to DIP Lender (an "Extension"); provided, however, that no Default or Event of Default shall have occurred and be continuing at the time of such request and on the date of the exercise of such Extension (the "Extension Date"), Borrower shall pay to DIP Lender the Extension Fee in cash.  In connection with any such Extension, DIP Lender shall have the right to require amendments or other modifications to this Agreement and the other DIP Loan Documents prior to or contemporaneously with such Extension and such amendments and modifications shall be acceptable to DIP Lender in its sole discretion.

17.    **Power of Attorney**. Borrower hereby irrevocably makes, constitutes and appoints DIP Lender (and any of such DIP Lender's officers, employees or agents designated by DIP Lender), with full power of substitution, as Borrower's true and lawful attorney, in Borrower's name:  (a) after the occurrence of an Event of Default and during the continuation thereof, to endorse such Person's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security constituting DIP Collateral that may come into DIP Lender's possession; (b) after the occurrence of an Event of Default and during the continuation thereof, to sign Borrower's name on drafts against account debtors, on schedules and assignments of accounts, on notices to account debtors and on any account invoice or bill of lading, in each case, to the extent constituting DIP Collateral; and (c) to the extent that either (i) Borrower fails to act after the reasonable request of DIP Lender or (ii) an Event of Default has occurred and is continuing, to do all other things necessary or advisable to accomplish the purposes of this Agreement or the other DIP Loan Documents.  The foregoing power of attorney, being coupled with an interest, is irrevocable so long as any Obligations are outstanding.  Borrower hereby ratifies and approves all acts of the attorney.  Neither DIP Lender nor any of its employees, officers or agents shall be liable for any acts or omissions or for any error in judgment or mistake of fact or law except for gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction.

18.    **Performance of Obligations**. If Borrower shall fail to discharge any covenant, duty or Obligation hereunder or under any of the other DIP Loan Documents, DIP Lender may, in its sole discretion at any time, for Borrower's account and at Borrower's expense, pay any amount or do any act required of Borrower hereunder or under any of the other DIP Loan Documents or otherwise lawfully requested by DIP Lender. All costs and expenses incurred by DIP Lender in connection with the taking of any such

action shall be reimbursed to DIP Lender by Borrower on demand with interest at the Default Rate from the date such payment is made or such costs or expenses are incurred to the date of payment thereof. Any payment made or other action taken by DIP Lender under this <u>Section 18</u> shall be without prejudice to any right to assert, and without waiver of, an Event of Default hereunder and without prejudice to the right of DIP Lender to proceed thereafter as provided herein or in any of the other DIP Loan Documents.

      **19.**      **PATRIOT Act**.  DIP Lender hereby notifies Borrower that it may be required to obtain, verify and record information that identifies Borrower pursuant to the requirements of the PATRIOT Act, which information includes the name and address of Borrower and other information that will allow the DIP Lender to identify Borrower in accordance with the PATRIOT Act.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above.

**BORROWER:**

**Wellmade Floor Coverings International, Inc.**

By: _____
Name:
Title:

**Wellmade Industries MFR NA LLC**

By: _____
Name:
Title:

**Address for notices to Borrower:**

Wellmade
c/o AURORA MANAGEMENT PARTNERS
1201 Peachtree Street, Suite 1570
Atlanta, GA 30361
Attn: David Baker
dbaker@auroramp.com
Greg Baker
gbaker@auroramp.com

With a copy to:

John D. Elrod
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
elrodj@gtlaw.com

SIGNATURE PAGE FOR AMENDED AND RESTATED SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

**DIP LENDER:**

**SUMMITBRIDGE NATIONAL INVESTMENTS VIII LLC**


By: _____
Name:
Title:


**Address for notices to DIP Lender:**

Summit Investment Management LLC
1700 Lincoln Street, Suite 2150
Denver, CO 80203
Attention: Senior Asset Manager

With a copy to:

William A. Rountree, Will B. Geer, and Ceci Christy
Rountree Leitman Klein & Geer LLC
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
wrountree@rlkglaw.com
wgeer@rlkglaw.com
cchristy@rlkglaw.com
wmatthews@rlkglaw.com

SIGNATURE PAGE FOR AMENDED AND RESTATED SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

## <u>SCHEDULE I</u>

## <u>DIP COLLATERAL</u>

"<u>DIP Collateral</u>" shall mean all right, title and interest of Borrower in and to the following assets, whether now owned or hereafter acquired and wherever located:

        (a)     all machinery, apparatus, equipment, fittings and fixtures of every kind and nature whatsoever, now or hereafter;

        (b)     all other personal property of Borrower, including all goods, inventory, and accounts; and

        (c)     any and all (i) proceeds paid or payable with respect to any of the foregoing, (ii) supporting obligations and commercial tort claims with respect to any of the foregoing and (iii) all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing (or any portion thereof), any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the foregoing (or any portion thereof).

