# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| YU CONG LIU, YIXIANG ZHANG, and CAN GEN HAN, individually and on behalf of all others similarly situated, | Civil Action No. |
| | _____ |
| Plaintiffs, | |
| v. | Class and Collective Action Complaint |
| WELLMADE INDUSTRIES MFR. N.A. LLC; WELLMADE FLOOR COVERINGS INTERNATIONAL, INC.; ZHU CHEN a/k/a GEORGE CHEN; JIAYI CHEN a/k/a MORGAN CHEN; JIAN JUN LU; and MING CHEN a/k/a ALLEN CHEN, | JURY DEMAND |
| Defendants. | |

## CLASS AND COLLECTIVE ACTION COMPLAINT

| | |
|---|---|
| RADFORD SCOTT LLP | AARON HALEGUA, PLLC |
| 125 Clairemont Ave., Suite 380 | 524 Broadway, 11th Floor |
| Decatur, Georgia 30030 | New York, New York 10012 |

*Attorneys for Plaintiffs*

## Table of Contents

I.    INTRODUCTION ........................................................................................ 1

II.   JURISDICTION AND VENUE ..................................................................... 3

III.  PARTIES ...................................................................................................... 4

      A.    Plaintiffs .......................................................................................... 4

      B.    Defendants ....................................................................................... 5

IV.   THE RICO ENTERPRISES AND CONTROL OF PROPERTY .................. 13

V.    FACTS ........................................................................................................ 14

      A.    Recruitment in China ..................................................................... 14

      B.    Employment Documents in the United States ................................ 17

      C.    Confiscated Passports ..................................................................... 18

      D.    Housing, Transportation, and Restrictions on Movement ............. 18

      E.    Unsafe Conditions, Injuries, and Lack of Medical Care ................. 21

      F.    Wage and Hour Violations .............................................................. 23

      G.    Forced Labor ................................................................................... 27

      H.    Escape from Wellmade, Factory Raid, and Arrests ......................... 31

      I.    Other Workers ................................................................................ 33

      J.    The RICO Conspiracy ..................................................................... 34

VI.   COLLECTIVE AND CLASS ALLEGATIONS .............................................. 34

      A.    FLSA Collective Action .................................................................. 34

      B.    Rule 23 Class Action ....................................................................... 36

i.      Numerosity ................................................... 37

ii.     Commonality .................................................. 37

iii.    Typicality ...................................................... 39

vi.     Adequacy ...................................................... 40

v.      Superiority .................................................... 40

VII.    CAUSES OF ACTION ................................................... 42

        Count I:        Trafficking Victims Protection Act .......................... 42

        Count II:       Fair Labor Standards Act ................................... 44

        Count III:      Georgia Racketeer Influenced and Corrupt
                        Organizations Act ........................................ 45

        Count IV:       Unjust Enrichment ........................................ 49

        Count V:        *Quantum Meruit* ......................................... 51

VIII.   JURY DEMAND ........................................................ 52

IX.     PRAYER FOR RELIEF ................................................. 52

# I.    INTRODUCTION

1.      Plaintiffs are a group of Chinese nationals who were brought to work at a flooring manufacturing factory in Cartersville, Georgia (the "Cartersville Facility"), where they and dozens of other immigrant workers were exploited, underpaid, and subjected to forced labor.

2.      Brothers Zhu "George" Chen and Ming "Allen" Chen own and operate Oregon-based Wellmade Floor Coverings International, Inc. ("Wellmade International") and its Georgia-based affiliate, Wellmade Industries MFR. N.A. LLC ("Wellmade NA") (collectively, "the Wellmade Defendants"). Defendant Allen Chen's son, Jiayi "Morgan" Chen, holds an executive role with the Wellmade Defendants. Jian Jun Lu, a Vice President/General Manager, also played a central role in running Wellmade NA's operations. These individuals and entities are collectively referred to herein as "Defendants."

3.      Plaintiffs were recruited in China for supposed supervisory or trainer roles with promises of free housing and medical care, good working conditions, and help obtaining long-term visas. However, after arriving in the United States, they faced a very different reality.

4.      Once in Georgia, Plaintiffs and similarly situated workers were expected to work at the Cartersville Facility six days each week for twelve hours each day for a fixed salary. If they worked more than twelve hours per day, there was no extra pay. When Defendant George Chen compelled Plaintiffs to perform

chores at his house on their day off, they received no extra pay. If forced to work an additional twelve-hour shift on their rest day, they only received a small additional payment. Despite regularly working over seventy-two hours per week, Plaintiffs never received the overtime premiums required under U.S. law for all hours beyond forty. Moreover, despite their promises of free housing, Defendants made deductions from Plaintiffs' wages for rent and utilities. Defendants also subjected Plaintiffs to unsafe working conditions and provided inadequate personal protective equipment ("PPE"), resulting in Plaintiffs suffering burns, respiratory problems from the dust and debris in the factory, and other injuries.

5.    While Plaintiffs all considered leaving this abusive employment environment, Defendants used a series of threats and other tactics to keep them working. Defendants confiscated Plaintiffs' passports after they arrived in the United States and denied requests that they be returned. Defendants instructed Plaintiffs not to leave the factory or their homes. Defendants threatened that if Plaintiffs did not work the full length of their contracts, then they would be required to pay a large financial penalty—up to $30,000—to Defendants. Defendants also intimidated Plaintiffs through threats of physical harm, including by making Plaintiffs aware that Defendants George and Morgan owned and carried handguns. Plaintiffs were only liberated from this forced labor situation when they either sneaked away in the middle of the night or when state and federal law enforcement agents raided the Cartersville Facility.

6.      Based on Defendants' exploitative and illegal conduct, Plaintiffs, on behalf of themselves and similarly situated workers, now bring claims under the Trafficking Victims Protection Act ("TVPA"), the Fair Labor Standards Act ("FLSA"), and the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as claims for unjust enrichment and *quantum meruit.*

## II.   JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over the federal claims in this case pursuant to 28 U.S.C. § 1331.

8.      Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs' state law claims because they are part of the same case or controversy as their federal claims.

9.      The Court has personal jurisdiction over Defendants because they reside in and/or conduct systematic and continuous activity in this District, including activity giving rise to Plaintiffs' and other similarly situated workers' causes of action.

10.     Venue is proper in this district and division, as all Defendants are residents of this state and district and/or the wrongs giving rise to Plaintiffs' claims took place herein.

### III.  PARTIES

**A.    Plaintiffs**

11.    Plaintiff Yu Cong Liu arrived in the United States from China and began working for Defendants at the Cartersville Facility on or around March 1, 2022, and continued working there until on or around August 21, 2024.

12.    Plaintiff Liu arrived on a B-1 visa.

13.    Plaintiff Liu's duties at the Cartersville Facility primarily involved electrician work, machine repair, and machine maintenance.

14.    Plaintiff Liu currently resides in the Rome Division of the Northern District of Georgia.

15.    Plaintiff Yixiang Zhang arrived in the United States from China and began working for Defendants at the Cartersville Facility in or around November 2023, and continued working there until March 26, 2025.

16.    Plaintiff Zhang arrived on an L-1 visa.

17.    Plaintiff Zhang's duties at the Cartersville Facility primarily involved working as a machine operator.

18.    Plaintiff Zhang currently resides in the Rome Division of the Northern District of Georgia.

19.    Plaintiff Can Gen Han arrived in the United States from China and began working for Defendants at the Cartersville Facility on or around January 18, 2024, and continued working there until March 26, 2025.

