**IT IS ORDERED as set forth below:**

**Date: July 20, 2026**

_Sage M. Sigler_

_____

**Sage M. Sigler**
**U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | CASE NUMBER |
| **WELLMADE FLOOR COVERINGS INTERNATIONAL, INC**., et al.,[1] | **25-58764-SMS** |
| Debtors. | CHAPTER 11 |
| | (Jointly Administered) |

**ORDER REGARDING CREDITORS' MOTIONS**
**FOR LEAVE TO FILE LATE PROOFS OF CLAIM**

Debtors owned and operated a profitable flooring manufacturing facility in Cartersville,

Georgia. Their bankruptcy filing was triggered not by traditional financial distress, but because

their lender called a nonmonetary default after the facility was raided by state and federal

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Wellmade Industries MFR, N.A. LLC (1058) and Wellmade Floor Coverings International, Inc. (8425). The mailing address for the Debtors for purposes of these chapter 11 cases is: 1 Wellmade Drive, Cartersville, GA 30121.

authorities and certain of Debtors' owners and/or managers were arrested in connection with human trafficking claims. The allegations are essentially that workers were brought from China to work in Debtors' facility, were required to work long hours without adequate pay, were overcharged to live in substandard company housing, and may have been denied access to their passports and/or work papers.[2]

The deadline to file proofs of claim in this bankruptcy case was November 21, 2025, and dozens of Debtors' workers and former workers filed proofs of claim before the deadline. But before the Court are three motions and related proofs of claim filed *pro se* by Bo Deng, Gengxu Wang, and Haitao Li (together, "Movants") between June 1 and June 8, 2026, requesting that the Court allow their late-filed claims (Docs. 393, 394, and 395, collectively, the "Motions").

The Court held an initial hearing on the Motions on June 17, 2026, at which Mr. Li appeared in person and Mr. Deng appeared via zoom, but the Court was unable to conclude the hearing without a Mandarin interpreter. The Court continued the hearing to July 16, 2026, and

---

[2]   Debtors have distanced themselves from these allegations by pointing to the fact that neither the corporate entities nor one of Debtors' owners were charged with any crimes. Debtors have further explained that most of the workers were recruited and brought to the U.S. by a number of staffing agencies, at least one of which was owned and operated by one of Debtors' managers who has been charged, and who the Court understands to be the nephew of the charged owner and the son of the owner who was not arrested or charged. Workers have asserted claims in these cases for unpaid wages and overtime and human trafficking violations, among other things. The Court has not adjudicated or taken evidence on any of the workers' claims and the Court's understanding of the allegations stems only from filings and arguments made in the case.

Debtors deny any liability for such claims but have reached settlements with most of the workers who have asserted claims other than Movants. Movants also objected to Debtors' motion to approve their settlement with the largest group of worker-claimants. At the June 17 hearing on the matter, the Court explained it was unable to rewrite any settlement agreement to include additional creditors even if Movants' late-filed claims were allowed. Because the proposed settlement agreement otherwise met the standards for approval, the Court overruled the Movants' objections and approved the settlement. *See* Doc. 426.

directed any party wishing to participate in the presentation of evidence to appear in person.[3] The continued hearing went forward on July 16 with Mr. Li, an official Mandarin interpreter, and counsel for Debtors present in the courtroom; Mr. Deng appeared via zoom. Mr. Wang did not appear at either the June 17 or July 16 hearings, and his Motion (Doc. 394) is therefore dismissed for want of prosecution. For the reasons set forth herein, Mr. Li's Motion is granted, but Mr. Deng's Motion is denied.

## I.      BACKGROUND

Wellmade Industries MFR. N.A. LLC and Wellmade Floor Coverings International, Inc. (collectively, "Wellmade" or "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of Georgia on August 4, 2025 (the "Petition Date"), and retained Kurtzman Carson Consultants, LLC d/b/a Verita Global ("Verita") as their claims and noticing agent (Doc. 29).