        (d)     all assets included in the definition of "Collateral" in the Interim DIP Order and DIP Financing Order.

ACTIVE 714281953v2

## **EXHIBIT 2**

**Approved Budget**

# Debtor-In-Possession Cash Flow Forecast WE 8/30/25

Wellmade Floor Coverings International
Wellmade Industries MFR NA LLC
**CONFIDENTIAL**



**Distribution Date:**      **8/28/2025**

1 Wellmade Drive
Cartersville, GA 30121

**Wellmade Flooring**                                                                  Distribution Date:        08/28/25
DIP Budget Key Assumptions

Chapter 11 Filing Assumptions:
   Wellmade files for bankruptcy on August 4, 2025
   Allowed appropriate restructuring fees, including UCC advisors
   Based on a filing date of August 4th, bank accounts should be accessed the week ending August 7th

Receipts
   Receipts are estimated based on order flow from customers and historical trends
   Chargebacks have been estimate based on historical return rates

Operating Disbursements
   Operating disbursements are calculated based on historical trends

   Payroll & Benefits
      Salary - Personnel disbursements are forecasted on analysis by entity inclusive of wages, taxes, and deductions. Employee payroll taxes
      withheld and employer payroll taxes paid by the Company

   COGS - Raw Materials
      Raw materials have been forecasted based on historical product absorbtion. As most raw materials vendors of Wellmade Flooring are already paid as cash-on-delivery
      or cash-on-order there is no lag period of raw materials purchasing post-petition.

   General & Administrative Expenses
      Utilities, rent, taxes & insurance expenses are calculated based on historical data and are highly consistent from month to month. No utility deposits have been
      quantified, but are being considered by the management team if necessary.

Non-Operating Disbursements
   Restructuring fees are based on AMP's historical knowledge and current market rates. Noticing Agents, Trustees, Attorneys and other professionals have been accounted for.