4

20.     Plaintiff Han arrived on an L-1 visa.

21.     Plaintiff Han's duties at the Cartersville Facility primarily involved working as a machine operator.

22.     Plaintiff Han currently resides in the Rome Division of the Northern District of Georgia.

23.     At all relevant times, each Plaintiff was a "person" with standing to sue within the meaning of the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"), O.C.G.A. § 16-14-6(b).

24.     At all relevant times, each Plaintiff was an "individual who [was] a victim" of a violation of Article 18, Chapter 77 of the United States Code and therefore has standing to sue under the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595.

25.     At all relevant times, each Plaintiff and each individual who files a written consent, pursuant to 29 U.S.C. § 216(b), to become a party for claims under the Fair Labor Standards Act ("FLSA") was an "employee" of Defendants within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

**B.    Defendants**

26.     Defendant Wellmade International is a domestic business corporation organized under the laws of Oregon with its principal place of business at 19150 SW 125th Ct., Tualatin, OR 97062.

5

27.    Defendant Wellmade International may be served with the summons and complaint through its Registered Agent Ming Chen at 19150 SW 125th Ct., Tualatin, OR 97062.

28.    Defendant Wellmade International regularly conducts business in the Rome Division of the Northern District of Georgia.

29.    Defendant Wellmade NA is a limited liability company organized under the laws of Georgia with its principal place of business at 1 Wellmade Drive NE, Cartersville, GA 30121.

30.    Defendant Wellmade NA may be served with the summons and complaint through its Registered Agent Zhu Chen at 1 Wellmade Drive NE, Cartersville, GA 30121.

31.    Defendant Wellmade NA regularly conducts business in the Rome Division of the Northern District of Georgia.

32.    Defendant Wellmade International is the parent company of Defendant Wellmade NA.

33.    Plaintiffs will refer to Defendants Wellmade International and Wellmade NA collectively as the "Wellmade Defendants" in this Complaint.

34.    Defendant Zhu Chen is one of the owners and operators of Defendants Wellmade International and Wellmade NA. He is also the Secretary of Defendant Wellmade International.

35.    Defendant Zhu Chen is known as George Chen in the United States.

6

36.     Plaintiffs will refer to Zhu Chen a/k/a George Chen as "George" in this Complaint.

37.     Defendant George resides and regularly conducts business in the Rome Division of the Northern District of Georgia .

38.     Defendant George was responsible for recruiting and hiring Plaintiffs to work at the Cartersville Facility, and he directly communicated with and interviewed many prospective employees while they were still in China.

39.     Defendant George executed immigration forms on behalf of the Wellmade Defendants related to obtaining visas for employees from China to come work at the Cartersville Facility.

40.     Defendant George frequently told employees at the Cartersville Facility that  he could fire anyone he wanted.

41.     On information and belief, Defendant George also set the rate of pay for Plaintiffs and other employees.

42.     At the Cartersville Facility, Defendant George directed the day-to-day work of employees. He regularly issued reprimands using threatening language or used other aggressive disciplinary measures when he was dissatisfied with employees' performance.

43.     When employees called out sick or refused overtime assignments, Defendant George contacted them directly to insist that they report to work.

7

44.    Defendant George regularly instructed employees, including Plaintiffs Liu and Han, to perform personal tasks for him at his residence, such as: building a fence around the property, installing fitness equipment in the basement, installing surveillance cameras, putting down flooring in the house, washing his car, and constructing dog cages. Defendants did not pay Plaintiffs any additional compensation for this work; although Defendant George occasionally gave them a few cartons of cigarettes.

45.    Defendant George made major decisions about Wellmade NA's operations and expenditures. For example, he decided in or around September 2024 that Wellmade NA would cease managing transportation of employees between company housing and the Cartersville Facility, and instructed certain employees to purchase vehicles with their own money and use those vehicles to help drive their coworkers to work.

46.    Defendant Jiayi Chen was an executive and manager for the Wellmade Defendants.

47.    Defendant Jiayi Chen is Defendant George's nephew, and the two shared the same residence in Cartersville.

48.    Defendant Jiayi Chen is known as Morgan Chen in the United States.

49.    Plaintiffs will refer to Jiayi Chen a/k/a Morgan Chen as "Morgan" in this Complaint.

50.    Defendant Morgan resides and regularly conducts business in the Rome Division of the Northern District of Georgia.

51.    Defendant Morgan often met employees, including Plaintiffs, at the airport when they arrived from China, took possession of their passports, and transported them to company housing.

52.    Defendant Morgan contacted employees, including Plaintiff Liu, on their days off to order them to report to work, and would drive to their houses to pick them up to ensure that they came in for these overtime hours.

53.    Defendant Jian Jun Lu was the General Manager at Wellmade NA's Cartersville Facility.

54.    Defendant Lu resides and/or regularly conducts business in the Rome Division of the Northern District of Georgia.

55.    Defendant Lu was the day-to-day supervisor of Plaintiffs at the Cartersville Facility, where he organized the assignment of work and frequently criticized Plaintiffs' work.

56.    Defendant Lu participated in demanding that employees surrender their passports to the Wellmade Defendants.

57.    When Plaintiffs were injured on the factory floor or became sick, they would report this first to Defendant Lu, who would either order them to return to work or grant them only a short time to recover.

58.    On information and belief, Defendant Lu seldom permitted employees to receive medical treatment, regardless of how severe the injury or illness.

59.    Defendant Lu conducted performance evaluations of employees that impacted their compensation.

60.    Defendant Lu reassigned employees to tasks outside their regular job duties, such as directing them to perform repairs on dangerous machines that lacked proper safety guards and to clean up dust around the factory.

61.    Defendant Ming Chen is a joint owner of Wellmade International and Wellmade NA. He is also President of Wellmade International.

62.    Defendant Ming Chen is known as Allen Chen in the United States.

63.    Plaintiffs will refer to Ming Chen a/k/a/ Allen Chen as "Allen" in this Complaint.

64.    Defendant Allen is Defendant George's brother and Defendant Morgan's father.

65.    Defendant Allen oversaw all aspects of those companies and their operations with Defendant George.

66.    Defendant Allen resides and/or regularly conducts business in the Rome Division of the Northern District of Georgia.

67.    Defendant Allen was regularly present at the Cartersville Facility, where he would oversee operations and meet with customers or clients.

68.     Defendant Allen participated in group chats on WeChat for Cartersville Facility managers and supervisors, including conversations about serious injuries at the factory not being reported.

69.     When Defendant Allen was at the Cartersville Facility, he directed maintenance technicians, including Plaintiff Liu, to fix certain machines.

70.     When Defendant George returned to China or was otherwise away, Defendant Allen would be in charge at the Cartersville Facility.

71.     On information and belief, Defendant Allen also assumed primary responsibility for the Cartersville Facility following Defendant George's arrest.

72.     At all relevant times, each Defendant was a "person" within the meaning of RICO, in that each Defendant is an individual or an entity capable of holding a legal or beneficial interest in property. O.C.G.A. § 16-14-4.

73.     At all relevant times, Defendants suffered or permitted Plaintiffs to work within the meaning of 29 U.S.C. §203(e)(l).

74.     At all relevant times, Plaintiffs were employed by Defendants within the meaning of 29 U.S.C. §203(g).

75.     At all relevant times, each Defendant was an "employer" of Plaintiffs, either individually or as a joint employer, within the meaning of the FLSA, 29 U.S.C. § 203(d).

76.    Defendants directly or indirectly hired Plaintiffs, controlled their work schedules and conditions of employment, and determined the rate and payment of wages.