### A.  Bar Date and Notice

On September 4, 2025, Debtors sought an order setting a bar date for filing proofs of claims (Doc. 137, the "Bar Date Motion"). Both the Committee and several claimants objected to the Bar Date Motion, arguing the proposed form and manner of notice would not effectively apprise workers of the bar date or the process for filing claims. *See* Docs. 169, 171. After lengthy, contested hearings, the Court approved a bar date notice and proof of claim form that was primarily in English, but included summary information in both Chinese and Spanish (Doc. 222, the "Bar Date Notice" and, together with the proof of claim form, the "Claim Package"). Debtors also published a notice of the Bar Date in Mandarin in the World Journal.[4]

---

[3]      This direction was provided orally at the June 17 hearing and in a written notice—in English and Chinese—mailed to Movants. *See* Doc. 436.

[4]      The World Journal is a Chinese language newspaper in North America.

### B. Movants

#### (i)      Haitao Li

Haitao Li worked at the Wellmade facility from May 21, 2024, through May 23, 2025. *See* Doc. 395. On June 1, 2026, Mr. Li filed Claim No. 142 in this bankruptcy case in the amount of $152,015.10.[5] On June 9, 2026, Mr. Li filed his Motion requesting the Court allow his late filed claim. Mr. Li presents two reasons he did not timely file his proof of claim. First, Mr. Li alleges he did not receive notice from Debtors about the bankruptcy case or the Bar Date Notice. Rather, Mr. Li alleges, he learned that other former Wellmade workers were asserting wage related claims against the company in January 2026 and learned about the bankruptcy filing in May 2026.[6]

Second, Mr. Li alleges he retained attorney Aaron Halegua to represent him, but Mr. Halegua confused him with another claimant, resulting in Mr. Li being misled to believe that he was part of a group of workers settling their claims with Debtors. But at the July 16 hearing, Mr. Li indicated that he did not wish to rely on this argument and instead relied on his assertion that he did not receive notice of the Bar Date in support of his Motion.

The record in this case and Debtors' submitted evidence indicate that Mr. Li was served with the Bar Date Notice via U.S. mail and email, and neither was returned to Debtors as undeliverable. *See* Doc. 233, Ex. C and E and Docket No. 419. Specifically, Mr. Li was served

---

[5]      The amount listed in part 7 of the claim form is "$152015.104," but the attachment at page 20 of the proof of claim provides a breakdown of the amounts sought by Mr. Li, which total $152,015.10. Mr. Li also filed proof of claim number 148 on June 8, 2026, which appears to be a handwritten version of Claim No. 142 that was mailed to the Court and asserts the same amount.

[6]      At the July 16 hearing, counsel for Debtors pointed to page 2 of Mr. Li's Motion, which states that Mr. Li "had absolutely no knowledge of the Debtors' Chapter 11 bankruptcy case until January 11, 2026, when he was casually informed of the proceeding by fellow Chinese laborers during a social gathering." Mr. Li clarified through testimony that while he learned that workers were asserting overtime claims against Wellmade, he did not learn of the bankruptcy filing until May 2026, after which he promptly filed his Motion and proofs of claim. Debtors cross-examined Mr. Li on this point and the Court found Mr. Li's testimony credible.

with the Claim Package on October 11, 2025, via first class mail at 66 Seminole Rd., Cartersville, GA 30121-7208, and on October 13, 2025, via email at 891771095@qq.com, the mailing and email addresses Debtors had on file at the time notice was served. *See* Doc. 419. The Claim Package included the modified proof of claim and the Bar Date Notice. The Bar Date Notice also included a link to the website of Verita, Debtors' claims and noticing agent, where claimants could submit electronic proofs of claim. The webpage included a notice in English, Mandarin, and Spanish. *Id.*

But according to Mr. Li's uncontroverted testimony, Mr. Li had not lived at 66 Seminole Rd. since May 23, 2025.[7] It is undisputed that 66 Seminole Rd. is company housing for Wellmade's workers and Wellmade was aware, or should have been aware, that Mr. Li did not reside at that address when the Claim Package was mailed in October 2025. Mr. Li could not recall whether or when he provided Wellmade with his updated address, but Wellmade mailed Mr. Li's 2025 Form W2 to Mr. Li's current address.

Mr. Li also never received the emailed notice sent to 891771095@qq.com. Mr. Li's uncontroverted testimony was that he provided that email address in the presence of a Wellmade translator who accompanied him to open a bank account, but that he never used the email address and that workers were directed by a Wellmade factory manager not to use the QQ email messaging app in the U.S., so he deleted the app from his phone.