**Wellmade**
13-Week Debtor In Possession Cash Flow Forecast
*(Shown in USD Thousand)*

Distribution Date: 08/28/25

| Actual/Forecast --> | FILE | ACT | ACT | ACT | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | 13-Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number --> | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | Total |
| Week Ending Date --> | 08/04/25 | 08/09/25 | 08/16/25 | 08/23/25 | 08/30/25 | 09/06/25 | 09/13/25 | 09/20/25 | 09/27/25 | 10/04/25 | 10/11/25 | 10/18/25 | 10/25/25 | 11/01/25 | 11/08/25 | 11/15/25 | 11/22/25 | 11/29/25 | 12/06/25 | 12/13/25 | 12/20/25 | 12/27/25 | | *(8/09-11/01)* |
| **Receipts** | | | | | | | | | | | | | | | | | | | | | | | | |
| AHF | - | 1,147 | 766 | 784 | 775 | 775 | 775 | 750 | 735 | 715 | 698 | 685 | 698 | 698 | - | - | - | - | - | - | - | - | - | 10,010 |
| Other | 391 | 177 | 262 | 100 | 100 | 100 | 78 | 50 | 50 | 64 | 50 | 71 | 50 | - | - | - | - | - | - | - | - | - | - | 1,593 |
| **Total Receipts** | 391 | 1,324 | 1,028 | 884 | 884 | 875 | 853 | 800 | 785 | 765 | 762 | 735 | 769 | 748 | - | - | - | - | - | - | - | - | - | $ 11,604 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | | | | | | | | |
| Raw Materials | - | 320 | 246 | 381 | 641 | 477 | 319 | 397 | 441 | 477 | 424 | 280 | 314 | 314 | - | - | - | - | - | - | - | - | - | 5,030 |
| Freight | - | 0 | - | 10 | 10 | 10 | 10 | 10 | 10 | 10 | - | - | - | - | - | - | - | - | - | - | - | - | - | 70 |
| Contract Employees | - | 91 | 98 | 91 | 99 | 99 | 91 | 99 | 91 | 99 | 91 | 91 | 91 | 45 | - | - | - | - | - | - | - | - | - | 1,276 |
| Payroll | 213 | 100 | 255 | 139 | 180 | 132 | 180 | 139 | 180 | 132 | 180 | 108 | 180 | 95 | 180 | 40 | - | - | - | - | - | - | - | 2,432 |
| Transport, Logistics, Warehousing | - | - | - | 90 | 100 | - | - | 90 | 50 | 90 | - | 50 | 50 | - | - | - | - | - | - | - | - | - | - | 520 |
| Utilities | - | - | - | 164 | 8 | - | 154 | 5 | 3 | - | 154 | - | 3 | - | - | - | - | - | - | - | - | - | - | 494 |
| Rent | - | - | 1 | 184 | 92 | 171 | 7 | - | 99 | 171 | 7 | - | - | - | - | - | - | - | - | - | - | - | - | 732 |
| Professional Services / Legal - Normal Course | - | - | 104 | - | - | - | - | - | 88 | - | - | 88 | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes & Insurance | - | - | - | - | - | - | - | - | 88 | - | 95 | 360 | 60 | 175 | 75 | - | - | - | - | - | - | - | - | 368 |
| Other Operating | - | 71 | 0 | 549 | 85 | 155 | 385 | 185 | 80 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2,276 |
| **Total Operating Disbursements** | 213 | 582 | 705 | 1,609 | 1,303 | 1,044 | 1,146 | 835 | 1,082 | 1,034 | 1,306 | 547 | 901 | 628 | 225 | 40 | - | - | - | - | - | - | - | 13,198 |
| **Weekly Net Cash Flow (Operations)** | 179 | 742 | 324 | (725) | (419) | (169) | (293) | (35) | (297) | (269) | (544) | 188 | (132) | 120 | (225) | (40) | - | - | - | - | - | - | - | (1,595) |
| **Non-Operating Disbursements/(Receipts)** | | | | | | | | | | | | | | | | | | | | | | | | |
| Debt - Interest Only | - | - | - | - | 175 | - | - | - | 175 | - | - | - | 175 | - | - | - | - | - | - | - | - | - | - | 525 |
| Professional Services / Legal - Non-normal Course | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Non-Operating Disbursements** | - | - | - | - | 175 | - | - | - | 175 | - | - | - | 175 | - | - | - | - | - | - | - | - | - | - | 525 |
| **Restructuring** | | | | | | | | | | | | | | | | | | | | | | | | |
| Restructuring Fees (Escrowed) | - | - | - | 400 | 175 | 195 | 150 | 150 | 140 | 160 | 140 | 90 | 110 | 75 | 75 | 75 | 50 | 50 | 50 | 50 | 50 | 50 | - | 2,185 |
| Claims and Noticing Agent | - | - | - | - | 90 | - | - | - | 60 | - | - | - | 50 | - | - | - | - | - | 10 | - | - | - | - | 210 |
| Trustee Fee | - | - | - | - | - | - | - | - | 74 | - | - | - | - | - | - | - | - | - | - | - | - | 58 | - | 132 |
| UCC Professionals | - | - | - | 100 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 100 |
| Critical Vendor & 503b9 | 140 | 221 | 40 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 400 |
| **Total Restructuring** | 140 | 221 | 40 | 400 | 275 | 285 | 150 | 150 | 214 | 220 | 140 | 90 | 110 | 75 | 125 | 75 | 50 | 50 | 50 | 60 | 108 | - | | 3,027 |
| Book Cash Beginning Balance | 766 | 4,305 | 4,826 | 5,110 | 3,986 | 4,117 | 3,663 | 3,220 | 3,035 | 2,349 | 1,861 | 1,177 | 1,275 | 858 | 903 | 552 | 437 | 387 | 337 | 287 | 227 | | | 766 |
| Total Net Cash Flow | 39 | 521 | 284 | (1,125) | (869) | (454) | (443) | (185) | (686) | (489) | (684) | 98 | (417) | 45 | (350) | (115) | (50) | (50) | (50) | (60) | (108) | | | (5,147) |
| Weekly DIP Draw | 3,500 | | | | 1,000 | | | | | | | | | | | | | | | | | | | 4,500 |
| **Book Cash Ending Balance** | 4,305 | 4,826 | 5,110 | 3,986 | 4,117 | 3,663 | 3,220 | 3,035 | 2,349 | 1,861 | 1,177 | 1,275 | 858 | 903 | 552 | 437 | 387 | 337 | 287 | 227 | 120 | | | 120 |
| **DIP Loan** | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | - | 4,000 | 4,000 | 4,000 | 4,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | | | |
| Weekly DIP Draw | 3,500 | - | - | - | 1,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | | |
| Interest Reserve Held | 500 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | | |
| **Ending Balance** | 4,000 | 4,000 | 4,000 | 4,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | | | 5,000 |

*Creditor Committee Fees - Committee professional fees have been included per proposal. One hundred thousand dollars to be paid the week ending September 6, 2025. The remaining four hundred thousand dollars will be paid out of the proceeds of the sale.