77.    At all relevant times, Defendants comprised an integrated enterprise within the meaning of 29 U.S.C. §203(r)(1).

78.    At all relevant times, Defendants were an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §203(s)(l).

79.    Defendants' employees routinely handled and worked on construction materials that were imported to Georgia from other countries—including materials from China, such as many of the machines in the factory and chemicals applied to the Wellmade Defendants' products.

80.    Defendants had a gross volume of sales made or business done of not less than $500,000 per year during the relevant period. For instance, a visa application submitted by the Wellmade Defendants in 2024 listed their revenue as over $100 million.

81.    Defendants were in a "venture" together within the meaning of the TVPA, 18 U.S.C. § 1595(a).

82.    At all relevant times, each Defendant was a "perpetrator" of one or more violations of the TVPA, and each Defendant knowingly benefited, financially or by receiving anything of value, from participation in the venture they knew or

should have known had engaged in violations of 18 U.S.C. §§ 1589, 1590, 1592, and

1597(a)(3).

## IV. THE RICO ENTERPRISES AND CONTROL OF PROPERTY

83.     All Defendants are an "enterprise" within the meaning of RICO

("RICO Enteprise I") in that they are an association or group of individuals

associated in fact though not a legal enterprise. O.C.G.A. § 16-14-3(3).

84.     All Defendants are associated with RICO Enterprise I.

85.     Defendant Wellmade International, the Wellmade Defendants'

immigration attorneys, and U.S. consular officials are an "enterprise" within the

meaning of RICO ("RICO Enteprise II") in that they are an association or group of

individuals associated in fact though not a legal enterprise. O.C.G.A. § 16-14-3(3).

86.     All Defendants are associated with RICO Enterprise II.

87.     Defendant Wellmade International is an "enterprise" within the

meaning of RICO ("RICO Enterprise III") in that it is a corporation. O.C.G.A. § 16-

14-3(3).

88.     Defendant Wellmade NA, Defendant George, Defendant Morgan,

Defendant Lu, and Defendant Allen were associated with RICO Enterprise III.

89.     Defendant George, Defendant Morgan, Defendant Lu, and Defendant

Allen are an "enterprise" within the meaning of RICO ("RICO Enteprise IV") in

that they are an association or group of individuals associated in fact though not a

legal enterprise. O.C.G.A. § 16-14-3(3).

90.     Defendant George, Defendant Morgan, Defendant Lu, and Defendant Allen are associated with RICO Enterprise IV.

91.     The members of RICO Enterprises I, II, III, and IV (collectively, "the RICO Enterprises"), respectively, associated with each other for the common purpose of recruiting and employing foreign nationals for employment at the Cartersville Facility.

92.     In the alternative, the members of the RICO Enterprises, respectively, associated with each other for the common purpose of manufacturing flooring products at the Cartersville Facility.

93.     All Defendants, through the pattern of racketeering activity set forth herein or proceeds derived therefrom, acquired or maintained interests in or control of real property or personal property, including money. O.C.G.A. § 16-14-4(a). At a minimum, all Defendants acquired significant sums of money through the pattern of racketeering activity.

## V.    FACTS

94.     The acts and omissions described herein were committed by the indicated Defendant or Defendants through their respective RICO Enterprises.

### A.    Recruitment in China

95.     Plaintiffs were recruited from China to work at the Cartersville Facility.

96.    Plaintiff Han, Plaintiff Zhang, and others were instructed to apply for an L-1 visa, which is designed for intracompany transfers.

97.    An L-1 visa applicant: (a) must be a current executive or manager at the petitioning company's affiliated foreign office, and (b) must have worked for the petitioning company for one continuous year within the three years immediately preceding the applicant's admission to the United States.

98.    At the time of their application, none of the Plaintiffs who applied for L-1 visas were employed or recently employed by a Wellmade-affiliated entity.

99.    Defendants fabricated elements of Plaintiffs' visa applications to make it appear that Plaintiffs were qualified for L-1 visas.

100.    Defendants coached Plaintiffs prior to their consular interviews to lie if asked about whether they had previously worked for an affiliate of Wellmade NA, or were currently working for an affiliate of Wellmade NA, and for how long.

101.    Plaintiff Liu and other employees were instructed to apply for a B-1 visa, which is intended for short-term business visits or tourism.

102.    Defendants told employees instructed to apply for B-1/B-2 visas that Defendants would get them a proper, long-term work visa after they arrived in the United States. However, this did not happen.

103.    Defendants made Plaintiffs execute various Chinese language documents in China before going to the United States.

104.    The documents executed in China state, among other things, that Plaintiffs must cooperate with and obey the company's decisions.

105.    Plaintiff Liu's document prohibits him from participating in any labor strikes while in the United States and indicates he would be terminated and liable for any damages to the company if he did participate in a strike.

106.    Plaintiff Liu's document mandates that he and his family must love their home country and that he must not join any social organizations or discuss any political issues while abroad. If this is violated, the document says Plaintiff Liu would be reported to the Chinese Embassy.

107.    Plaintiff Liu's document prohibits him from leaving the company's working area or housing area without permission of the company.

108.    Plaintiff Liu's document provides that if Plaintiff Liu is found to disobey the company's orders, he would be terminated and need to pay the Wellmade Defendants up to 30,000 Chinese yuan (more than $4,000).

109.    Plaintiff Liu's document contains a liquidated damages clause stating that if he stopped working for the Wellmade Defendants before the end of the first year, he would be reported to the local authorities, deported back to China, and forced to repay thirty percent of his annual salary.

110.    Plaintiffs Han and Zhang were required to sign documents (the "L Visa Documents") with many provisions similar to those in Plaintiff Liu's documents.

111.    The L Visa Documents require that Plaintiffs commit to work for the Wellmade Defendants for a term of five years.

112.    The L Visa Documents contain a liquidated damages clause providing that if the employee does not complete the five-year employment term, the employee would need to pay $30,000 to the Defendants for their "losses."

113.    The L Visa Documents do not provide any further explanation or calculation for this $30,000 penalty.

**B.    Employment Documents in the United States**

114.    Defendants required Plaintiffs to sign additional documents upon their arrival in the United States.

115.    Plaintiff Liu and, upon information and belief, other B-1/B-2 visa holders, were required to sign a document stating that they would be deported back to China at their own cost if they disobeyed the company's rules, and that if the company wanted to extend the length of their work terms in the United States, they must comply.

116.    Plaintiffs who obtained L-1 visas were required to sign English language documents when they arrived in the United States.

117.    Defendants did not explain the contents of these English language documents to Plaintiffs at any time.

118.    Defendants did not provide Plaintiffs with a copy of the English language documents that Plaintiffs were required to sign.

119.   Defendants knew Plaintiffs were not aware of their legal rights in the United States, made no effort to inform them of these rights, and used Plaintiffs' lack of understanding of their rights to coerce their continuing labor.

### C.   Confiscated Passports

120.   Defendants confiscated Plaintiffs' passports after they arrived in the United States.

121.   Plaintiff Liu asked Defendants to return his passport on at least two occasions during his employment, but was refused each time.

122.   Defendants did not return Plaintiffs' passports until in or around May 2024. Upon information and belief, Defendants only returned the passports because another Chinese employee filed a police report regarding the confiscated passports.

### D.   Housing, Transportation, and Restrictions on Movement

123.   Plaintiffs were crammed into housing owned and controlled by Defendants.

124.   Defendants often put three or four mattresses in each bedroom, but some workers were still required to sleep in the kitchen or garage due to overcrowding.

125.   The houses were barely furnished and often lacked tables or chairs where the workers could sit and eat.

126.    The houses were in a state of complete disrepair, with mold present,

regular issues with leaks, and regular air conditioning outages.