---

[7]     Specifically, Mr. Li testified that following the raid on the facility in March 2025, the U.S. government issued work permits authorizing Wellmade workers to work in the U.S. for entities other than Wellmade. Mr. Li received his work permit on May 23, 2025, and resigned from Wellmade and moved out of company housing the same day. He moved to his current address on May 24, 2025.

**(ii)      Bo Deng**

Bo Deng worked at the Wellmade facility from July 2022 through March 2024 and from June 3, 2024, through November 25, 2025. *See* Doc. 393. On June 6, 2026, Mr. Deng filed Claim No. 145 in this bankruptcy case in the amount of $4,954,774.35.[8] On June 8, 2026, Mr. Deng filed his Motion for Leave requesting the Court allow his late filed claim. Mr. Deng provides several arguments as to why he did not timely file his proof of claim. First, Mr. Deng alleges he "never saw the bankruptcy notice before the bar date" and that because "nobody asked [him] to sign for [the Claim Package] he "had no way of knowing it had arrived." *Id.*

Second, Mr. Deng alleges that even if he had seen the Bar Date Notice, he had no way of understanding it because he has limited English-language skills and Wellmade's alleged poor treatment towards him made him believe he "had no rights [he] could assert." *Id*. Third, Mr. Deng alleges he reached out to Mr. Halegua in January 2026 to inquire about representation, but that Mr. Halegua responded in February 2026 telling Mr. Deng that "it was too late for [him] to join the case." *Id.* Mr. Deng alleges he had "no way to find another attorney" due to the language barrier.

Mr. Deng did not present evidence at the July 16 hearing,[9] but made extensive arguments to the Court consistent with those made in his papers, asserting that he was unable to timely file a proof of claim because of his inability to read or speak English and the control that Wellmade exerted over him while he was living in company housing.

---

[8]      On June 7, 2026, Mr. Deng filed Claim No. 144 in the amount of $4,676,538.70. The claim is otherwise identical to Claim No. 145 and the attachment to claim No. 145 includes a breakdown of the claim totaling $4,954,774.35.

[9]      Mr. Deng appeared via zoom for the July 16 hearing and the Court explained its prior directive that anyone wishing to present evidence needed to appear in person. Mr. Deng acknowledged that he was unable to present evidence but would present arguments to the Court.

Like Mr. Li, the record in this case and evidence submitted by Debtors indicate Mr. Deng was served with the Bar Date Notice via U.S. mail and email, and neither was returned as undeliverable. *See* Docket No. 233, Ex. C and E and Docket No. 419. Specifically, Debtors show that Mr. Deng was served with the Claim Package on October 11, 2025, via first class mail at 66 Seminole Rd., Cartersville, GA 30121-7208 and on October 13, 2025, via email at dengbo19910708@qq.com, the mailing and email addresses Debtors had on file at the time notice was served. *See* Doc. 419.

Unlike Mr. Li, however, Mr. Deng acknowledges he received the Claim Package but did not open it or look at the Bar Date Notice until he found it while moving out of company housing months after the Bar Date had passed. Mr. Deng also indicated that the email sent by Debtors was "filtered into a spam folder and was not seen before the Bar Date." Doc. 421.

## II. LEGAL STANDARD

### A. The *Pioneer* Factors

A creditor's late filed claim may be allowed by a bankruptcy court if the creditor can prove his failure to timely file was the result of excusable neglect. Whether "neglect of a deadline is excusable" to justify allowing the late claim depends upon "all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Specifically, a court should weigh four factors: (i) the danger of prejudice to the debtor, (ii) the length of the delay and its potential impact on judicial proceedings, (iii) the reason for the delay, including whether it was within the reasonable control of the movant, and (iv) whether the movant acted in good faith. *Id*.