*Figure 1: Black mold in the bathroom of Wellmade's worker housing*

127.    Due to the number of workers sharing each home, workers would

often need to wait in line to use the kitchen to prepare their dinner, after already

having completed an exhausting twelve-hour shift.

128.    Until approximately September 2024, Defendants arranged

transportation for Plaintiffs and other employees to and from the factory in vans

owned or rented by Defendants.

129.    If an employee missed the van operated by Defendants on their way

home from the factory because they were forced to do extra work beyond their

shift, the employee had to either arrange for their own transportation at their own

expense or walk back to their housing—which could take as long as an hour.

19

130.   One of these vans was designed to seat a maximum of seven passengers. However, Defendants frequently transported up to a dozen workers at once in the van, and there were not enough seatbelts for each worker.

131.   Defendants also sometimes directed employees who did not have a valid driver's license to drive the van.

132.   Defendants instructed certain employees to drive the van but did not give them any extra compensation for doing so.

133.   Though Defendants had promised they would provide Plaintiffs free transportation between their housing and the Cartersville Facility, beginning in or around September 2024, Defendants insisted that Plaintiffs drive themselves to the factory or otherwise arrange and pay for their own transportation.

134.   Defendants did not permit Plaintiffs to leave the Cartersville Facility during working hours, including during their lunch breaks.

135.   Defendant George instructed employees, through WeChat and personal conversations, not to leave their housing during their non-work hours.

136.   Defendant Morgan told employees via WeChat that they should not leave their housing during non-work hours.

137.   The Chinese language document that Defendants required Plaintiff Liu to sign in China forbade him from leaving his housing without Defendants' permission.

E.    **Unsafe Conditions, Injuries, and Lack of Medical Care**

138.    Plaintiffs were subjected to unsafe working conditions at the Cartersville Facility.

139.    Many employees were put to work at the Cartersville Facility before they received the required health and safety training.

140.    When employees needed to obtain or replace PPE, Defendants frequently refused their requests, and sometimes reprimanded employees for asking for proper PPE.

141.    Contrary to Defendants' promises to do so, Defendants did not purchase medical insurance in the United States for Plaintiffs.

142.    Between September 2022 and October 2023, the Cartersville Facility was inspected by the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") on three occasions in response to worker complaints. Defendants received twelve citations, including for ten "serious" violations, and were assessed $95,528.00 in fines. The cited workplace hazards included a failure to provide fire extinguishers, electrical shock hazards, amputation hazards, and failure to protect employees from severe noise exposure with the potential to cause hearing loss.

143.    During the time that Plaintiffs worked for Defendants at the Cartersville Facility, certain Plaintiffs and their coworkers suffered serious injuries due to a lack of PPE and Defendants' failure to follow safety protocols.

144.    In 2022, Plaintiff Liu was severely injured when a heavy floorboard was dropped onto his toe. His toe became badly swollen, and the nail eventually fell off. Only a day or two later, Defendant George began messaging Plaintiff Liu ordering Plaintiff Liu to return to work, which Plaintiff Liu ultimately did even though he could barely walk and was in significant pain. Plaintiff Liu did not seek hospital treatment for this injury because he had no insurance and did not have the funds to pay for a hospital visit himself. Defendants did not inform Plaintiff Liu of his rights under Georgia workers' compensation law.

145.    On one occasion, an employee of Defendants fell ill, collapsed on the lawn outside the Cartersville Facility, and was foaming at the mouth. When Defendant George was made aware of this, he did not take any action to help the ill employee. In fact, he reprimanded another employee for saying she wanted to drive the ill employee to the hospital rather than attend a meeting. Defendant George also initially refused to reimburse that employee, who paid for the ill employee's hospital bill with her own money.

146.    In 2023, Plaintiff Liu and other employees witnessed a Latino worker at the factory be taken to the hospital in an ambulance after he lost several fingers in one of the machines at the Cartersville Facility.

147.    In late 2024 or early 2025, another employee at the Cartersville Facility seriously injured two of his fingers when they became caught in a machine on the factory floor. His fingers were badly crushed and he was unable to move them.

The employee showed his injured hand to Defendant Lu, who ordered the employee to resume work. Only after the employee pleaded with Defendant Lu did Defendant Lu agree to drive him to the hospital. The employee received only one day of rest after this injury and then was forced to return to work. He worked while recovering, and it was more than one month until he could move his fingers again. As of May 2025, his fingernails had still not grown back.

148.   There was a large amount of dust and debris in the Cartersville Facility that affected Plaintiffs' and their coworkers' respiratory systems. Defendants did not provide a sufficient number of masks that could filter out these dust particles. Instead, Plaintiffs often had to use thin and flimsy surgical masks with no filter.

149.   Plaintiffs and other employees frequently sustained burns from the hot coatings used in machines in the Cartersville Facility because they did not have the proper PPE. These burns could take several months to heal.

**F.   Wage and Hour Violations**

150.   Plaintiffs regularly worked over forty hours per week.

151.   Plaintiffs' typical schedule during the relevant period was to work six days per week, for twelve hours each day.

152.   Plaintiffs often worked more than twelve hours per day because they were not permitted to leave the factory until they finished certain assignments, because they were called into work late at night after they already completed their

23

regular shift, or because they were required to attend meetings before or after their shifts.

153.   Defendants told Plaintiffs they would have a thirty-minute lunch break and two fifteen-minute breaks during each twelve-hour shift. However, Plaintiffs regularly did not get either of the promised fifteen-minute breaks. Plaintiffs were required to check with either Defendant George or Defendant Lu beforehand, and were often told that they could not take a break because the factory was too busy. Defendants also often required Plaintiffs to go back to work before their thirty-minute lunch break had concluded.

154.   Plaintiffs were required to bring their own lunch to the factory and were not permitted to leave the factory during the lunch break.

155.   Defendants promised to pay Plaintiffs a fixed annual amount based on the expectation that they would work twenty-six shifts of twelve hours each per month.

156.   Defendants promised to pay Plaintiffs 1,000 Chinese yuan (approximately $140) per each twelve-hour shift beyond the twenty-six shifts to be worked each month. This amount was to be deposited into Plaintiffs' bank accounts in China at the end of each year.

157.   Plaintiffs were not paid any extra compensation when their work shift exceeded twelve hours in a given day. However, Defendants threatened to reduce Plaintiffs' pay if they missed a shift or did not report to work when summoned.

158.    Plaintiffs were not paid an overtime premium when they worked more than forty hours per week.

159.    Plaintiffs' formal job titles did not match the actual jobs they performed at the Cartersville Facility.

160.    Plaintiff Han was hired as a "Paint Technician" and told that he would be training other employees, but his primary job duties actually involved performing manual labor and operating machines.

161.    Plaintiff Zhang was hired as a "Plant Manager" according to the L-1 visa application submitted by Defendants, but his primary job duties actually involved operating machinery.

162.    Plaintiff Liu was hired as a "Packaging Equipment Maintenance Engineer," but he was regularly directed to perform duties on the factory floor that were not included in his job description, including cleaning up dust or fixing machines that he was not responsible for maintaining.

163.    Plaintiffs' work at the Cartersville Facility did not involve management duties or the regular exercise of independent discretion as to matters that would have a significant impact on Defendants' business.

164.    Plaintiffs did not have the authority to hire or fire other employees or influence any hiring or firing processes.

165.    Plaintiffs generally were paid only a portion of their wages into a bank account in the United States.

166.    Plaintiffs generally had a portion of their wages paid in Chinese currency into a bank account in China.

167.    Plaintiff Liu was paid the entirety of his salary only to his bank account in China.

168.    Defendants designed this pay structure to prevent Plaintiffs from having the financial resources to leave their employment with the Wellmade Defendants or return to China without Defendants' permission.