The Eleventh Circuit and the courts under it have emphasized that the determination of excusable neglect is ultimately an equitable one that requires consideration of all the factors set

forth in *Pioneer*. *See Valdez v. Feltman (In re Worldwide Web Sys., Inc.)*, 328 F.3d 1291, 1297 (11th Cir. 2003). But the Eleventh Circuit has also accorded "primary importance" to the first two *Pioneer* factors, the danger of prejudice to the debtor or nonmoving party and the impact on judicial administration. *See id.* at 1297 (affirming the "primary importance" of the first two *Pioneer* factors but noting "the *Pioneer* and *Cheney* decisions do not alter the fact that a determination of excusable neglect is an equitable one" that requires all consideration of all factors); *Cheney v. Anchor Glass Container Corp.*, 71 F.3d 848, 850 (11th Cir. 1996) (applying *Pioneer* and stating the Court in *Pioneer* "accorded primary importance" to the first two factors) (citation omitted); *Advanced Estimating Sys. v. Riney*, 77 F.3d 1322, 1325 (11th Cir. 1996) ("Primary importance should be accorded to the absence of prejudice to the nonmoving party and to the interest of efficient judicial administration."); *In re MedCross Imaging, LLC*, No. 20-61522, 2023 WL 4111563, at *7 (Bankr. N.D. Ga. June 21, 2023) (giving greater weight to the first and second *Pioneer* factors); *In re Lett*, No. 10-61451, 2023 WL 2780908, at *4 (Bankr. N.D. Ga. Apr. 4, 2023) (doing the same).[10]

### B. Burden of Proof

"As the party seeking relief, the creditor seeking to file a late proof of claim bears the burden of proving excusable neglect by a preponderance of the evidence." *In re Cable & Wireless USA, Inc.*, 338 B.R. 609, 613 (Bankr. D. Del. 2006); *see In re Graham Bros. Const., Inc.*, 451 B.R. 646, 650 (Bankr. S.D. Ga. 2011) (applying the preponderance of the evidence standard to an excusable neglect determination).

---

[10] The primary importance of the first two *Pioneer* factors in the Eleventh Circuit is notably different than some other circuits, which place the primary importance on the third factor—the reason for the claimant's delay. *See, e.g., In re Roman Cath. Diocese of Syracuse*, 638 B.R. 33 (Bankr. N.D.N.Y. 2022).

### C. Presumption Notice was Received

Movants aver, in part, that they did not receive or did not know they received notice of Debtors' bankruptcy case or the Bar Date Notice. A properly addressed and mailed letter is presumed to "be delivered to the addressee in a timely manner." *In re Hobbs*, 141 B.R. 466, 468 (Bankr. N.D. Ga. 1992) (citing *Hagner v. United States*, 285 U.S. 427, 430 (1932)); *In re Harrell*, 325 B.R. 643, 648 (Bankr. M.D. Fla. 2005). This presumption is rebuttable, but "mere denial of receipt is insufficient to rebut the presumption." *In re Hobbs*, 141 B.R. 466, 468 (Bankr. N.D. Ga. 1992). A bar date notice is adequate if "it was reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *In re Vital Pharms., Inc.*, No. 22-17842, 2026 WL 1529022, at *7 (Bankr. S.D. Fla. May 29, 2026) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *see also In re Energy Future Holdings Corp.*, 619 B.R. 99, 108 (Bankr. D. Del. 2020) ("The proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons affected, not whether each person actually received notice.") (citations omitted).

### D. Inadvertence, Ignorance, or Mistake

Courts have held that inadvertence, ignorance, or mistake do not constitute excusable neglect. *See In re Belcher*, 293 B.R. 265, 268–69 (Bankr. N.D. Ga. 2001) (holding debtor-plaintiff's misunderstanding of the temporal limitations for filing a notice of appeal did not constitute excusable neglect); *MedCross Imaging*, 2023 WL 4111563, at *6 (stating plaintiff's "mistaken understanding" of local rule did not justify failure to conduct discovery and weighed against argument for excusable neglect); *Matter of Jones*, No. 16-12590-WHD, 2017 WL 562434, at *1-2 (Bankr. N.D. Ga. Feb. 10, 2017) (finding no excusable neglect where *pro se* debtor was unaware the certificate of service had to be received by the court, not merely mailed, by the

deadline). In *Jones*, the debtor's failure did not constitute excusable neglect because "'inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute excusable neglect.'" *Jones* at \*2 (quoting *Pioneer*, 507 U.S. at 392). Courts are often more lenient with *pro se* litigants but still expect them "to know and abide by the rules." *Jones* at \*2; *see also Freeman v. Citibank, N.A.*, 3:14-cv-00067-TCB, 2015 WL 13777266, at \*21 (N.D. Ga. Jan. 20, 2015) ("even *pro se* pleadings must adhere to time requirements") (citation omitted).