169.    The actual wages paid to the Plaintiffs on L-1 visas were significantly less than the wages Defendants reported they would pay in the visa applications that they filed with U.S. government authorities.

170.    Plaintiffs were promised a performance-contingent bonus of $10,000, to be paid in January of the following calendar year.

171.    Plaintiffs understood that if they left their employment with the Wellmade Defendants before receiving their bonus for the prior year, they would never receive that bonus.

172.    Plaintiffs never received the full amount of their promised bonus.

173.    On information and belief, Defendants made numerous improper deductions from Plaintiffs' wages.

174.    Despite promising Plaintiffs that they would receive free housing, Defendants made deductions from Plaintiffs' wages for housing costs, including

rent and utilities, and failed to provide Plaintiffs with clear documentation and categorization of these deductions.

175.    Despite promising Plaintiffs that they would receive free transportation to the workplace, Defendants stopped providing free transportation for Plaintiffs in or around September 2024. Thereafter, Defendants required Plaintiffs to arrange and pay for their own transportation.

**G.    Forced Labor**

176.    Due to the long work hours, low pay, and terrible treatment by Defendants, Plaintiffs wanted to leave their jobs with Defendants.

177.    Defendants engaged in a pattern of behavior to make Plaintiffs reasonably believe that they would suffer serious harm if they stopped working at the Cartersville Facility.

178.    Plaintiffs were unable to simply leave the Cartersville Facility because Defendants were in possession of their passports.

179.    Plaintiffs feared that if they left the Cartersville Facility, Defendants would enforce the liquidated damages clauses contained in the documents that Plaintiffs signed in China, which would be financially devastating to Plaintiffs.

180.    Because Defendants deposited part or all of Plaintiffs' wages in bank accounts in China, Plaintiffs did not have the financial resources to leave their employment.

181.    Chinese law prohibits an employer or any other person from confiscating a worker's identity document.

182.    Chinese law prohibits an employer or employment agency from collecting any form of security deposit or imposing any form of performance guarantee upon a worker.

183.    Plaintiffs, per their L-1 and B-1/B-2 visas, were not legally permitted to work for employers in the United States other than the Wellmade Defendants.

184.    Defendants told Plaintiff Liu and others with B-1/B-2 visas that Defendants would assist with converting their visas to L-1 visas, but then allowed the visas to expire without either renewing or converting them.

185.    Plaintiffs reasonably feared that Defendants would retaliate against them, either physically or by other means, if they decided to leave their employment with Defendants.

186.    Plaintiffs had numerous reasons to believe that Defendants could actually cause them serious harm if they acted against Defendants' wishes, such as by leaving their jobs at the Cartersville Facility.

187.    Plaintiffs knew that Defendants had a system of cameras to surveil Plaintiffs and other employees while they were at work at the Cartersville Facility.

188.    Plaintiff Liu and other employees were aware that both Defendant George and Defendant Morgan kept handguns in their shared residence.

189.    Defendant George told Plaintiff Liu that he kept a gun in his house, and Plaintiff Liu witnessed Defendant George stating this to other employees.

190.    On one occasion, when Plaintiff Liu was in Defendant Morgan's car with another employee, Defendant Morgan removed his gun from his car's glove compartment and handed it to Plaintiff Liu. Plaintiff Liu was shocked and took a picture of the gun. Defendant Morgan told Plaintiff Liu that he generally kept this gun in his home, where Plaintiffs Liu, Han, and other employees were frequently ordered to go to perform personal tasks for Defendant George.



*Figure 2: Photograph taken by Plaintiff Liu of Defendant Morgan's handgun*

191.    When Defendant George suspected that Plaintiff Zhang wanted to leave his job with Defendants, he approached Plaintiff Zhang at work and threatened to make Plaintiff Zhang "repay" tens of thousands of dollars to Defendants. Defendant George also instructed other managers to approach

29

Plaintiff Zhang and remind him of the $30,000 penalty that he would owe if he left his job with Defendants.

192.    On November 26, 2022, during the Thanksgiving holiday, Defendant George called Plaintiff Liu and told him that he needed to report to work. Plaintiff Liu was exhausted from recently working on a high-stress project, so he wanted to take his rest day and declined to come in. After repeatedly calling Plaintiff Liu and one of his roommates, Defendant George drove to their house, where Plaintiff Liu lived in the garage storage room. Defendant George began shouting and kicked the door of Plaintiff Liu's room so violently that the door opened, and he left a large hole in the door. Defendant George then began making threatening gestures at Plaintiff Liu, coming within centimeters of hitting Plaintiff Liu with his fists, and was shouting and using very aggressive language. Later, Defendant Morgan also drove to Plaintiff Liu's housing and began to harass him. Plaintiff Liu felt he was in physical danger.



*Figure 3: Photograph of hole created by Defendant George kicking in Plaintiff Liu's door*

193.    Ultimately, Plaintiff Liu believed he had no choice but to go back to the Cartersville Facility that evening. After making the repair that Defendants George and Morgan had demanded, Plaintiff Liu then requested his passport so that he could try to leave. Defendants refused to give him his passport.

194.    After he returned home from the Cartersville Facility that evening, Plaintiff Liu contacted Defendants' Human Resources department in China and stated that he wanted them to purchase a plane ticket for him to return home. The Human Resources employee told Plaintiff Liu that because Defendants George and Morgan had not notified Human Resources that his employment had concluded, Human Resources could not help him to return to China. The following Monday, Plaintiff Liu returned to work at the Cartersville Facility.

195.    Since Plaintiff Liu neither had possession of his passport nor enough money to purchase his own plane ticket, he had no choice but to continue working for Defendants.

196.    Plaintiffs believed that if they left their employment with Defendants, they would not receive the portions of their wages that had been earned but not paid, including their annual bonus.

**H.    Escape from Wellmade, Factory Raid, and Arrests**

197.    Defendants did not allow Plaintiffs to leave their employment at the Cartersville Facility.

198.    Plaintiff Liu ultimately was able to escape from his employment with Defendants in or around August 2024. A few months prior, Plaintiff Liu had convinced Defendants to return his passport so that he could take a test in New York for a driver's license. When he returned, Defendant Lu demanded that he return the passport. However, Plaintiff Liu persuaded Defendant Lu to let him keep the passport by stating that he would need his passport for additional steps in the process of obtaining a driver's license.

199.    In or around August 2024, Plaintiff Liu and another employee executed their escape. After completing an evening shift, they returned to company housing, secretly packed their things, and then drove off in Plaintiff Liu's car.

200.    After Plaintiff Liu and his coworker escaped, they informed Defendants via a message to a WeChat group chat that they were leaving. Defendant Lu telephoned them and threatened that if they left, they would have difficulties collecting their final earned wages. Indeed, Plaintiff Liu and his coworker never received the bonus compensation or wages from their last month of work that were owed to them.

201.    On March 26, 2025, federal and local law enforcement agents conducted a raid at the Cartersville Facility and surrounding company-owned housing.

202.    Defendants' employees were taken from the Cartersville Facility to another location to speak with the agents.

203.    A press release from U.S. Immigration and Customs Enforcement ("ICE") stated that the raid was part of an ongoing criminal investigation into allegations of labor trafficking involving foreign nationals.

204.    Defendants George, Morgan, and Lu were arrested and charged with trafficking persons for labor servitude under state law.

205.    At an April 4, 2025 news conference, Steven Schrank, a special agent with ICE, stated that law enforcement encountered sixty victims of "horrific" forced labor.