### III.   ANALYSIS

Mr. Li requests that the Court allow his late-filed claim on the basis that he did not receive the Bar Date Notice and was unaware of the bankruptcy filing until shortly before he filed his Motion. Mr. Deng requests that the Court allow his late-filed claim because while he did receive the Bar Date Notice, he did not look at it until after the Bar Date had passed and, even if he had, he would not have been able to understand it. Under Fed. R. Bankr. P. ("Rule") 9006(b)(1), a court may allow a late-filed claim where the court finds the failure to timely file was the result of excusable neglect. While the nature of Mr. Li and Mr. Deng's claims and their relationship to Wellmade is virtually identical, the facts surrounding whether and how Movants received notice of the Bar Date are very different. Through his Motion, related filings, and evidence submitted at the July 16 hearing, Mr. Li has demonstrated, by a preponderance of the evidence, that the delay in filing his claim constitutes excusable neglect, justifying relief under Rule 9006(b)(1). Mr. Deng, however, has not met his evidentiary burden and even if Mr. Deng's arguments were supported by evidence, they are insufficient to establish excusable neglect.

### A.  Application of the Pioneer Factors

#### (i) Prejudice to Debtors

Unquestionably, denying Movants' Motions would prejudice them in that they would not be entitled to any distributions under the Plan. Instead of completing a simple claim form that could be liquidated in this Court, Movants would need to wait to the conclusion of this bankruptcy case and file suit in U.S. District Court seeking to recover against whatever surplus is returned to Wellmade and/or its equity holders post-bankruptcy. But Movants bear the burden of proving the late filing of their claims will not prejudice Debtors. As explained above, this is one of the factors of "primary importance" in the Court's consideration in the Eleventh Circuit. Several factors contribute to the Court's determination of whether a late-filed claim will prejudice a debtor, including:

(1) whether the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated;
(2) whether the payment of the claim would force the return of amounts already paid out under the confirmed Plan or affect the distribution to creditors;
(3) whether payment of the claim would jeopardize the success of the debtor's reorganization;
(4) whether allowance of the claim would adversely impact the debtor actually or legally; and
(5) whether allowance of the claim would open the floodgates to other future claims.

*In re Energy Future Holdings Corp.*, 619 B.R. 99, 112 (Bankr. D. Del. 2020).

First, claims in the nature of those filed by Movants should be no surprise to Debtors as they result from the allegations underlying the raid on Debtors' facility and related arrests that prompted this bankruptcy filing. Second, Debtors have not confirmed a plan and have not initiated distributions to creditors under a plan. As to the third and fourth factors, Debtor's Disclosure Statement (Doc. 386) has not yet been approved, and while approval is set for hearing on July 21, 2026, the pending objection filed by the creditors' committee indicates that Debtors are already in

the process of amending their disclosure statement and plan. *See* Doc. 445. Adding language to deal with these late-filed claims would not materially delay the disclosure statement approval and solicitation process such that it would prejudice Debtors.

Whether allowing the late-filed claims would force Debtors to reformulate its plan to address the claims may be a more complicated question, with potentially different answers for the claims of Mr. Li and Mr. Deng. As filed, the Plan (Doc. 385) includes classes of priority and unsecured creditors. There is a separate class of Labor Plaintiffs (defined in the Plan) that treats a particular group of workers who reached a joint settlement with Debtors, but as the Court already explained to Movants, the Court cannot rewrite that settlement to include additional parties. Instead, Debtors' Plan would presumably treat Movants as priority and/or unsecured creditors. But the Plan currently proposes to pay all claims in full, and the impact Movants' claims may have on Debtors' ability to do so is not clear.