206.    Plaintiffs Han and Zhang were only freed from their forced labor situation when this raid occurred.

**I.    Other Workers**

207.    In addition to the workers hired directly from China, Defendants also employed a number of Latino and Chinese workers who were hired through labor agencies or brokers in the United States.

208.    Defendants also employed non-immigrant employees at the Cartersville Facility.

209.    On information and belief, the non-immigrant employees enjoyed better terms and conditions of employment than Plaintiffs or the other immigrant employees, such as receiving paid time off, more holidays, full rest and meal

breaks, and proper overtime premiums when they worked more than forty hours in a week.

**J.    The RICO Conspiracy**

210.    Plaintiffs plead the existence of a RICO Conspiracy.

211.    Defendants conspired with each other to commit the pattern of racketeering activity set forth herein either through the respective RICO Enterprises and/or to acquire or maintain interests in or control of real property or personal property.

212.    Defendants agreed to work together by illegal means to secure Plaintiffs' and other Class members' labor by committing racketeering offenses.

213.    Therefore, as set forth above, Defendants conspired with each other and committed overt acts to effect, support, and further their objectives to engage in the racketeering acts through Enterprises I, II, III, and IV and/or to acquire or maintain interests in or control of real property or personal property.

## VI.    COLLECTIVE AND CLASS ALLEGATIONS

**A.    FLSA Collective Action**

214.    Plaintiffs assert their FLSA claims on behalf of a collective of individuals (the "FLSA Collective").

215.    The FLSA statute of limitations for members of the FLSA collective is subject to equitable tolling for the following reasons:

a.    Defendants intentionally misled members of the FLSA Collective about their right to receive overtime premiums;

b.    Even if members of the FLSA Collective were aware of their right to receive overtime premiums, Defendants maintained such control over their movement, communications, and ability to leave that they were unable to assert their rights under the FLSA; and

c.    Defendants did not post and keep a notice explaining their employees' FLSA rights in conspicuous places, as required by 29 C.F.R. § 516.4.

216.    Therefore, the FLSA Collective is defined as follows:

All individuals who worked at the Cartersville Facility for more than forty hours in any workweek between June 1, 2020 and the present.

217.    In the alternative, if the Court determines the doctrine of equitable tolling does not apply, the FLSA Collective is defined as follows:

All individuals who worked at the Cartersville Facility for more than forty hours in any workweek in the previous three years.

218.    Excluded from the FLSA Collective are the legal representatives, officers, directors, assigns, and successors of Defendants; any individual who at any time during the class period has had a controlling interest in Defendant Wellmade International and/or Wellmade NA; and Defendants George, Morgan, Allen, Lu, and their immediate family members.

219.    Plaintiffs and other FLSA Collective members were subject to the Defendants' same policies and practices with respect to underpayment of overtime at the rate of one-and-a-half times the regular rate of pay for all hours over forty performed in a given workweek.

220.    Common proof applicable to Plaintiffs and other FLSA Collective members will show that Defendants failed to properly pay them overtime wages as required by the FLSA.

221.    Other FLSA Collective members will consent to sue if the Court grants conditional certification of this collective action.

222.    For the reasons set forth above, certification of this case as a FLSA collective action is necessary and appropriate.

**B.    Rule 23 Class Action**

223.    Plaintiffs assert their TVPA, RICO, unjust enrichment, and *quantum meruit* claims on behalf of a class of individuals (the "Class") defined as follows:

> All Chinese nationals who worked for Defendants at the Cartersville Facility between June 1, 2020 and the present.

224.    Excluded from the Class are the legal representatives, officers, directors, assigns, and successors of Defendants; any individual who at any time during the class period has had a controlling interest in Defendant Wellmade International and/or Wellmade NA; Defendants George, Morgan, Allen, Lu, and

their immediate family members; and all persons who submit timely and otherwise proper requests for exclusion from the Class.

225.    Plaintiffs bring these claims as a class action pursuant to Rule 23.

    *i.*    *Numerosity*

226.    There are more than forty individuals, in addition to the Plaintiffs, who are putative members of the Class ("Class Members") in this action.

227.    The Class Members are sufficiently numerous that joinder of all members is impractical.

    *ii.*    *Commonality*

228.    Common questions of law and fact exist as to Plaintiffs and all Class Members and predominate over questions affecting only individual Class Members.

229.    These common questions include:

    a.    Whether Defendants provided and obtained Plaintiffs' and other Class Members' labor by means of a scheme that constituted an abuse of legal process;

    b.    Whether Defendants used threats of physical restraint, serious harm, and/or abuse of law or legal process to coerce Plaintiffs and other Class Members to remain employed by Defendants;

c.      Whether Defendants recruited, transported, harbored, provided, and/or obtained Plaintiffs and other Class Members for forced labor;

d.      Whether Defendants concealed, removed, confiscated, or possessed Plaintiffs' and other Class Members' passports or other immigration documents in the course of committing forced labor and/or trafficking for forced labor;

e.      Whether Defendants concealed, removed, confiscated, or possessed Plaintiffs' and other Class Members' passports or other immigration documents in order to, without lawful authority, maintain, prevent, or restrict the labor or services of Plaintiffs and other Class Members;

f.      Whether Defendants knowingly benefited from participation in a venture Defendants knew or should have known was engaged in the actions and omissions set forth in the preceding subparagraphs;

g.      Whether Defendants violated or conspired to violate the RICO;

h.      Whether Defendants, through one or more of the RICO Enterprises, committed a pattern of racketeering activity causing Plaintiffs and other Class Members to suffer injuries;

i.      Whether Defendants accepted the fruits of Plaintiffs' labor and were unjustly enriched therefrom;

j.    Whether Defendants' actions were undertaken knowingly, willfully, intentionally, and without justification to deprive Plaintiffs' and Class Members' of their rights; and

k.    The nature and extent of Plaintiffs' and Class Members' injuries.

*iii.    Typicality*

230.    Members of the proposed Class have all been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

231.    Plaintiffs and the proposed Class Members have the same rights under the TVPA and the RICO, and they are entitled to relief for Defendants' unjust enrichment and for *quantum meruit*.

232.    Plaintiffs and the proposed Class Members performed similar work under similar circumstances giving rise to the same claims.

233.    Plaintiffs and proposed Class Members suffered similar types of damages.

234.    Plaintiffs' claims are typical of the claims of the Class because, among other things, Plaintiffs were employees who worked for the Defendants and suffered the same violations as the proposed Class Members.

235.    Plaintiffs' interests are co-extensive with the interests of the Class Members; Plaintiffs have no interest adverse to the Class Members.

       *iv.*    *Adequacy*

236.   Plaintiffs will fairly and adequately represent the interests of the Class Members. Their interests do not conflict with the interests of the Class Members they seek to represent.

237.   Plaintiffs understand that, as Class representatives, they assume a responsibility to the Class to represent its interests fairly and adequately.

238.   Plaintiffs have retained counsel experienced in prosecuting class actions and in employment matters. There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

       *v.*    *Superiority*

239.   A class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein.

240.   The damages suffered by each individual Class Member may not be sufficient to justify the burden and expense, particularly in light of the transnational nature of this case, of individual prosecution of the litigation necessitated by Defendants' conduct.  Further, it would be difficult for members of the Class to obtain individual redress effectively for the wrongs done to them.

241.   Many members of the Class are foreign nationals and migrant workers who lack the means and resources to secure individual legal assistance, have limited command of the English language or familiarity with the U.S. legal

system, and are particularly unlikely to be aware of their rights to prosecute these claims.

242.   If individual actions were to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardships for members of the Class, the Court, and the Defendants.

243.   Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system.