The late claims as filed differ by an order of magnitude. Mr. Li's claim is approximately $150,000 and Mr. Deng's is nearly $5 million. While it may be unlikely that allowing Mr. Li's claim, even in its full amount, would impede Debtors' ability to pay all claims in full under the Plan, Mr. Deng's asserted claim could conceivably tip the scales such that Debtors could no longer pay all claims in full. Were such a hypothetical to come to fruition, unimpaired classes under the Plain could become impaired, and Debtors would have to reformulate their plan, materially delaying the plan process and distributions to creditors. And while Mr. Deng has indicated that he would like to mediate his claim with Debtors as the Labor Claimants have successfully done, the sheer amount of his claim suggests that liquidating his claim may require protracted litigation. Debtors have not completed their claims allowance process, and neither this hypothetical nor the

amount of Mr. Deng's claim are determinative. But it demonstrates that there may be far greater prejudice to Debtors in allowing Mr. Deng's claim than allowing Mr. Li's claim

Finally, the Court is not concerned that allowing the late filing of these claims would open the floodgates to additional requests for late-filed claims by other former Wellmade workers. Based upon the filings and arguments of Movants, there was clearly a flurry of communications about claims against Wellmade amongst the workers in January 2026, and again in May 2026 shortly before Movants filed their Motions. No additional late claims have been filed since Movants' claims, suggesting to the Court that all workers intending to file claims have already done so. Further, this Order in no way suggests that any additional late-filed claims will be allowed. Such allowance depends entirely on the facts surrounding that specific claim, and if Debtors' notice to such claimant was reasonably calculated to provide notice of the Bar Date, the claim is unlikely to be allowed. Additionally, the plan process is underway, so any future analysis of the *Pioneer* factors may differ as this case progresses.

Mr. Li has demonstrated by a preponderance of the evidence that allowing his late-filed claim would not cause significant prejudice to Debtors. Mr. Deng, however, has failed to meet his evidentiary burden and based on the record before the Court, allowing his claim is likely to prejudice Debtors by delaying the plan process and potentially impacting, both in time and amount, distributions to other creditors.

**(ii)    Length of Delay and Impact on Proceedings**

While more than 6 months passed between the Bar Date and the filing of Movants' Motions and claims, Mr. Li demonstrated, by a preponderance of the evidence, that he filed his Motion within weeks of learning about Debtors' bankruptcy cases and the Bar Date in May 2026. Mr. Li credibly testified that while he was aware other workers were asserting overtime claims against

Wellmade as early as January 2026, he was unaware of the bankruptcy case or any deadline to file a claim until May and filed his Motion soon after in early June. And while reliance on counsel does not typically constitute excusable neglect, and Mr. Li has abandoned his argument that his claim should be allowed due to his belief that he was being represented by the Labor Plaintiffs' counsel, the testimony surrounding Mr. Li's reliance on Mr. Halegua's representation demonstrates that Mr. Li did not delay in attempting to exercise his rights to assert a claim against Wellmade, even before he understood there was a bankruptcy case and Bar Date at issue. And as explained above, any delay by Mr. Li has no material impact on Debtors or these proceedings.

It is unclear from the record when Mr. Deng became aware of the bankruptcy case or the Bar Date, but he argues that Mr. Halegua informed him in February 2026 that the "Debtors were unwilling to negotiate or mediate with any worker who had not filed a proof of claim before the November 21 Bar Date," indicating that Mr. Deng was aware of these proceedings and the Bar Date no later than February 2026. *See* Doc. 421. Mr. Deng further argues that he sought the assistance of lawyers, social workers, and others following his February communications with Mr. Halegua, but the record reflects that he waited over three months before filing anything with the Court. It is impossible to know whether Debtors would have been willing to negotiate with Mr. Deng had he approached them in February, months before the Plan was filed, but the case has now progressed, the plan process has begun, and allowing Mr. Deng's late-filed claim may materially delay, if not entirely derail, the Plan as set forth in more detail above.

(iii)    **Whether the Delay was Within Movants' Control**

a.    **Mr. Li**

The delay between the Bar Date and the filing of Mr. Li's Motion was not within his control. As detailed above, Mr. Li was unaware of the bankruptcy case until May 2026, shortly before he

filed his Motion. While Mr. Li had been told by other workers they were asserting claims for overtime against Wellmade, he was not aware of the bankruptcy case specifically, or the deadline to file claims. The notices Debtors directed to Mr. Li were mailed to him at an address that Debtors knew, or should have known, Mr. Li had vacated months earlier because it was company housing. Debtors also provided email notice to Mr. Li at a qq.com email address that he credibly testified he was directed not to use by a Wellmade factory manager.