244.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

245.   This case does not present individualized factual or legal issues which would render a class action difficult.

246.   In the alternative, the Class may be certified because: (a) the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their

41

interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

## VII.   CAUSES OF ACTION

### <u>Count I</u>
### Trafficking Victims Protection Act (TVPA)
### (Class Claim Against All Defendants)

247.   By this reference, Plaintiffs hereby incorporate all allegations in the preceding paragraphs as if fully stated herein.

248.   This cause of action sets forth Plaintiffs' and other Class Members' claims against Defendants under the civil remedies provision of the TVPA, 18 U.S.C. § 1595, in that:

    a.   Plaintiffs and other Class Members are victims of violations of the following provisions of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589, 1590, 1592, and 1597(a)(3);

    b.   Defendants were perpetrators of the foregoing violations; and

    c.   Defendants knowingly benefited from participation in a venture they knew or should have known engaged in the foregoing violations. *See* 18 U.S.C. § 1595(a).

249.   In violation of 18 U.S.C. § 1589, Defendants knowingly provided and obtained Plaintiffs' and other Class Members' labor or services by means of:

    a.   Threats of physical restraint;

b.      Threats of serious harm;

c.      Abuse of legal process and threats of abuse of legal process; and

d.      A scheme, plan, or pattern intended to cause Plaintiffs and other Class Members to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint.

250.    In violation of 18 U.S.C. § 1590, Defendants knowingly recruited, transported, harbored, provided, and obtained Plaintiffs and other Class Members for labor or services in furtherance of Defendants' violations of 18 U.S.C. §§ 1589, 1592, and 1597(a)(3).

251.    In violation of 18 U.S.C. § 1592, Defendants knowingly concealed, removed, confiscated, or possessed Plaintiffs' and other Class Members' passports or other immigration documents in the course of violating 18 U.S.C. §§ 1589 and 1590.

252.    In violation of 18 U.S.C. § 1597(a)(3), Defendants knowingly concealed, removed, confiscated, or possessed Plaintiffs' and other Class Members' passports or other immigration documents in order to, without lawful authority, maintain, prevent, or restrict Plaintiffs' and other Class Members' labor or services.

253.    Defendants are liable for the foregoing TVPA violations, as set forth in 18 U.S.C. § 1595(a).

254.   Defendants' acts and omissions giving rise to this claim showed willful misconduct, malice, wantonness, oppression, and entire want of care, giving rise to a presumption of conscious indifference to the consequences.

255.   Due to Defendants' forced labor scheme, Plaintiffs and other Class Members suffered economic harm in the form of, *inter alia*, unpaid wages, unpaid overtime, suppressed wage rates, illegal deductions, and lost work opportunities.

256.   As a result of Defendants' forced labor scheme, Plaintiffs and other Class Members also experienced physical and emotional injuries.

257.   Plaintiffs and other Class Members are entitled to damages for all economic and non-economic harm suffered as a result of the foregoing TVPA violations, punitive damages, as well as attorneys' fees and costs.

## Count II
### Fair Labor Standards Act (FLSA)
### (Collective Claim Against All Defendants)

258.   By this reference, Plaintiffs hereby incorporate all allegations in the preceding paragraphs as if fully stated herein.

259.   The FLSA requires that each employee be paid at least the applicable minimum wage.

260.   The FLSA requires that employees be paid overtime wages in the amount of one and one-half times their applicable regular pay rate for each and all of the hours worked in excess of forty hours in each workweek.

261.    The FLSA prohibits deductions from wages for expenses that benefit the employer.

262.    The FLSA requires that an employee's compensation be paid "free and clear" and prohibits any kickback to the employer. 29 C.F.R. § 531.35.

263.    Defendants violated the FLSA's overtime requirements by failing to compensate Plaintiffs and other FLSA Collective members overtime premiums at one-and-a-half times the regular rate of pay.

264.    Defendants violated the FLSA by making improper deductions from the compensation of Plaintiffs and other FLSA Collective members.

265.    Defendants' violations of the FLSA were willful.

266.    Defendants are thus liable and obligated to compensate Plaintiffs and other FLSA Collective members for these illegal deductions and overtime violations, plus an equal amount as liquidated damages pursuant to § 216(b) of the FLSA.

267.    Plaintiffs and other FLSA Collective members are likewise entitled to an award of costs of this action and reasonable attorneys' fees, as well as prejudgment interest, pursuant to §216(b) of the FLSA.

### Count III
### Georgia Racketeer Influenced and Corrupt Organizations Act (RICO)
### (Class Claim Against All Defendants)

268.    By this reference, Plaintiffs hereby incorporate all allegations in the preceding paragraphs as if fully stated herein.

269.    This Count sets forth Plaintiffs' and other Class Members' claims for damages against all Defendants caused by all Defendants' violations of the RICO.

270.    Each Plaintiff and other Class Member is an aggrieved person with standing to sue within the meaning of the RICO, O.C.G.A. § 16-14-6(b).

271.    Each Plaintiff and other Class Member is a person who was injured by reason of violations of O.C.G.A. § 16-14-4; therefore, Plaintiffs and other Class Members have standing to sue pursuant to the RICO, O.C.G.A. § 16-14-6(c).

272.    The RICO Enterprises, as defined in ¶¶ 83-90, *supra*, had the common purposes of recruiting and employing foreign nationals for employment at the Cartersville Facility or, in the alternative, for the common purpose of manufacturing flooring products at the Cartersville Facility.

273.    The RICO Enterprises function as continuing units.

274.    Defendants were associated with the RICO Enterprises and conducted or participated in the RICO Enterprises – and/or conspired to do so – through a pattern of racketeering activity in violation of O.C.G.A. §§ 16-14-4(b) and 16-14-4(c), related by their common purpose.

**A.     Predicate Acts**

275.    Specifically, the predicate acts of racketeering activity by which the Defendants committed the RICO violations set forth in the preceding paragraphs are:

a.   Forced labor, 18 U.S.C. § 1589 (Count I, ¶ 249, *supra*);

b.   Trafficking with respect to forced labor, 18 U.S.C. § 1590 (Count I, ¶ 250, *supra*); and

c.   Unlawful conduct with respect to documents in furtherance of trafficking and forced labor, 18 U.S.C. § 1592 (Count I, ¶ 251, *supra*).

276.   Defendants used proceeds derived from the foregoing racketeering activity—and/or conspired to do so—to acquire and maintain an interest in property, including money. O.C.G.A. § 16-14-4(a).

## B.  Pattern of Related Racketeering Acts

261.   Defendants engaged in the racketeering activity described in this lawsuit repeatedly, starting in 2020 or 2021 and continuing at least through March 26, 2025, when law enforcement took action at the Cartersville Facility.

262.   Defendants' racketeering acts had similar purposes: to employ a captive foreign workforce and to profit from coerced, inexpensive labor.

263.   Each of the Defendants' racketeering acts yielded similar results and caused similar injuries to Plaintiffs and other Class Members.

## C.   Injury and Remedies

264.   As a direct and proximate result of the Defendants' willful, knowing, and intentional acts in violation of the RICO set forth in this Complaint, Plaintiffs and Class Members have suffered injuries to their property, as well as physical injuries and emotional suffering.

265.    The injuries flowed directly from the RICO predicate acts which were targeted at Plaintiffs and other Class Members such that they were the intended victims.

266.    Defendants' acts and omissions giving rise to this claim showed willful misconduct, malice, fraud, wantonness, oppression, and entire want of care, giving rise to a presumption of conscious indifference to the consequences.

267.    Plaintiffs and other Class Members are entitled to damages in an amount to be determined at trial, including but not limited to:

        a.    compensation for their injuries;

        b.    punitive damages;

        c.    trebling of the damages set forth in subparagraph (a) and (b), *supra*; and

        d.    attorneys' and experts' fees and costs associated with this action, as authorized by O.C.G.A. § 16-14-6(c).