While it may, in some situations, be reasonable and the best course of action for a debtor to mail notice to a former employee's last known address, mailing notice to Mr. Li at a company-owned property that Debtors knew he vacated was not "reasonably calculated" to provide notice to Mr. Li as required. During the extensive proceedings leading to the entry of the Bar Date Order, the Court expressed the importance of Debtors providing notice to employees and former workers and imposed requirements on Debtors to locate former workers through staffing agencies or otherwise. There were also extensive discussions regarding the best means of electronic notification for the workers. The Labor Plaintiffs' counsel argued that the workers should be notified via WhatsApp chats that Wellmade and its management regularly used to communicate with the workers. But Debtors objected and the Court approved the email manner of service suggested by Debtors based on Debtors' representation that they had valid email addresses for most, if not all, workers. But the uncontroverted evidence now before the Court is that Wellmade's management instructed workers not to use qq.com email addresses in the U.S. and to delete the app from their phones. Mr. Li followed that instruction and did not receive electronic notice of the Bar Date as a result. Again, Debtors should have known that emailing workers at qq.com email addresses was not "reasonably calculated" to provide notice to workers who had been instructed not to use that email service. Debtors also point to the Court-approved publication notice in this

case and correctly argue that they complied with the Court's mandate for publication notice in Chinese language newspaper. But while publication notice alone may be effective as to unknown creditors or potential creditors, it is not a substitute for providing direct notice to known potential creditors in this context. *See In re RML, LLC*, 662 B.R. 858, 868 (Bankr. S.D.N.Y. 2024) ("[W]hat constitutes 'reasonable notice' principally depends on the status of the parties and whether the creditor is a 'known' creditor or an 'unknown' creditor. While actual notice is required if the creditor is a 'known' creditor, constructive notice is sufficient where a creditor is 'unknown.'").

The Court understands the difficulties debtors face in finding appropriate contact information for potential creditors. But the workers are the primary creditors in this case and, with respect to Mr. Li, Debtors were obligated to do more to locate him. Debtors should have reviewed all parties being served at company-owned housing to confirm they still lived in that company-owned housing. If such parties were not current employees, it would have been obvious they did not live in company housing. And if Debtors were unable to locate workers who had vacated company-owned housing, they could have contacted the workers via WhatsApp to request their contact information, or they could have requested guidance from the Court on how to proceed.

### b. Mr. Deng

Mr. Deng, on the other hand, did live in company housing at the time the Claim Package was mailed and actually received it via U.S. Mail. But he failed to open the mail and/or look at the Bar Date Notice until months after the Bar Date passed. Mr. Deng argues that he would not have been able to understand the Bar Date Notice even if he looked at it because it was primarily in English and the one paragraph in Chinese did not explain specifically that workers could assert claims for backpay or human trafficking violations. While the Court is sympathetic to Mr. Deng's position, the Debtors complied with their obligations to provide Mr. Deng with notice of the Bar

Date, and the Court cannot fault Debtors for Mr. Deng's failure, even under these circumstances, to read his mail.

While the Notice was predominantly in English, the Chinese paragraph specifically referenced workers at the Wellmade factory in Cartersville, Georgia and directed them to file any claims they believed they had against Wellmade in the bankruptcy case before November 21, 2025, providing a link to do so electronically. The claim form itself also contained Chinese translations of much of the content. Further, Mr. Deng has demonstrated an impressive ability to interpret and analyze filings in this case using artificial intelligence and other online translation resources. The Court has no doubt that had Mr. Deng opened Claim Package and endeavored to understand the Bar Date Notice, he could have. And while Mr. Deng is correct that the Bar Date Notice and claim form did not expressly reference wage/overtime or human trafficking claims, it is neither a requirement nor customary for a debtor's claim form and bar date notice to provide examples of what types of claims creditors may file. Indeed, the Bar Date Notice's specific reference to workers is beyond what is typically required.