268.    Plaintiffs and other Class Members are also entitled to injunctive relief pursuant to O.C.G.A. § 16-14-4(a), including an order and judgment:

        a.    Ordering Defendants to divest themselves of interests in an enterprise, real property, or personal property wrongfully obtained or used in violation of the RICO;

b.    Imposing reasonable restrictions on Defendants' future activities or investments to prevent violations of the law like those alleged in this Complaint;

c.    Dissolving the Defendant Wellmade NA and/or ordering the suspension or revocation of its license to do business in the State of Georgia; and/or

d.    Ordering the forfeiture of Wellmade NA's corporate charter or the revocation of any certificates authorizing it to do business in Georgia.

## Count IV
### Unjust Enrichment
### (Class Claim Against All Defendants)

269.    By this reference, Plaintiffs hereby incorporate all allegations in the preceding paragraphs as if fully stated herein.

270.    This Count sets forth claims by Plaintiffs and other Class Members against all Defendants for damages resulting from the Defendants' unjust enrichment.

271.    No enforceable contract exists between Plaintiffs and Defendants governing the subject matter of this claim. To the extent any agreement is alleged to exist, Plaintiffs and other Class Members assert that such agreement is unenforceable, void, or otherwise does not preclude equitable relief.

272.    Plaintiffs and other Class Members performed valuable services on behalf of and at the request of Defendants.

49

273.    Defendants accepted the fruits of Plaintiffs' and other Class Members' services, including increased profits.

274.    Plaintiffs and other Class Members provided this benefit with the reasonable expectation of compensation, and Defendants were aware of that expectation.

275.    If Defendants are allowed to retain monies associated with Plaintiffs' and other Class Members' services and earnings, Defendants would be unjustly enriched at the expense of Plaintiffs and other Class Members.

276.    Defendants must disgorge to Plaintiffs and other Class Members ill-gotten gains as a consequence of Defendants' unjust enrichment.

277.    Defendants were unjustly enriched by their fraudulent inducement of Plaintiffs and other Class Members to continue providing labor to Defendants. Therefore, Plaintiffs and other Class Members are entitled to punitive damages.

278.     Because Defendants acted in bad faith, Plaintiffs and other Class Members are entitled to their expenses of litigation, including attorneys' fees and costs, under O.C.G.A. § 13-6-11.

279.    Defendants are jointly and severally liable to Plaintiffs and other Class Members for the damages that arose naturally and according to the usual course of things from the unjust enrichment claim and interest until recovery.

## Count V
### *Quantum Meruit*
### (Class Claim Against All Defendants)

280.    By this reference, Plaintiffs hereby incorporate all allegations in the preceding paragraphs as if fully stated herein.

281.    This Count sets forth claims by Plaintiffs and other Class Members against all Defendants for damages based on *quantum meruit*.

282.    No enforceable contract exists between Plaintiffs and Defendants governing the subject matter of this claim. To the extent any agreement is alleged to exist, Plaintiffs and other Class Members assert that such agreement is unenforceable, void, or otherwise does not preclude equitable relief.

283.    As set forth above, Plaintiffs and other Class Members performed valuable services on behalf of and at the request of Defendants.

284.    Defendants, as shown above, accepted the fruits of Plaintiffs' and other Class Members' labors with full knowledge that they were not provided gratuitously.

285.    Defendants were aware, prior to and at the time that Plaintiffs and other Class Members provided such services, that Plaintiffs and other class Members expected to be compensated for the reasonable value of their labors.

286.    Defendants have failed and refused to pay Plaintiffs and other Class Members the reasonable value of their labors.

287.    As a direct result of Defendants' actions and inactions, Plaintiffs and other Class Members are entitled to recover the reasonable value of the labor provided under the doctrine of *quantum meruit.*

288.    Defendants have acted in bad faith, and have caused Plaintiffs and other Class Members unnecessary trouble and expense. Therefore, Defendants should be required to pay the expenses, including attorneys' fees and costs, associated with the *quantum meruit* claim.

289.    Defendants fraudulently induced Plaintiffs and other Class Members to continue working for Defendants for less than the reasonable value of their labors. Therefore, Plaintiffs and other Class Members are entitled to punitive damages in addition to consequential damages.

290.    Defendants are jointly and severally liable to Plaintiffs and other Class Members for the damages that arose naturally and according to the usual course of things from the *quantum meruit* claim and interest until recovery.

## VIII.  JURY DEMAND

291.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury as to all issues so triable.

## IX.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request a jury trial and that this Court enter an Order:

a.    assuming jurisdiction over this action;

b.      declaring this action to be maintainable as an FLSA collective action pursuant to 29 U.S.C. § 216(b), allowing Plaintiffs to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible workers who choose to do so to opt-in to this action;

c.      certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

d.       declaring that Defendants violated the TVPA;

e.      declaring that Defendants violated the FLSA;

f.      declaring that Defendants violated the RICO;

g.      declaring that Defendants were unjustly enriched;

h.      declaring that Defendants violated the doctrine of *quantum meruit*;

i.      permanently enjoining Defendants from further violations of the TVPA;

j.      permanently enjoining Defendants from further violations of the FLSA;

k.      permanently enjoining Defendants from further violations of the RICO and ordering the injunctive relief set forth in O.C.G.A. 16-14-4(a);

l.      granting judgment to Plaintiffs and other Class Members and against Defendants on Plaintiffs' and other Class Members' TVPA claims and awarding them actual damages, punitive damages, and interest;

m.      granting judgment to Plaintiffs and other similarly situated workers who opt in pursuant to 29 U.S.C. § 216(b) and against Defendants on Plaintiffs' and similarly situated workers' FLSA claims and awarding each of them their unpaid wages plus an equal amount in liquidated damages;

n.      granting judgment to Plaintiffs and other Class Members and against Defendants on Plaintiffs' and other Class Members' RICO claims and awarding them actual damages, punitive damages, and trebling of actual and punitive damages;

o.      granting judgment to Plaintiffs and other Class Members and against Defendants on Plaintiffs' unjust enrichment claims and ordering Defendants to disgorge to Plaintiffs and other Class Members all resulting ill-gotten gains, as well as punitive damages;

p.      granting judgment to Plaintiffs and other Class Members and against Defendants on Plaintiffs' and other Class Members' *quantum meruit* claims and ordering Defendants to provide Plaintiffs and other Class members the reasonable value of their labor, as well as punitive damages;

q.    awarding Plaintiffs and other Class Members their costs and

reasonable attorneys' fees; and

r.    granting such further relief as the Court finds just.

Respectfully submitted this day: May 27, 2025.

/s/ Daniel Werner
Daniel Werner
Georgia Bar No. 422070
dwerner@radfordscott.com
Elaine Woo
Georgia Bar No. 430956
ewoo@radfordscott.com
RADFORD SCOTT LLP
125 Clairemont Ave., Suite 380
Decatur, Georgia 30030
Telephone: (678) 271-0300

/s/ Aaron Halegua
Aaron Halegua*
ah@aaronhalegua.com
AARON HALEGUA, PLLC
524 Broadway, 11th Floor
New York, New York 10012
Telephone: (646) 854-9061

Attorneys for Plaintiffs

*Motion for admission pro hac vice
forthcoming.

<u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that on May 27, 2025, I prepared the foregoing in Book Antiqua, 13-point type in accordance with L.R. 5.1(C).

/s/ Daniel Werner
Daniel Werner
Co-Counsel for Plaintiffs