Mr. Deng points to *In re Roman Cath. Diocese of Syracuse*, in further support of his Motion, arguing in essence that he had suffered trauma and was still under the control of Wellmade at the time he received the Bar Date Notice and therefore would not have been able to timely file a claim even if he read the Notice. 638 B.R. 33 (Bankr. N.D.N.Y. 2022) (allowing a late-filed claim of a victim of sexual abuse on the basis that confusion over different claim deadlines and the claimant's past trauma prevented the claimant from timely filing a claim). The Court does not discount Mr. Deng's alleged suffering, but his argument is purely hypothetical; we cannot know what Mr. Deng would have done had he opened the Claim Package. And because Mr. Deng did not present evidence at the hearing, there is simply no evidence in the record to support his position.

In sum, Mr. Li's delay in filing his claim and Motion was not within his control—it was the result of Debtors' failure to take appropriate steps to provide him notice. But Mr. Deng's delay in filing his claim and Motion was within his control—it was the result of his failure to review and take action on notice he timely received.

**(iv)    Good Faith**

Debtors argue that Movants have not acted in good faith in seeking to have their late-filed claims allowed, but there is simply no evidence or indication in the record that Movants have acted other than in good faith. Both Mr. Li and Mr. Deng immediately reached out to lawyers and other organizations for assistance when they learned they could assert claims against Wellmade. Any delay in filing the Motions with the Court was a result of confusion or a lack of understanding of the process, not bad faith. This is the fourth of four factors weighing in favor of allowing Mr. Li to pursue his claim against Debtors but is the only factor weighing in Mr. Deng's favor, and good faith alone is not sufficient to satisfy the *Pioneer* requirements in the Eleventh Circuit.

**IV.    <u>CONCLUSION</u>**

Serious labor and human trafficking violations have been asserted against Debtors by dozens of their workers. Three workers have now come forward, more than six months after the deadline to file claims in these cases, seeking to have similar claims allowed in this case. While the Court is sympathetic to the complications these workers have faced in trying to navigate this legal process in a language that is not their own, the Court is obligated to apply well-established law to the facts before it. Specifically, claimants seeking to receive a distribution from the bankruptcy estate on a claim filed after the deadline must establish that the circumstances of their lateness constitute "excusable neglect" under the factors articulated by the Supreme Court in *Pioneer*.

Mr. Wang has not appeared at either hearing on his Motion, nor has he filed any papers with the Court explaining his absence. Mr. Li and Mr. Deng have both actively participated in these proceedings, but while Mr. Li has satisfied the *Pioneer* standard for allowing a late-filed claim by a preponderance of the evidence, Mr. Deng has not. Notably, granting Mr. Li's Motion means only that his late-filed Claim Nos. 142 and 148 are deemed timely filed. The Court has not yet adjudicated the validity of those claims, and Debtors may object to Mr. Li's claims consistent with the Bankruptcy Code, Rules, and the provisions of any confirmed plan.

Also, the denial of Mr. Wang and Mr. Deng's Motions is not a determination that their claims are invalid. It means only that they are not entitled to any distribution from Debtors' bankruptcy estates.[11] The Bankruptcy Code does not grant a discharge to liquidating corporate Chapter 11 debtors, and Debtors' counsel has represented on the record that Debtors' Plan does not seek to circumvent this limitation. *See* 11 U.S.C. 1141(d)(3). The Plan contemplates that surplus funds will be available to Wellmade's owners after paying creditors of the bankruptcy estate. These bankruptcy cases do not prohibit claimants from asserting claims against Wellmade's owners or other non-debtor entities in U.S. District Court at any time, and if Debtors retain surplus funds after paying creditors, claimants may be able to assert their claims against Wellmade post-bankruptcy.

For the foregoing reasons, it is

**ORDERED** that Mr. Wang's Motion (Doc. 394) is **DENIED** for want of prosecution and Claim Nos. 143, 146, and 147 are **DISALLOWED** as untimely; and it is further

---

[11] If this were a chapter 7 case, Mr. Wang and Mr. Deng would be entitled to distributions from the surplus after payment of all timely-filed claims in full. *See* 11 U.S.C. § 726(a)(3).

**ORDERED** that Mr. Deng's Motion (Doc. 393) is **DENIED** and Claim Nos. 144 and 145 are **DISALLOWED** as untimely; and it is further

**ORDERED** that Mr. Li's Motion (Doc. 395) is **GRANTED** to the extent that Claim Nos. 142 and 148 are deemed timely filed.

**END OF DOCUMENT**